# EXHIBIT B

## **All Process, Pleadings, and Orders**



**JOHN F. WARREN**
**Dallas County Clerk**
**George Allen Sr. Court Bldg.**
**600 Commerce St, Ste 101**
**Dallas, Texas 75202-3551**

STATE OF TEXAS

COUNTY OF DALLAS

I, John F. Warren, Clerk of the County Court of Dallas County Court at Law No. 5, Dallas County, Texas do hereby certify that the foregoing is a true and correct copy of document in Cause No. CC-11-06571-E.

DALLAS COUNTY, TEXAS, **PLAINTIFF (S)**

**VS**

MERSCORP, INC.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; STEWART TITLE GUARANTY COMPANY; STEWART TITLE COMPANY; BANK OF AMERICA, NATIONAL ASSOCIATION; ASPIRE FINANCIAL, INC., **DEFENDANT (S)**

DOCKET SHEET filed on 20th day of September, 2011

PLAINTIFF'S ORIGINAL PETITION, JURY DEMAND, AND REQUESTS FOR DISCLOSURE filed on 20th day of September, 2011

**CIVIL CASE INFORMATION SHEET filed on 20th day of September, 2011**

**NOTICES filed on 22nd day of September, 2011**

**SERVICE RETURN filed on 29th day of September, 2011**

**SERVICE RETURN filed on 30th day of September, 2011**

**SERVICE RETURN filed on 30th day of September, 2011**

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION, JURY DEMAND, AND REQUESTS FOR DISCLOSURE filed on 30th day of September, 2011**

**SERVICE RETURN filed on 30th day of September, 2011**

**SERVICE RETURN filed on 6th day of October, 2011**

**SERVICE RETURN filed on 6th day October, 2011**

**In the Dallas County Court at Law No. 5, Dallas County, Texas.**
**WITNESS MY HAND AND SEAL** of said Court this 10th day of October, 2011.

John F. Warren, County Clerk

By: ______________________
Lizzetta Smith, Deputy

FILED
2011 SEP 20 PM 4:24
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

Cause No. CC-11-06571-E

| | |
|---|---|
| DALLAS COUNTY, TEXAS,<br>PLAINTIFF,<br>vs.<br>MERSCORP, INC.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; STEWART TITLE GUARANTY COMPANY; STEWART TITLE COMPANY; BANK OF AMERICA, NATIONAL ASSOCIATION; AND ASPIRE FINANCIAL, INC. D/B/A TEXASLENDING.COM,<br>DEFENDANTS. | IN COUNTY COURT AT LAW NO. 5<br><br>DALLAS COUNTY, TEXAS |

**PLAINTIFF'S ORIGINAL PETITION, JURY DEMAND, AND REQUESTS FOR DISCLOSURE**

TO THE HONORABLE JUDGE OF THE COURT:

COMES NOW Dallas County, Texas complaining of MERSCORP, INC.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; STEWART TITLE GUARANTY COMPANY; STEWART TITLE COMPANY; BANK OF AMERICA, NATIONAL ASSOCIATION; AND ASPIRE FINANCIAL, N.A., D/B/A TEXASLENDING.COM ("Defendants") and would show the Court as follows:

## I.
## PARTIES

1. The Plaintiff in this action is Dallas County, Texas ("Dallas County, Texas" or "Plaintiff").

2. Defendant MERSCORP, INC. ("MERSCORP") is a Delaware corporation that may be served with citation by serving its registered agent in Texas by certified mail, return receipt requested, addressed to:

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS

MERSCORP
C/o Its Registered Agent
CT Corporation System
350 N. St. Paul Street
Suite 2900
Dallas, Texas 75201-4234

At all times material hereto Defendant MERSCORP has engaged in business in Dallas County, Texas or committed a tort, in whole or in part, in Dallas County, Texas and the claims made herein arise out of such activities in Dallas County, Texas.

3. Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") is a Delaware corporation and wholly-owned subsidiary of Defendant MERSCORP. MERS engages in business in Dallas County, Texas but does not maintain a regular place of business in this state or a designated agent for service of process for proceedings that arise out of MERS' business done in this state. MERS may therefore be served with citation by certified mail, return receipt requested, addressed to:

Bill Beckmann
President and Chief Executive Officer
Mortgage Electronic Registration Systems, Inc.
1818 Library Street, Suite 300
Reston, Virginia 20190

At all times material hereto Defendant MERS has engaged in business in Dallas County, Texas or committed a tort, in whole or in part, in Dallas County, Texas and the claims made herein arise out of such activities in Dallas County, Texas.

4. Defendant STEWART TITLE GUARANTY COMPANY ("Stewart") is a Texas corporation with its principal place of business in Houston, Harris County, Texas. Stewart may be served with citation by serving its Chairman and Chief Executive Officer by certified mail, return receipt requested, addressed to:

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

Malcolm S. Morris
Chairman and Chief Executive Officer
Stewart Title Guaranty Company
1980 Post Oak Boulevard
Suite 800
Houston, Texas 77252 -2029

Upon information and belief, Stewart was at all times material hereto and currently is a shareholder in MERSCORP, an affiliate of Defendant Stewart Title Company, and a subsidiary of Stewart Information Services Corporation.

5. Defendant STEWART TITLE COMPANY ("Stewart Title") is a Texas corporation with its principal place of business in Houston, Harris County, Texas. Stewart may be served with citation by serving its registered agent by certified mail, return receipt requested, addressed to:

STEWART TITLE COMPANY
C/o Its Registered Agent
CT Corporation System
350 N. St. Paul Street
Suite 2900
Dallas, Texas 75201-4234

Upon information and belief, Stewart Title was at all times material hereto and currently is an affiliate of Stewart and a subsidiary of Stewart Information Services Corporation.

6. Defendant BANK OF AMERICA, NATIONAL ASSOCIATION ("BOA") is a Delaware corporation that may be served with citation by serving its registered agent in Texas by certified mail, return receipt requested, addressed to:

BANK OF AMERICA, NATIONAL ASSOCIATION
C/o Its Registered Agent
CT Corporation System
350 N. St. Paul Street
Suite 2900
Dallas, Texas 75201-4234

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

At all times material hereto BOA has engaged in business in Dallas County, Texas or committed a tort, in whole or in part, in Dallas County, Texas; and the claims made herein arise out of such activities in Dallas County, Texas. Upon information and belief, BOA was at all times material hereto and currently is a shareholder in MERSCORP.

7. Defendant ASPIRE FINANCIAL, INC. d/b/a TEXASLENDING.COM ("Aspire") is a Texas corporation with its principal place of business located at 4100 Alpha Road Suite 400 Dallas, Dallas County, Texas 75244. Aspire may be served with citation by serving its registered agent by certified mail, return receipt requested, addressed to:

Kevin C. Miller
President, Aspire Financial, Inc.
4100 Alpha Road
Suite 400
Dallas, Texas 75244

**II.**
**JURISDICTION AND VENUE**

8. Jurisdiction herein is based upon section 24.007 of the Texas Government Code; Article V, Section 8, of the Texas Constitution; and section 12.004 of the Texas Civil Practice & Remedies Code.

9. Venue herein is based upon sections 15.002(a)(1)-(2) and 15.005 of the Texas Civil Practice & Remedies Code.

**III.**
**AGENCY AND CORPORATE VEIL/ALTER-EGO**

10. At all times material hereto, each Defendant was acting by and through its actual, apparent, ostensible, or by estoppel agents and/or employees.

11. Plaintiff moves the Court pierce the MERSCORP and MERS corporate veils and impose liability upon Defendants Stewart and BOA as shareholders in MERSCORP for the activities of MERSCORP and MERS alleged herein. Recognizing the corporate existence of

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

MERSCORP and MERS separate from their shareholders, including Stewart and BOA, would cause an inequitable result or injustice, or would be a cloak for fraud or illegality. MERSCORP and MERS were undercapitalized in light of the nature and risk of their business. The corporate fiction is being used to justify wrongs, as a means of perpetrating fraud, as a mere tool or business conduit for others, as a means of evading existing legal obligations, to perpetrate monopoly and unlawfully gain monopolistic control over the real property recording system in the State of Texas, and to circumvent statutory obligations.

## IV.
## INTRODUCTION

12. On January 27, 2011, the Financial Crisis Inquiry Commission ("FCIC") issued its final report on the causes of the financial collapse of 2008. According to the FCIC:

> The profound events of 2007 and 2008 were neither bumps in the road nor an accentuated dip in the financial and business cycles we have come to expect in a free market economic system. This was a fundamental disruption—a financial upheaval, if you will—that wreaked havoc in communities and neighborhoods across this country.
>
> As this report goes to print, there are more than 26 million Americans who are out of work, cannot find full-time work, or have given up looking for work. About four million families have lost their homes to foreclosure and another four and a half million have slipped into the foreclosure process or are seriously behind on their mortgage payments. Nearly $11 trillion in household wealth has vanished, with retirement accounts and life savings swept away. Businesses, large and small, have felt the sting of a deep recession. There is much anger about what has transpired, and justifiably so. Many people who abided by all the rules now find themselves out of work and uncertain about their future prospects. The collateral damage of this crisis has been real people and real communities. The impacts of this crisis are likely to be felt for a generation. And the nation faces no easy path to renewed economic strength.
>
> **We conclude this financial crisis was avoidable.** The crisis was the result of human action and inaction, not of Mother Nature or computer models gone haywire. The captains of finance and the

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

public stewards of our financial system ignored warnings and failed to question, understand, and manage evolving risks within a system essential to the well-being of the American public. Theirs was a big miss, not a stumble. While the business cycle cannot be repealed, a crisis of this magnitude need not have occurred. To paraphrase Shakespeare, the fault lies not in the stars, but in us.

Despite the expressed view of many on Wall Street and in Washington that the crisis could not have been foreseen or avoided, there were warning signs. The tragedy was that they were ignored or discounted. There was an explosion in risky subprime lending and securitization, an unsustainable rise in housing prices, widespread reports of egregious and predatory lending practices, dramatic increases in household mortgage debt, and exponential growth in financial firms' trading activities, unregulated derivatives, and short-term "repo" lending markets, among many other red flags. Yet there was pervasive permissiveness; little meaningful action was taken to quell the threats in a timely manner.

The prime example is the Federal Reserve's pivotal failure to stem the flow of toxic mortgages, which it could have done by setting prudent mortgage-lending standards. The Federal Reserve was the one entity empowered to do so and it did not. The record of our examination is replete with evidence of other failures: financial institutions made, bought, and sold mortgage securities they never examined, did not care to examine, or knew to be defective; firms depended on tens of billions of dollars of borrowing that had to be renewed each and every night, secured by subprime mortgage securities; and major firms and investors blindly relied on credit rating agencies as their arbiters of risk. What else could one expect on a highway where there were neither speed limits nor neatly painted lines?

****

**We conclude there was a systemic breakdown in accountability and ethics.** The integrity of our financial markets and the public's trust in those markets are essential to the economic well-being of our nation. The soundness and the sustained prosperity of the financial system and our economy rely on the notions of fair dealing, responsibility, and transparency. In our economy, we expect businesses and individuals to pursue profits, at the same time that they produce products and services of quality and conduct themselves well.

Unfortunately—as has been the case in past speculative booms and busts—we witnessed an erosion of standards of responsibility and

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY DISTRICT CLERK'S OFFICE

ethics that exacerbated the financial crisis. This was not universal, but these breaches stretched from the ground level to the corporate suites. They resulted not only in significant financial consequences but also in damage to the trust of investors, businesses, and the public in the financial system.

For example, our examination found, according to one measure, that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007. This data indicates they likely took out mortgages that they never had the capacity or intention to pay. You will read about mortgage brokers who were paid "yield spread premiums" by lenders to put borrowers into higher-cost loans so they would get bigger fees, often never disclosed to borrowers. The report catalogues the rising incidence of mortgage fraud, which flourished in an environment of collapsing lending standards and lax regulation. The number of suspicious activity reports—reports of possible financial crimes filed by depository banks and their affiliates—related to mortgage fraud grew 20-fold between 1996 and 2005 and then more than doubled again between 2005 and 2009. One study places the losses resulting from fraud on mortgage loans made between 2005 and 2007 at $112 billion.

Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

****

In an interview with the Commission, Angelo Mozilo, the longtime CEO of Countrywide Financial—a lender brought down by its risky mortgages—said that a "gold rush" mentality overtook the country during these years, and that he was swept up in it as well: "Housing prices were rising so rapidly - at a rate that I'd never seen in my 55 years in the business - that people, regular people, average people got caught up in the mania of buying a house, and flipping it, making money. It was happening. They buy a house, make $50,000 . . . and talk at a cocktail party about it . . . Housing suddenly went from being part of the American dream to house my family to settle down - it became a commodity. That was a change in the culture . . . . It was sudden, unexpected."

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

The bubble that was the genesis of the Financial Crisis of 2008, burst when the collapse of the primary and secondary mortgage markets triggered a liquidity shortfall in the U.S. banking system. This collapse was a direct result of the financial system's commoditization, packaging, securitization, and sale of tens of millions of mortgages throughout the U.S. – activities in which the Defendants actively participated. Without the fiction of the MERS System, these activities would not have been possible.

## V.
## FACTS

### A. The U.S. Mortgage System

13. In the most common residential lending scenario, there are two parties to a real property mortgage – the mortgagee, *i.e.*, a lender, and the mortgagor, *i.e.*, a borrower. When a mortgage lender loans money to a home buyer, it obtains two documents: 1) a promissory note in the form of a negotiable instrument from the borrower; and 2) a "mortgage" or a "deed of trust"[1] granting to the mortgage lender a security interest in the property as collateral to repay the note. The mortgage, as distinguished from the note, establishes the lien on the property securing repayment of the loan. For the lien to be perfected and inoculate the property against subsequent efforts by the mortgagor to sell the property or borrow against it, however, the mortgage instrument must be filed in the deed records of the county in which the property is located.

[1] The law of the state in which property is located generally will determine whether a "mortgage" or a "deed of trust" is used to pledge real property as security on a note. In lien theory states such as Texas, a "deed of trust" is used and only creates a lien on the property - the title remains with the borrower. The lien is removed when all the payments have been made. *See Taylor v. Brennan*, 621 S.W.2d 592, 593 (Tex. 1981). In title theory states, a "mortgage" is used and it conveys ownership to the lender. A clause in the mortgage provides that title reverts back to the borrower when the loan is paid. In common parlance, the term "mortgage" is generally used to refer to the instrument creating the security interest, whether formally denominated as a "mortgage" or a deed of trust." Unless noted, the terms "mortgage" and "deed of trust" are used interchangeably herein.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

1. **<u>The Public Recording System</u>**

14. The origins and reasons for public recordation of mortgage interests in the U.S. dates back to at least the middle of the 17th Century. According to one commentator:

> One of the most striking features of Anglo-American law is the requirement to file notice in public files of a nonpossessory secured transaction in order to enforce the transaction in the court against third parties. The transaction of interest first developed during the early seventeenth century. English mortgage law developed for real estate. Originally, the parties structured mortgages with the secured-mortgagee in possession of the landed collateral, not the debtor-mortgagor. But by the early seventeenth century, the English had developed the technique of leaving the debtor-mortgagor in possession of the land to work off the loan.
>
> ****
>
> Not all legal systems have the filing requirement. Roman law recognized the transaction, but did not require a filing. The Napoleonic Code banned the transaction. The modern explanation of these three different legal rules involves the secret lien. When debtors retain possession of the personalty serving as collateral under the nonpossessory secured transaction, subsequent lenders and purchasers have no way of discovering the prior ownership interest of the earlier secured creditors unless the debtor's honesty forces disclosure. Without that disclosure, the debtor could borrow excessively offering the same collateral as security several times, possibly leaving some of the debtor's creditors without collateral sufficient to cover their loan upon the debtor's financial demise. Roman law solved the problem by providing a fraud remedy against the debtor. The Napoleonic Code solved the problem by banning the transactions. Anglo-American law solved the problem by requiring a filing. Potential subsequent lenders and purchasers could then become aware of the debtor's prior obligation by examining the public files and protect themselves by taking the action they deemed appropriate, either not lending or charging higher interest.[2]

15. Mortgage recordation in Texas is generally governed by Chapter 12 of the Texas Property Code. Section 12.001 of the Property Code provides, in part, that "[a]n instrument concerning real or personal property may be recorded if it has been acknowledged, sworn to with

---

[2] George Lee Flint, Jr. and Marie Juliet Alfaro, *Secured Transactions History: The First Chattel Mortgage Act in the Anglo-American World*, 30:4 William Mitchell Law Review 1403, 1404-05.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

a proper jurat, or proved according to law." Once properly filed, a mortgage is "notice to all persons of the existence of the instrument," protects the mortgagee's (lender's) security interest against creditors of the mortgagor, and places subsequent purchasers on notice that the property is encumbered by a mortgage lien. Unless the mortgage is recorded, the "mortgage or deed of trust is void as to a creditor or to a subsequent purchaser for a valuable consideration without notice."[3]

16. Until recently, when a loan secured by a mortgage was sold, the assignee would generally record the assignment of the mortgage to protect the security interest. If a servicing company serviced the loan and the servicing rights were sold – an event that could occur multiple times during the life of a single mortgage loan – multiple assignments were recorded to ensure that the proper mortgagee appeared in the land records in the County Clerk's office.[4] With some nuances and allowances for the needs of modern finance, this model has been followed throughout the U.S. for over three hundred years to provide the public with notice of the ownership of, and liens encumbering, real property throughout the U.S.. Defendants and others similarly situated have changed all of this and collapsed the public recordation system in Dallas County and throughout the U.S.

17. The MERS business plan, as envisioned and implemented by Wall Street, is based in large part on amending the traditional model of recording security interests in real property and introducing a third party into the equation - MERS. The motivation for creating MERS was Wall Street's desire to alleviate what Wall Street considered to be the "inconvenience" of the public recording system and create its own privately owned shadow electronic recording system

[3] Tex. Prop. Code § 13.001(a).

[4] Some sources estimate that mortgage loans or servicing rights are transferred an average of five times or more during the life of a mortgage - transfers which would necessitate recordation.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

– the MERS System. According to one court, the MERS system was designed "as a replacement for our traditional system of public recordation of mortgages."[5]

2. **Mortgage Origination**

18. In order to fully understand the genesis of the MERS System, one must consider the historical context in which it was created.

19. For most Americans, a mortgage is the largest and most serious financial obligation ever undertaken. Mortgages are originated by a variety of financial institutions.

20. Depository institutions, which accept deposits from the public and lend that money to households and businesses, are one type of originator. Depository institutions include commercial banks as well as credit unions, savings and loan associations, and mutual savings banks. Depository institutions are regulated by a set of federal and/or state agencies charged with ensuring the safety and soundness of these institutions.

21. Non-depository institutions, called mortgage companies or mortgage banks, also originate mortgages. Mortgage companies borrow money from banks (or by issuing bonds) and lend that money to consumers in the form of mortgage loans. They typically then sell those loans to other financial institutions and use that money to originate additional mortgages.

22. Mortgage lenders are sometimes owned by holding companies or other financial institutions. Some mortgage companies are owned by depository institutions, and are therefore subsidiaries of a depository. Others are owned by holding companies that also own a depository institution and are therefore an affiliate of a depository. Mortgage companies that are not a subsidiary or an affiliate of a depository institution are called independent mortgage companies.

23. Federal Housing Administration ("FHA") loans are made by private lenders and insured by the FHA. They are usually made to low-income or moderate-income borrowers, often

[5] *In Re Agard*, 444 BR 231, 247 (E.D.N.Y. 2011).

COUNTY CLERK'S OFFICE

with weaker credit histories, and require smaller down payments. Historically, the size limits on these loans were low.

24. Veterans' Administration ("VA") loans are offered to military personnel and are guaranteed by the Department of Veteran Affairs. These too require little or no down payment.

25. One common type of mortgage is a 30-year fixed rate mortgage ("FRM"), in which the interest rate is fixed for the entire term of the loan and the borrower is required to make a series of equal monthly payments until the loan is paid off. The fixed payment amount that results in the loan being fully paid off at the end of the term is called the fully amortizing payment amount. In contrast, an adjustable rate mortgage ("ARM") has an interest rate that is specified in terms of a margin above some interest rate index. For example, "Prime + 3%" means that the borrower is charged interest based on an interest rate equal to the prime rate plus 3 percentage points. The interest rate on an ARM adjusts at regular intervals. Other mortgages are hybrids of FRMs and ARMs in which the interest rate is fixed for some introductory period and then adjusts at regular periods according to some interest rate index.

26. Other types of mortgages involve the borrower paying less than the fully amortizing amount each month. For example, a balloon mortgage is one in which the borrower pays less than the fully amortizing payment amount but must then pay some relatively large fixed sum at the end of the term – ("balloon payment") - to pay off the mortgage. Interest-only mortgages allow the borrower to pay only the interest accrued each month and make no payments toward principal for some period. Option ARMs, also called negative amortization ARMs, allow the borrower to pay less than the interest charged for some period so that the balance on the loan grows over time before the required payment amount resets to the fully amortizing rate. Interest-only mortgages grew from only 2 percent in 2004 to 20 percent by 2007. Option ARMs and balloon mortgages also grew in this period.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

**B. The Commoditization of Mortgages**

27. In the decades leading up to the early 1970s, the housing finance system was relatively simple: banks and savings and loan associations made mortgage loans to households and held them until they were repaid. Deposits provided the major source of funding for these lenders, as most were depository institutions.

28. In the 1970s, the housing finance system began to shift from depository-based funding to capital markets-based funding. By 1998, 64 percent of originated mortgage loans were sold by originators to large financial institutions that package bundles of mortgages and sell the right to receive borrowers' payments of principal and interest directly to investors. Key to this shift to capital markets-based funding of mortgage lending were Fannie Mae and Freddie Mac, the government-sponsored enterprises ("GSEs"), created by the federal government to develop a secondary mortgage market. The GSEs did this in two ways:

a. by issuing debt to raise capital and using those funds to purchase mortgages to hold in their portfolios; and

b. by securitizing mortgages, that is, by selling to investors the rights to the principal and interest payments made by borrowers on pools of mortgages through what is referred to as mortgage-backed securities ("MBS").

29. MBS are securities that give the holders the right to receive the principal and interest payments from borrowers on a particular pool of mortgage loans. The GSEs purchase mortgages to hold in portfolios and to securitize into MBS that the GSEs guarantee against default. MBS issued by the GSEs or Ginnie Mae are referred to as agency MBS.

30. Fannie Mae and Freddie Mac provide a guarantee that investors in their MBS will receive timely payments of principal and interest. If the borrower for one of the underlying mortgages fails to make his payments, the GSE that issued the MBS will pay to the trust the scheduled principal and interest payments. In return for providing this guarantee, Fannie Mae

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

and Freddie Mac deduct an ongoing guarantee fee, which is charged by setting the pass-through annual interest rate (*i.e.*, the interest rate received by holders of the MBS) about 20-25 basis points (*i.e.*, 0.20 - 0.25 percentage points) below the weighted average interest rate of the mortgages in the pool. Because the GSEs were perceived to be implicitly backed by the federal government, their guarantee was perceived by investors to have essentially removed the credit risk from their MBS.

31. Other financial institutions also create MBS, referred to as non-agency MBS, which have a structure similar to agency MBS but typically have no guarantee against default risk. In a non-agency securitization, the sponsor of the securitization, which could be an investment bank, commercial bank, thrift, or mortgage bank, first acquired a set of mortgages, either by originating them or by buying them from an originator. The sponsor then would create a new entity, a "special purpose vehicle" ("SPV"), and transfer the mortgages to the SPV.[6]

32. The principal and interest payments on the pool of mortgages would provide the underlying set of cash flows for the SPV. The SPV could then enter into contracts in order to

[6] These SPVs often took the form of Real Estate Mortgage Investment Conduits, or "REMICs." REMICs are investment vehicles that hold commercial and residential mortgages in trust and issue securities representing an undivided interest in these mortgages. A REMIC assembles qualified mortgages into pools and issues pass-through certificates, multiclass bonds similar to a collateralized mortgage obligation (CMO), or other securities to investors in the secondary mortgage market. Mortgage-backed securities issued through a REMIC can be debt financings of the issuer or a sale of assets.

Qualified mortgages encompass several types of obligations and interests. Qualified mortgages are defined as "(1) any obligation (including any participation or certificate of beneficial ownership therein) which is principally secured by an interest in real property, and is either transferred to the REMIC on the startup day in exchange for regular or residual interests, or purchased within three months after the startup day pursuant to a fixed-price contract in effect on the startup day, (2) any regular interest in another REMIC which is transferred to the REMIC on the startup day in exchange for regular or residual interests in the REMIC, (3) any qualified replacement mortgage, or (4) certain FASIT regular interests."

Several class actions have been filed against various sponsors of REMICs alleging that the REMIC structure was used unlawfully because a REMIC can never be the owner of a mortgage loan and that, in any event, many mortgages purportedly owned by various REMICs were not timely transferred to the REMIC thereby eliminating the REMIC's favorable tax treatment.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

manage the risk it faced. For example, to reduce interest rate-related risks, the SPV could enter into interest rate swap agreements that provided floating interest rate-based payments to the SPV in exchange for a fixed set of payments from the SPV. The SPV then would issue various classes of mortgage-backed securities that gave investors who were holders of the securities rights to the cash flows available to the SPV. Each class of securities was referred to as a tranche.

33.     Unlike agency MBS, non-agency MBS are not typically guaranteed against credit loss. A crucial goal of the capital structure of the SPV was to create some tranches that were deemed low risk and could receive the highest investment- grade ratings, such as AAA, from the rating agencies. This was done using a set of credit enhancements, ways of structuring the MBS so that some of its tranches received high credit ratings.

34.     One key credit-enhancement tool was subordination. The classes of securities issued by the SPV were ordered according to their priority in receiving distributions from the SPV. The structure was set up to operate like a waterfall, with the holders of the more senior tranches being paid prior to the more junior (or subordinate) tranches. The most senior set of tranches - referred to simply as senior securities - represented the lowest risk and consequently paid the lowest interest rate. They were set up to be paid prior to any of the classes below and were typically rated AAA. The next most senior tranches were the mezzanine tranches. These carried higher risk and paid a correspondingly higher interest rate. The most junior tranche in the structure was called the equity or residual tranche and was set up to receive whatever cash flow was left over after all other tranches had been paid. These tranches, which were typically not rated, suffered the first losses on any defaults of mortgages in the pool.

35.     The payments of principal and interest by borrowers flow first to make the promised payments to the AAA senior bondholders, then down to pay the AA bonds, and so

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

forth. If there is any money left over after all bondholders have been paid, it flows to the residual tranche of securities.

36. An example of a typical subprime MBS in which cumulative losses on mortgages in the SPV were expected to amount to 4 percent of the total principal amount is as follows. Assume that AAA senior bonds make up 92 percent of the principal amount of debt issued by the SPV, AA bonds account for 3 percent, mezzanine BBB bonds make up 4 percent, and the residual tranche amounts to 1 percent. If the MBS does indeed experience such a 4 percent loss on its mortgage assets, then 4 percent of the total principal amount on its bonds would default. Because of the SPV's subordination structure, these losses would first be applied to the residual tranche. The residual tranche, which accounts for 1 percent of the principal amount of the SPV's bonds, would fully default, paying nothing. That would leave 3 percent more of the total principal amount in losses to apply to the next most junior tranche, the mezzanine BBB tranche. Since the mezzanine BBB tranche totals 4 percent of the deal, the 3 percent left in losses would reduce its actual payments to 1 percent, meaning that 75 percent of the BBB bonds' principal value would be lost. The AA and AAA bonds, however, would pay their holders in full. In this simple example, the junior tranches below the AA and AAA bonds would be large enough to fully absorb the expected loss on the SPV's mortgages.

37. Another credit enhancement technique was overcollateralization. The principal balance of the underlying mortgages often exceeded the principal balance on all of the debt securities issued by the SPV. Thus, some of the underlying mortgages could default, resulting in loss of principal on the mortgage, without any of the MBS bonds defaulting on their promised payments to investors.

38. Similarly, the weighted average coupon interest rate on the underlying mortgage pool would typically exceed the weighted average coupon interest rate paid on the SPV's debt

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

securities by an amount sufficient to provide a further buffer before the debt tranches incur losses. In essence, the SPV received a higher interest rate from mortgage borrowers than it paid to investors in its bonds. The resulting excess spread gave the SPV extra cash flow to pay its bond holders, further insulating the MBS from credit risk in the underlying mortgages.

39. With both over-collateralization and excess spread, the total amount of cash that had been promised to be paid to the SPV by mortgage borrowers was greater than the total amount of cash that the SPV had promised to pay out to investors. This gave the SPV a cushion in case some of the mortgage borrowers defaulted on their promised payments.

40. The prospectus for an MBS would include a description of the mortgages held by the SPV, such as information about the distribution of borrowers' credit scores and loan-to-value ratios, and the geographic distribution of the homes that serve as collateral for the mortgages. The underwriting practices used by the originators usually would also be described. For example, Goldman Sachs disclosed the following about the underwriting standards used by the originator - New Century Mortgage - of the mortgages it packaged in a 2006 MBS offering:

> The mortgage loans will have been originated in accordance with the underwriting guidelines established by New Century. On a case-by-case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist. It is expected that a substantial portion of the mortgage loans will represent these exceptions. All of the mortgage loans were also underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market. As a result of New Century' underwriting criteria, changes in the values of [homes securing the mortgage loans] may have a greater effect on the delinquency, foreclosure and loss experience on the mortgage loans than these changes would be expected to have on mortgage loans that are originated in a more traditional manner.

41. The originators of the mortgages also generally made representations and warranties to the SPV, described in the prospectus, regarding the nature of the mortgages in the pool. For example, they typically represented that the mortgages had never been delinquent and

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

that they complied with all national and state laws in their origination practices. Moreover, in the event that any of the representations and warranties were breached, or if any of the mortgages defaulted early (within some fixed period after being transferred to the SPV), the originator typically agreed to repurchase the mortgage from the SPV.

42. The SPV would contract with a firm to service the mortgages in the pool, i.e., to collect payments from borrowers. The mortgage servicer would also handle defaults in the mortgage pool, including negotiating modifications and settlements with the borrowers and initiating foreclosure proceedings. In exchange, the mortgage servicer would get an ongoing servicing fee from the flow of interest payments from borrowers of typically between 25 and 50 basis points, or 0.25 and 0.50 percentage points, at an annual rate.

43. Servicers also typically would retain late fees charged to delinquent borrowers and would be reimbursed for expenses related to foreclosing on a loan. The borrowers would be informed by the originator or the new servicer when servicing rights to their mortgages were transferred so that they knew how to make payments to the new servicer.

44. The sponsor of an MBS typically approached Fitch, Standard & Poor's, or Moody's to obtain credit ratings on the classes of debt securities issued in the deal. The credit rating agencies analyzed the probability distribution of cash flows associated with each tranche using proprietary models based on historical data and assigned a credit rating to each debt tranche. These ratings were intended to represent the riskiness of the securities and were used by investors to inform their decision whether to invest in the security. Sponsors of MBS typically structured them to produce as many bonds with the highest credit rating (*e.g.* AAA) while offering attractive yields. AAA-rated bonds were in demand by investors who required low-risk assets in their portfolio. The internal credit enhancements used in non-agency securitizations, discussed above, enabled the transformation of mortgages, including relatively risky mortgages

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

to borrowers with low credit scores or with little equity, into bonds that were considered to be low risk but relatively high yield.

45. The junior tranches of an MBS typically received lower ratings because they were more likely to default than the senior tranches. This is because, as discussed above, senior securities would be paid before the junior securities would be paid, so that the more junior a tranche, the more likely it would be to bear losses if the underlying mortgages defaulted.

46. The same credit-enhancement techniques that produced highly rated tranches out of a pool of mortgages were used to create highly rated securities out of pools of junior tranches of MBS. This was done using a product known as a collateralized debt obligation ("CDO").

47. The sponsor of such a CDO assembled a pool of junior tranches from many different MBS, for example mezzanine tranches rated BBB, transferred them to an SPV, and using the same tools of subordination, over-collateralization, and excess spreads issued AAA-rated senior securities from that SPV, along with junior tranches and a first-loss residual tranche.

48. Credit default swaps (CDS) were used to protect against the risk of an MBS defaulting. In a CDS, the buyer agreed to pay the seller a fixed stream of payments. In return, the seller agreed to pay the buyer a fixed amount if the "reference entity" of the CDS experienced a "credit event," which was typically some sort of default. For MBS- and CDO-based CDSs, the reference entity was the trust that issued the MBS or CDO security. CDS were used by holders of MBS and CDOs for the purpose of reducing their exposure to credit risk of MBS and CDOs.

49. As demonstrated by the following chart, the 2000s saw a large increase in the market share of non-agency securitization. The chart shows the fraction of total residential mortgage originations in each year that were securitized into non-agency MBS, GSE MBS, and Ginnie Mae MBS, as well as the fraction nonsecuritized (i.e., held as whole loans by banks, thrifts, the GSEs, and other institutions).

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS



50. Four trends are notable. Non-securitized mortgage originations declined steadily from half the market in 1995 to under 20 percent in 2008. Non-agency MBS hovered between 8 and 12 percent until 2003; non-agency MBS then more than trebled in market share to a peak of 38 percent in 2006. During the growth years for non-agency MBS, Ginnie Mae's market share dropped considerably. Finally, both GSEs and Ginnie Mae rapidly escalated their market share as nonagency securitization dropped in 2008.

51. The following chart plots the volume of prime, subprime,[7] and alt-A[8]

---

[7] The term "subprime" refers to mortgage loans made to borrowers with relatively poor credit histories. These loans are therefore riskier than prime loans, which are made to borrowers with stronger credit. The marketing, underwriting, and servicing of subprime loans is different than that of prime loans. Although the mortgage industry lacks a consistent definition of the subprime mortgage market, subprime loans are typically: 1) loans with interest rates above a given threshold; 2) loans from lenders that have been classified as specializing in subprime loans; or 3) mortgages that back MBS.

[8] The term "alt-A" refers to loans generally made to borrowers with strong credit scores but which have other characteristics that make the loans riskier than prime loans. For example, the loan may have no or limited documentation of the borrower's income, a high loan-to-value ratio (LTV), or may be

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

(self-identified as such by the sponsors) non-agency MBS issued from 1995-2008.

The chart reveals that early in the period covered, the prime nonagency MBS, which contained largely jumbo mortgages, were the biggest of the three types of non-agency MBS. But, by 2006 the subprime and alt-A non-agency MBS had each surpassed prime non-agency MBS in volume. In particular, subprime non-agency MBS showed a dramatic increase from 2003 to 2005. Alt-A non-agency MBS saw its largest jump in volume in 2005. Notably, the non-agency MBS market was nearly nonexistent in 2008.

### C. <u>The Collapse</u>

52. By 2004, commercial banks, thrifts, and investment banks caught up with Fannie Mae and Freddie Mac in securitizing home loans. By 2005, they had taken the lead. The two

for an investor-owned property. Typically, loans are identified as being alt-A by virtue of being in an MBS that is marketed as alt-A.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

government-sponsored enterprises maintained their monopoly on securitizing prime mortgages below their loan limits, but the wave of home refinancing by prime borrowers spurred by very low, steady interest rates petered out. Meanwhile, Wall Street focused on the higher-yield loans that the GSEs could not purchase and securitize—loans too large, called jumbo loans, and nonprime loans that didn't meet the GSEs' standards. The nonprime loans soon became the biggest part of the market—"subprime" loans for borrowers with weak credit and "Alt-A" loans, with characteristics riskier than prime loans, to borrowers with strong credit.

53. By 2005 and 2006, Wall Street was securitizing one-third more loans than Fannie and Freddie. In just two years, private-label mortgage-backed securities had grown more than 30%, reaching 1.15 trillion in 2006; 71% were subprime or Alt-A.

54. "Securitization could be seen as a factory line," former Citigroup CEO Charles Prince told the FCIC. "As more and more and more of these subprime mortgages were created as raw material for the securitization process, not surprisingly in hind-sight, more and more of it was of lower and lower quality. And at the end of that process, the raw material going into it was actually bad quality, it was toxic quality, and that is what ended up coming out the other end of the pipeline. Wall Street obviously participated in that flow of activity." One theory for the demand Wall Street was so intent on satisfying pointed to foreign money.

55. Developing countries were booming and—vulnerable to financial problems in the past—encouraged strong saving. Investors in these countries placed their savings in apparently safe and high-yield securities in the United States. Fed Chairman Bernanke called it a "global savings glut." As the United States ran a large current account deficit, flows into the country were unprecedented. Over six years from 2000 to 2006, U.S. Treasury debt held by foreign official public entities rose from $0.6 trillion to $1.43 trillion; as a percentage of U.S. debt held by the public, these holdings increased from 18.2% to 28.8%. According to former Fed governor

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE



Frederic Mishkin, "You had a huge inflow of liquidity. A very unique kind of situation where poor countries like China were shipping money to advanced countries because their financial systems were so weak that they [were] better off shipping [money] to countries like the United States rather than keeping it in their own countries." The demand for what was perceived to be the safety of MBS created a surplus in liquidity, thereby helping to lower long-term interest rates and providing easy money to mortgage originators.

56.    According to Paul Krugman, an economist at Princeton University, "It's hard to envisage us having had this crisis without considering international monetary capital movements. The U.S. housing bubble was financed by large capital inflows. So were Spanish and Irish and Baltic bubbles. It's a combination of, in the narrow sense, of a less regulated financial system and a world that was increasingly wide open for big international capital movements." And as more and more foreign capital became available, underwriting standards were lowered to extend credit to borrowers who represented a new risk paradigm.

57.    As 2007 went on, increasing mortgage delinquencies and defaults compelled the ratings agencies to downgrade first mortgage-backed securities, then CDOs. Alarmed investors sent prices plummeting. Hedge funds faced with margin calls from their repo lenders were forced to sell at distressed prices; many would shut down. Banks wrote down the value of their holdings by tens of billions of dollars.

58.    Predictably, borrowers who had been extended credit without having been adequately qualified began to default on their loans in escalating numbers beginning in late 2006. As demonstrated by the following chart, defaults peaked in 2010.

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE



Mortgage Delinquencies by Region
Arizona, California, Florida, and Nevada - the "sand states"—had the most problem loans.
IN PERCENT, BY REGION
16%
12
8
4
0
1998
2000
2002
2004
2006
2008
2010
13.6%
Sand states
8.7%
U.S. total
7.0%
Non-sand states
NOTE: Serious delinquencies include mortgages 90 days or more past due and those in foreclosure
SOURCE: Mortgage Bankers Association National Delinquency Survey

59. The summer of 2007, also saw a near halt in many securitization markets, including the market for non-agency mortgage securitizations. For example, a total of $75 billion in subprime securitizations were issued in the second quarter of 2007 (already down from prior quarters). That figure dropped precipitously to $27 billion in the third quarter and to only $12 billion in the fourth quarter of 2007. Alt-A issuance topped $100 billion in the second quarter, but fell to $13 billion in the fourth quarter of 2007. Once-booming markets were now gone—only $14 billion in subprime or Alt-A mortgage-backed securities were issued in the first half of 2008, and almost none after that. Simply stated, Wall Street's system made virtually unlimited funds available to unqualified buyers to feed the MBS demand. More buyers in the market caused housing prices to rise thereby creating a housing bubble. Pretty soon, there simply were not enough buyers, qualified or not, to sustain the model and the entire system collapsed. The ease with which non-agency MBS were created, and mortgages transferred into them, would not have been possible without the MERS System.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

**D. Wall Street Ignores 300 Years of History and Creates the "MERS System"**

60. To facilitate the commoditization of mortgages and resulting explosion in non-agency MBS, Wall Street needed to create a mechanism that would enable it to buy and sell mortgages and mortgage servicing rights multiple times, packaged with tens of thousands of other mortgages, without the "inconvenience," expense, or time associated with recording each transfer. In order to issue MBS, however, the issuer was and is required by law and industry standards to record (and pay recording fees on) every assignment of a mortgage loan from origination through deposit in a securitization trust. Faced with this dilemma Wall Street simply wrote its own rules and created MERSCORP and MERS.

**1. How MERS Works**

61. MERS is a subsidiary of MERSCORP. MERSCORP is owned by various mortgage banks, title companies, and title insurance companies, including Defendants BOA and Stewart. When a lender which is a "member" of MERS makes a mortgage loan, the lender instructs the title company to show not only the lender, but MERS, as "beneficiary" or "mortgagee" under the mortgage. MERS then shows up in the deed records as a "grantee."

62. When the lender sells the note, or transfers the servicing rights, MERS remains as a "mortgagee" or "beneficiary" under the mortgage and "grantee" in the deed records. The purchaser of the note, or successor servicer, agrees at the time of acquisition of its rights to notify MERS when the note is paid so that MERS can "release" its lien and the lien of the original lender. MERS has described its role as follows:

> [MERS] and MERSCORP, Inc. were developed by the real estate industry to serve as the mortgagee of record and operate an electronic registration system for tracking interests in mortgage loans. . . . Specifically, the MERS® System tracks the transfers of mortgage servicing rights and beneficial ownership interests in mortgage loans on behalf of MERS Members.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

The promissory note is a negotiable instrument under Article 3 of the Uniform Commercial Code, and originating lenders routinely sell these notes on the secondary markets to investors. (citation omitted). "The ability of lender to replenish their capital by selling loans in the secondary market is what makes money accessible for home ownership." (citation omitted).

**** 

At the origination of the loan by a lender who is a MERS Member, the lender takes possession of the note (and becomes the holder of the note), and the borrower and lender designate MERS (as the lender's nominee) to serve as the mortgagee or beneficiary of record. The lender's secured interest is thus held by MERS. . . . Rules, which are incorporated into all MERS' agreements with its members, provide that members "shall cause Mortgage Electronic Registration System, Inc. to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System." (citation omitted).

Accordingly, when a MERS Member originates a loan, the original lender and the borrower contractually agree in the mortgage that MERS will be the mortgagee and will serve as nominee for the lender and its successors and assigns. (citation omitted). In the event of a default on the loan, MERS as the beneficiary or mortgagee, is authorized to foreclose on the home. After the borrower signs the mortgage agreement, it is recorded in the public, local land records with MERS as the named beneficiary or mortgagee. (citation omitted).

The MERS Member then registers the mortgage loan information from the security instrument on the MERS® System. Id. When the beneficial interest in a loan is sold, the promissory note is still transferred by an endorsement and delivery from the buyer to the seller, but MERS Members are obligated to update the MERS® System to reflect the change in ownership of the promissory note. (citation omitted).

So long as the sale of the note involves a MERS Member, MERS remains the named mortgagee of record, and continues to act as the mortgagee, as the nominee for the new beneficial owner of the note (and MERS' Member). The seller of the note does not and need not assign the mortgage because under the terms of that security instrument, MERS remains the holder of title to the mortgage, that is, the mortgagee, as the nominee for the purchaser of the note, who is then the lender's successor and/or assign. (citation omitted). Accordingly, there is no splitting of the note and mortgage for

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

> loans in the MERS® System. If, however, a MERS' Member is no longer involved with the note after it is sold, an assignment from MERS to the party who is not a MERS Member is executed by MERS, that assignment is recorded in the County Clerk's office where the real estate is located, and the mortgage is "deactivated" from the MERS® System. (citation omitted).[9]

**2. *And after all, what is a lie? 'T is but The truth in masquerade*[10] – The MERS Lie**

63. According to MERS, it is the "mortgagee" or "beneficiary" of record in more than 65 million mortgages filed in the deed records of counties throughout the U.S. MERS is, however, neither a borrower nor a lender and, indeed, in MERS' own words:

> MERS has no interest at all in the promissory note evidencing the mortgage loan. MERS has no financial or other interest in whether or not a mortgage loan is repaid. . . .
>
> ****
>
> MERS is not the owner of the promissory note secured by the mortgage and has no rights to the payments made by the debtor on such promissory note. . . . MERS is not the owner of the servicing rights relating to the mortgage loan and MERS does not service loans. **The beneficial interest in the mortgage (or the person or entity whose interest is secured by the mortgage) runs to the owner and holder of the promissory note.** In essence, MERS immobilizes the mortgage lien while transfers of the promissory notes and servicing rights continue to occur. (citation omitted).[11]

64. MERS has also admitted that under its agreement with its mortgage-lender members, MERS "cannot exercise, and is contractually prohibited from exercising, **any of the**

---

9 *Mortgage Electronic Registration Systems, Inc. v. Nebraska Dept. of Bnkng and Fin.*, 704 N.W.2d 784 (Neb. 2005), Brief of Appellant at 11-12.

10 George Gordon Noel Byron, Lord Byron (1788–1824), *Don Juan*. Canto xi. Stanza 37.

11 *Mortgage Electronic Registration Systems, Inc. Nebraska Dept. of Bnkng and Fin.*, 704 N.W.2d 784 (Neb. 2005), Brief of Appellant at 11-12 (emphasis added). MERS does not explain how it can be a "mortgage lien" holder or "inoculate" loans "against future assignments" while simultaneously insisting that "MERS is not the owner of the promissory note secured by the mortgage and has no rights to the payments made by the debtor on such promissory note. . . . " and "is not the owner of the servicing rights relating to the mortgage loan and MERS does not service loans."

Also in question in cases pending in other jurisdictions is MERS' assertion that it has the authority to assign the note and mortgage to subsequent purchasers and the authority to appoint substitute trustees under the deeds of trust in which MERS appears as the "beneficiary" or "mortgagee."

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

**rights or interests in the mortgages or other security documents"** and that **MERS has "no rights whatsoever** to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or **to any mortgaged properties securing such mortgage loans."**[12]

65. At this point one might ask how MERS can be the "mortgagee" in or "beneficiary" of a mortgage as to which the beneficial interest "runs to the owner and holder of the promissory note."[13] Simply stated, it cannot. As one court has observed:

> MERS and its partners made the decision to create and operate under a business model that was designed in large part to avoid the requirements of the traditional mortgage recording process. This Court does not accept the argument that because MERS may be involved with 50% of all residential mortgages in the country, that is reason enough for this Court to turn a blind eye to the fact that this process does not comply with the law.
>
> ****
>
> Aside from the inappropriate reliance upon the statutory definition of "mortgagee," MERS's position that it can be both the mortgagee and an agent of the mortgagee is absurd, at best.
>
> ****
>
> This Court finds that MERS's theory that it can act as a "common agent" for undisclosed principals is not supported by the law. The relationship between MERS and its lenders and its distortion of its alleged "nominee" status was appropriately described by the Supreme Court of Kansas as follows: "The parties appear to have defined the word [nominee] in much the same way that the blind men of Indian legend described an elephant – their description depended on which part they were touching at any given time." *Landmark Nat'l Bank v. Kesler*, 216 P.3d 158, 166-67 (Kan. 2010).[14]

66. One scholar has observed With regards to the legal accuracy of MERS' recitation that it is the "mortgage" or "beneficiary" one scholar has stated:

[12] *Id.* at 10 (emphasis added).

[13] *Id.* at 11-12.

[14] *In Re Agard*, 444 BR 231 (E.D.N.Y. 2011).

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

MERS and its member use false documents to avoid paying recording fees to county governments. At the most simple level, mortgages and deeds of trust recorded at origination represent that MERS is the mortgagee or deed of trust beneficiary. Taking the appellate decisions in Arkansas, Kansas, Maine, and Missouri at face value, MERS recorded mortgages contain a false statement. While it is true that MERS recorded mortgages and deeds of trust also have qualifying language suggesting that MERS is also a "nominee," the representation that MERS is the owner of the lien is not some innocuous legalism. It causes county recorders that maintain grantor-grantee indexes to list MERS in the chain of title for the land. The false designation of MERS as a mortgagee or beneficiary creates a false lead in the true chain of title defeating an essential purpose of recording mortgages and deeds of trust.

But perhaps even more troubling are the documents recorded in the name of MERS later in the life of mortgage loans. Recall that MERS' business model does not include actually recording documents relating to its purported ownership itself. Instead, it allows employees of mortgage servicing companies and law firms to do so on its behalf. MERS has an internet web page where mortgage servicers and law firms can enter names of their own employees to automatically produce a boilerplate "corporate resolution" that purports to designate the servicers' and law firms' employees as certifying officers of MERS with the job title of assistant secretary and/or vice president. These servicer and law firm employees then sign and record documents such as mortgage assignments, substitution of deed of trust trustees, and substitutions of deed of trust beneficiaries—all including the representation that they are a MERS vice president or assistant secretary. Some states require that the individual signing a document conveying an interest in land have the job title of vice president or higher. Surely this policy is to prevent mistakes, confusion, and disputes over land ownership. But many servicer and law firm employees use the "vice president" title even when it is not required—perhaps because it just sounds better.

Only, it is not true. The representation that employees of mortgage servicing companies and foreclosure law firms are "vice presidents" of MERS is false. In the English language the words vice president primarily mean: "an officer next in rank to a president and usually empowered to serve as president in that officer's absence or disability." Sometimes, vice president can mean "any of several officers serving as a president's deputies in charge of particular locations or functions." (citation omitted). The reality of what MERS "vice presidents" actually do, from whom they receive their paychecks, and their actual job titles are fundamentally inconsistent with a corporate officer than serves as

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS

president when the president is disabled, or acts as the president's deputy. A deposition transcript taken from a foreclosure case brought by a Florida debt collection law firm is illustrative. The deponent was a non-attorney employee of the firm that was claiming MERS certifying officer status. The employee was responsible for signing 20-40 mortgage assignments that would be recorded with county officials per day. (citation omitted). The firm's rationale for allowing this was one of the boilerplate "corporate resolutions" taken off of MERS' website that stated: "The attached list of candidates are employees of Florida Default Law Group and are hereby appointed as assistant secretaries and vice-presidents of MERS." When this "Vice President" of MERS was asked about her relationship with MERS she responded:

Q. Did you have to have any sort of training to become a Certified Officer?

A. No.

Q. Do you know where MERS is located?

A. No.

Q. Have you ever been there?

A. No.

Q. Have you ever spoken with anyone at MERS?

A. No.

Q. Have you ever had e-mail transmissions back and forth with anyone from MERS?

A. No.

Q. Do you file any reports with MERS relating to assignments?

A. No.

Q. Do you know who the president of MERS is?

A. No.

****

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

Q. And I guess at some point, somebody explained to you that you were a Certified Officer is that correct? . . . .

A. Yes.

Q. And what do you remember as to their explanation as to what that meant?

A. Why I was being chosen as a Certified Officer?

Q. Yes.

A. That it was actually a group of us, we had one meeting and they explained that people that had an understanding of what an assignment was were going to go ahead and become certified officers because we then had authorization to execute on behalf of MERS.

It is inconsistent with even the most expansive definition of the term vice president, that an individual who is not an employee of the company, has never been to the company's location, does not even know where the company is located, has never met the company's president, does not know who the president is, and has never personally communicated with the company in any way can be considered a vice-president of that company. It does not follow that because a belief is convenient, it is also true.

Perhaps the designation of servicer and law firm employees as "assistant secretaries" of MERS is less absurd, but it is also still false. While many of these servicer and law firm employees are secretarial workers in the businesses that they actually work for, they are not assistant secretaries of MERS in any meaningful economic sense. They have no more contact with MERS than vice presidents do. Indeed the fact that MERS' boilerplate resolutions allow the employees to just pick which title they want to use is compelling evidence that the whole concept is twaddle. MERS Assistant secretaries are not paid by MERS. They receive no health benefits from MERS. In yet one more example of Orwellian doublespeak, it is the financial institutions and law firms that pay MERS to allow them to pretend that they have MERS employees.100 Who pays to be an assistant secretary? (citation omitted). While mortgage brokers and financiers may be keen on entrusting the nation's real property records to a company with these standard business practices, one can imagine that this might make the democratically elected county recorders that have dedicated their professional careers to preservation of land ownership rights somewhat uncomfortable.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

> County recorders deserve a fair hearing if they were to request payment of recording fees for assignments avoided through use of documents containing these false statements. Recording of these legally and factually false statements caused a reduction in the revenue that county governments would have collected from mortgage financiers. MERS itself used projections of this reduction in revenue in its sales pitches and marketing material. Indeed the studies done by accountants that justified the creation of MERS show how use of the MERS system—which entailed recording false documents—would cause a reduction in fees paid to counties.
>
> But perhaps most compelling, pooling and servicing agreements packaging mortgage loans into securities legally require finance companies to record (and pay recording fees on) every assignment of a mortgage loan from origination through deposit in a securitization trust. A 2005 Pooling and Servicing Agreement between J.P. Chase Morgan's subprime subsidiary as a depositor, J.P. Chase Morgan's actual bank as servicer, and Wachovia Bank as trustee Chase's subprime subsidiary provides a typical example. The pool included both non-MERS and MERS loans, but had different assignment recording warranties for each. In the agreement Chase's subprime subsidiary promised to turn over to the securitization trustee "Originals of all recorded intervening Assignments of Mortgage, or copies thereof, certified by the public recording office in which such Assignments or Mortgage have been recorded showing a complete chain of title from the originator to the Depositor, with evidence of recording . . . ." (citation omitted). Conversely, in the case of MERS-recorded loans, the same agreement does not require recording of intermediate assignments. Instead it only requires the depositor to take "such actions as are necessary to cause the Trustee to be clearly identified as the owner of each such Mortgage Loan on the records of MERS. . . ." (citation omitted). In this typical securitization deal, Chase used the MERS system to duck a contractual obligation to produce recorded assignments for every non-MERS loan included in the pool—even though counties depend on the revenue produced by those assignments.[15]

67. Recording of deeds of trust containing these legally and factually false statements caused a reduction in the revenue that county governments, including Dallas County, Texas

---

[15] Christopher L. Peterson, *Two Faces: Demystifying the Mortgage Electronic Registration System's Land Title Theory*, 53 WILLIAM & MARY L. REV. (forthcoming 2011) (available at: www.papers.ssrn.com/sol3/papers.cfm?abstract_id=1684729).

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

would have collected from mortgage financiers. MERS itself used projections of this reduction in revenue in its sales pitches and marketing material. Indeed the studies done by accountants that justified the creation of MERS show how use of the MERS system—which entailed recording false documents—would cause a reduction in fees paid to counties. And it has. By some estimates, the MERS system has cost counties nationwide in excess of $10 billion.

68. In a nutshell, when Wall Street "financiers talk to investors, they claim to own mortgages in order to convey the sense that they own what they are selling. But when financiers talk to the government they claim not to own what they are selling so as to not be obliged to pay fees associated with owning it. MERS and its members prevent recording fees from being paid on assignments—that was the whole point of MERS—but then attempt to avail themselves of the protection that having taken such an action would have afforded."[16]

69. The havoc wrought by MERS was summarized aptly in an April 6, 2011, letter from the Guilford County, North Carolina Register of Deeds and Southern Essex District of Massachusetts Register of Deeds to Iowa Attorney General Tom Miller, leader of the Mortgage Foreclosure Multistate Group, comprised of state attorneys general in all 50 states. The letter outlines the concerns shared by county clerks and recorders nationwide and states, in part:

> As County Land Record Recorders in Massachusetts and North Carolina, we have been gravely concerned about the role of the Mortgage Electronic Registration Systems (MERS) in not only foreclosure proceedings, but as it undermines the legislative intent of our offices as stewards of land records. MERS tracks more than 60 million mortgages across the United States and we believe it has assumed a role that has put constructive notice and the property rights system at risk. We believe MERS undermines the historic purpose of land record recording offices and the "chain of title" that assures ownership rights in land records.
>
> As a result, we are asking as part of your probe, that this task force and the National Association of Attorney Generals require that all

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

[16] *Id.*

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

past and present MERS assignments of deeds of trust/mortgages be filed in local recording offices throughout the United States immediately. Assignments are required by statute to be filed in Massachusetts, however they are not currently required to be recorded in North Carolina. We feel, that it is important that the Registers of Deeds should have representatives at the table before any settlement is discussed or agreed to as it relates to MERS failure to record assignments and pay the proper fees.

This action would serve three specific purposes. First, the filing of all assignments would help recover the chain of title that determines property ownership rights that has been lost and clouded over during the past 13 years because of the scheme that MERS has set in place. Second, transparency and confidence in ownership rights would be restored and this would prevent the infringement upon those rights by others. Third, this action would support a return to sound fundamentals in our economy between the financial services industry and public recording offices.

MERS has defended their practices by saying that they were helping the registries of deeds by reducing the amount of paperwork that needed to be recorded. This claim is outrageous. This is help we did not ask for, nor was it help that we needed. It is very clear that the only ones that they were helping were themselves. Over the past 10-12 years, recording offices across the United States have upgraded their internal and external technology to meet the demands of lenders, title underwriters, title searchers and citizens. In fact, in 1998 the Southern Essex District Registry of Deeds in Massachusetts became the first registry of deeds to provide both document images and indices available to the public, 24 hours a day, free of charge on the world-wide-web. In doing so, the Registry received a Computerworld Smithsonian Award which recognized the innovative use of technology to benefit society. In 2009, the Guilford County Register of Deeds was given a local Government Federal Credit Union Productivity Award by the North Carolina Association of County Commissioners for their technological innovations. Nationally, over 93% of the public land records are up to date and current, according to Ernest Publishing.

As of today, there are over 600 recording jurisdictions, covering 43% of the US population that have incorporated an eRecording model into their document recording operations. We believe these jurisdictions cover nearly 80% of the volume of assignments that should be recorded. The remaining areas could be covered quickly, with legislation requiring such action by state legislatures.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

> Quite frankly, we believe this can and should be done. It's the right thing to do.
>
> In the coming weeks, we will be working with our national organizations, the National Association of County Recorders, Election Officials and Clerks (NACRC) and the International Association of Clerks, Recorders, Election Officials, and Treasurers (IACREOT) to take the same position. We are also sending a copy of this Letter to the National Conference on State Legislatures (NCSL) and the National Association of Counties (NACO).[17]

70. According to many observers the MERS System has created massive confusion as to the true owners of beneficial interests in mortgage loans and mortgages throughout the U.S. And the loss of revenues to counties throughout the U.S., including Dallas County, has resulted in blight and other harms.

## E. The Dallas County Deed Records

71. Section 11.004 of the Texas Property Code requires that County Clerks throughout the State of Texas, including Dallas County: (1) correctly record, as required by law, within a reasonable time after delivery, any instrument authorized or required to be recorded in that clerk's office that is proved, acknowledged, or sworn to according to law; (2) give a receipt, as required by law, for an instrument delivered for recording; (3) record instruments relating to the same property in the order the instruments are filed; and (4) provide and keep in the clerk's office the indexes required by law.

72. Section 193.003 of the Texas Local Government Code requires that a county clerk maintain "a well-bound alphabetical index to all recorded deeds, powers of attorney, mortgages, and other instruments relating to real property" with "a cross-index that contains the names of the grantors and grantees in alphabetical order." Under policies in effect for many years, employees of the Dallas County Clerk's Office record as a grantee any person identified in a

[17] http://www.co.guilford.nc.us/departments/rod/ROD_Letter_To_AG_Miller.pdf.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

deed of trust as a "beneficiary." As of midnight on Sunday, September 11, 2011, MERS was shown as the "grantee" in 157,319 records and "grantor" in 128,206 on the Dallas County, Texas Clerk's ROAM website.

73. MERS is described as follows in many of the deeds of trust filed by MERS or on MERS' behalf in Dallas County, Texas:

> The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.

In yet another section of these deeds of trust MERS is identified as follows:[18]

> "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument**. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P,O, Box 2026, Flint, MI 48501-2026, tel. (888) 679·MERS.

Despite it denomination as such, MERS is not the beneficiary of such deeds of trust as the word "beneficiary" has been used in deeds of trust in Texas for over 100 years. And MERS' attempt to qualify that denomination by including the notation that it is the "beneficiary" solely as "nominee for Lender and Lender's successors and assigns" does not cure this infirmity.

74. The explanation for why MERS decided to identify itself as the "beneficiary" of a security interest in property pledged as security on a debt as to which MERS is not the obligee is simple - in order for the MERS System to work, MERS had to misrepresent its interests in the

[18] If this description of MERS status under deeds of trust in which it appears as the "beneficiary" seems somewhat imprecise, that is because it is. Simply stated, MERS cannot be the "beneficiary" of deed of trust which secures to **another**, the Lender: "(i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note."

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

deeds of trust of which it purports to be a beneficiary.

75. For over 100 years, Texas law has provided that the grantee or beneficiary of a deed of trust is the lender on the note secured by the deed of trust.[19] So long as a debt exists, the "security will follow the debt," and the assignment of the debt carries with it the rights created by the deed of trust securing the note.[20]

76. Deed records in Texas were created to provide public notice of the identity of the person whose interest is protected by a deed of trust. Once properly filed, a deed of trust is "notice to all persons of the existence of the instrument," protects the lender's security interest against creditors of the mortgagor, and places subsequent purchasers on notice that the property is encumbered by a mortgage lien.

77. In order to be shown in deed records as a "grantee," and therefore a party whose interest is protected by recording, one must be identified on a deed of trust as either a "mortgagee," "grantee," or "beneficiary" of the deed of trust. As noted above, however, MERS has admitted that it is none of these:

> MERS has no interest at all in the promissory note evidencing the mortgage loan. MERS has no financial or other interest in whether or not a mortgage loan is repaid. . . .
>
> ****
>
> MERS is not the owner of the promissory note secured by the mortgage and has no rights to the payments made by the debtor on such promissory note. . . . MERS is not the owner of the servicing rights relating to the mortgage loan and MERS does not service loans. **The beneficial interest in the mortgage (or the person or entity whose interest is secured by the mortgage) runs to the owner and holder of the promissory note.** In essence, MERS

[19] *See Lawson v. Gibbs*, 591 S.W.2d 292, 294 (Tex. Civ. App.-Houston [1st. Dist.] 1979, writ ref'd n.r.e.).

[20] A deed of trust in Texas creates a lien in favor of the lender – it does not operate as a transfer of title. This has been the law in Texas for more than 100 years. *See McLane v. Paschal*, 47 Tex. 365, 369 (1877); *see also Johnson v. Snell*, 504 S.W.2d 397, 399 (Tex. 1973).

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS

> immobilizes the mortgage lien while transfers of the promissory notes and servicing rights continue to occur. (citation omitted).[21]

78. Acting only in its capacity as a "nominee" of the lender, MERS has no rights which qualify it to assert that it is a beneficiary of a deed of trust. But unless MERS identifies itself as a "beneficiary," MERS will not be denominated as a "grantee" in the deed records. And unless MERS is identified as a "grantee" in the deeds records, the MERS System does not work because the protections of the recording statutes are not extended to MERS. For MERS the solution was simple – ignore the law and identify itself as a "beneficiary" of an instrument in which it holds no beneficial interest. In that way, county clerks, including the Dallas County Clerk, would identify MERS as a "grantee" in the deed records and MERS and its associates could take advantage of the recording system.

79. As demonstrated by the criminal and civil penalties for filing false or deceptive real estate liens, Texas public policy favors a reliable functioning public recordation system to avoid destructive breaks in title, confusion as to true identity of the holder of a note, fraudulent foreclosures, and uncertainty as to title when a home is sold. The MERS System has all but collapsed this system throughout the U.S., including Dallas County, Texas.[22]

---

[21] *Mortgage Electronic Registration Systems, Inc. Nebraska Dept. of Bnkng and Fin.*, 704 N.W.2d 784 (Neb. 2005), Brief of Appellant at 11-12 (emphasis added).

[22] To understand the scale and seriousness of the institutional failures MERS and MERSCORP and the role of these entities in creating a morass of the recordation systems in the U.S., one needs look no further than the disaster MERS has made of the foreclosure process in the U.S. On April 12, 2011, MERSCORP and MERS entered into a *Consent Order* with several federal agencies. According to the findings contained in the *Consent Order*, MERS and MERSCORP "a) have failed to exercise appropriate oversight, management supervision and corporate governance, and have failed to devote adequate financial, staffing, training, and legal resources to ensure proper administration and delivery of services to Examined Members; (b) have failed to establish and maintain adequate internal controls, policies, and procedures, compliance risk management, and internal audit and reporting requirements with respect to the administration and delivery of services to Examined Members" and, that "MERS and MERSCORP engaged in unsafe or unsound practices that expose[d] them and Examined Members to unacceptable operational, compliance, legal, and reputational risks." *Consent Order*, April 12, 2011, OCC No. AA-EC-11-20; Board of Governors Docket Nos. 11-051-B-SC-1 and 11-051-B-SC-2; FDIC-11-194b; OTS No. 11-040; FHFA No. EAP-11-01 at 4-5.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

## F. Other Conduct of Defendants

80. **BOA:** Defendant BOA's actionable conduct related to MERS and the other activities made the basis of this action included, but was and is not limited to, originating loans secured by deeds of trust recorded in Dallas County, Texas listing MERS as "mortgagee" or "beneficiary" and which BOA knew or should have known would result in the Dallas County Clerk's Office improperly listing MERS each as "grantee" in the deed records index. The denomination of MERS as "mortgagee" or beneficiary" or "grantee" is false. Upon information and belief, many of the notes and mortgages securing such notes, or the servicing rights thereto, have been sold, assigned, or transferred without notice of such sales, assignments, or transfers being recorded in the deed records of Dallas County, Texas.

81. In addition to BOA's direct liability for its conduct alleged herein, Plaintiff seeks a determination of the court that it is appropriate to pierce the MERSCORP and MERS corporate veils in this instance and hold BOA as a shareholder of MERSCORP liable for the conduct of MERSCORP and its subsidiary, MERS.

82. Recognizing the corporate existence of MERSCORP and MERS separate from their shareholders, including BOA, would bring about an inequitable result or injustice, or would be a cloak for fraud or illegality. MERSCORP and MERS were undercapitalized in light of the nature and risk of their business. The corporate fiction is being used to justify wrongs; as a means of perpetrating fraud; as a mere tool or business conduit for others; as a means of evading existing legal obligations; to perpetrate monopoly and unlawfully gain monopolistic control over the real property recording system in the State of Texas; and to circumvent statutory obligations.

---

In response to the hundreds of cases filed nationwide against MERSCORP and MERS for wrongful foreclosure, MERSCORP and MERS recently promulgated new policies that include the mandate that "[n]o foreclosure proceeding may be initiated, and no Proof of Claim or Motion for Relief from Stay (Legal Proceedings) in a bankruptcy may be filed, in the name of Mortgage Electronic Registration Systems, Inc. (MERS)."

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

83. **ASPIRE:** Defendant Aspire's actionable conduct related to MERS and the other activities made the basis of this action included, but was and is not limited to, originating loans secured by deeds of trust recorded in Dallas County, Texas listing MERS as "mortgagee" or "beneficiary" and which Aspire knew or should have known would result in the Dallas County Clerk's Office improperly listing MERS each as "grantee" in the deed records index. The denomination of MERS as "mortgagee" or beneficiary" or "grantee" is false. Upon information and belief, many of the notes and mortgages securing such notes, or the servicing rights thereto, have been sold, assigned, or transferred without notice of such sales, assignments, or transfers being recorded in the deed records of Dallas County, Texas.

84. **STEWART TITLE:** Defendant Stewart Title's actionable conduct related to MERS and the other activities made the basis of this action included, but was and is not limited to, directing the preparation and filing of thousands of deeds of trust in the deed records of Dallas County, Texas listing MERS as "mortgagee" or "beneficiary" and which Stewart Title knew or should have known would result in the Dallas County Clerk's Office improperly listing MERS each as "grantee" in the deed records index. The denomination of MERS as "mortgagee" or beneficiary" or "grantee" is false. Upon information and belief, many of the notes and mortgages securing such notes have been sold, assigned, or transferred without notice of such sales, assignments, or transfers being recorded in the deed records of Dallas County, Texas.

85. Stewart Title also marketed MERS through Stewart Title's established sales and marketing forces thereby encouraging others to utilize the defective MERS System.

86. **STEWART:** Stewart is a Texas-based title insurance underwriter. It is relatively unique within the industry in that it only insures title risks, and does not generally conduct title examinations or perform closing-related services such as document preparation and acting as an

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

escrow agent. Instead, Stewart contracts with independent and affiliated agents for these functions, including Stewart Title.[23]

87. Plaintiff seeks a determination of the court that it is appropriate to pierce the MERSCORP and MERS corporate veils in this instance and hold Stewart as a shareholder of MERSCORP liable for the conduct of MERSCORP and its subsidiary, MERS.

88. Recognizing the corporate existence of MERSCORP and MERS separate from their shareholders, including Stewart, would bring about an inequitable result or injustice, or would be a cloak for fraud or illegality. MERSCORP and MERS were undercapitalized in light of the nature and risk of their business. The corporate fiction is being used to justify wrongs; as a means of perpetrating fraud; as a mere tool or business conduit for others; as a means of evading existing legal obligations; to perpetrate monopoly and unlawfully gain monopolistic control over the real property recording system in the State of Texas; and to circumvent statutory obligations.

## VI. CAUSES OF ACTION

### A. Violation of § 12.002 of the Texas Civil Practice & Remedies Code – All Defendants

89. Section 12.002 of the Texas Civil Practice & Remedies Code ("CPRC") provides, in part:

> (a) A person may not make, present, or use a document or other record with:
>
> (1) knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property;
>
> (2) intent that the document or other record be given the same legal effect as a court record or document

---

[23] Stewart is the successor-in-interest of Stewart Title North Texas, Inc. which merged into Stewart on or about October 1, 2008.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

of a court created by or established under the constitution or laws of this state or the United States or another entity listed in Section 37.01, Penal Code, evidencing a valid lien or claim against real or personal property or an interest in real or personal property; and

(3) intent to cause another person to suffer:

(B) financial injury . . . .

(b) A person who violates Subsection (a) or (a-1) is liable to each injured person for:

(1) the greater of:

(A) $10,000; or

(B) the actual damages caused by the violation;

(2) court costs;

(3) reasonable attorney's fees; and

(4) exemplary damages in an amount determined by the court.

90. By their conduct set forth above Defendants violated section 12.002 of the CPRC for which Plaintiff seeks judgment against Defendants, jointly and severally, in the amount of $10,000 per violation, together with attorney's fees, court costs, and exemplary damages in an amount determined by the court.

**B. <u>Unjust Enrichment – MERSCORP, MERS, BOA, and STEWART</u>**

91. MERSCORP and MERS have been unjustly enriched by their conduct described above by their receipt of fees charged to MERS members for MERS to track mortgage loan and mortgage transfers which would otherwise have been recorded in the deed records of Dallas County, Texas. BOA and Stewart are liable to Dallas County, Texas for these damages alleged

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

herein as shareholders in MERSCORP and/or MERS under a theory of alter-ego or otherwise piercing the corporate veil of MERSCORP and/or MERS.

92. Damages to Dallas County, Texas have been proximately caused by the conduct of Defendants described herein as measured by the filing fees that would have been received by Dallas County, Texas had all of the transfers described herein been recorded[24] or, in the alternative as to MERS and MERSCORP, as measured by the fees received by MERSCORP and MERS for tracking the mortgage loans and mortgages tracked by MERS but not recorded in the deed records of Dallas County, Texas, for which damages Dallas County, Texas seeks judgment of the Court.

C. **Unjust Enrichment – BOA and Aspire**

93. Defendants BOA and Aspire have been unjustly enriched by avoiding the filing fees associated with recordation of transfers that would otherwise have been recorded, but for their participation in the MERS System.

94. Damages to Dallas County, Texas have been proximately caused by the conduct of BOA and Aspire described herein as measured by the filing fees that would have been received by Dallas County, Texas had all of the transfers described herein and in which BOA or Aspire participated, been recorded rather than tracked exclusively on the MERS database, for which damages Dallas County, Texas seeks judgment of the court.

**D. Negligent Misrepresentation – All Defendants**

95. Defendants negligently misrepresented the true beneficial owner of notes and related mortgages filed by them in Dallas County, Texas for the purpose of avoiding the recordation of subsequent transfers and payment of attendant filing fees.

[24] At the time of origination, MERS asserts that it is the beneficiary of the mortgage. When it comes time to transfer the loan into a securitization trust, MERS asserts that the lender owns the mortgage.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

96. The negligence of Defendants set forth herein was a proximate cause of damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.

E. **Grossly Negligent Misrepresentation – All Defendants**

97. Defendants were grossly negligent in misrepresenting the true beneficial owner of notes and related mortgages filed by them in Dallas County, Texas for the purpose of avoiding the recordation of subsequent transfers and payment of attendant filing fees.

98. The gross negligence of Defendants set forth herein was a proximate cause of damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.

F. **Negligent Undertaking – All Defendants**

99. Defendants negligently undertook the misconduct alleged herein and to file false and deceptive records in the deed records of Dallas County, Texas.

100. The negligent undertaking of Defendants set forth herein was a proximate cause of damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.

G. **Grossly Negligent Undertaking – All Defendants**

101. Defendants were grossly negligent in undertaking the misconduct alleged herein and the filing of false and deceptive records in the deed records of Dallas County, Texas.

102. The grossly negligent undertaking of Defendants set forth herein was a proximate cause of damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.

H. **Fraudulent Misrepresentation – All Defendants**

103. Defendants fraudulently misrepresented the true beneficial owner of notes and related mortgages filed by them in Dallas County, Texas for the purpose of avoiding the recordation of subsequent transfers and payment of attendant filing fees.

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

104. The fraudulent misrepresentation of Defendants as set forth herein was a proximate cause of damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.

**I. Declaratory Judgment**

105. Dallas County hereby seeks a judicial declaration that the filing of deeds of trust identifying MERS as a "mortgagee" or "beneficiary" under the deed of trust, when in fact MERS has no beneficial interest in the note secured by such deed of trust, constitutes a violation of section 51.901 of the Texas Government Code.

106. To be clear, Dallas County does not assert that any such deed of trust is ineffective in establishing a security interest in the subject property in favor of the lender or any other person properly identified as a "mortgagee" or "beneficiary."

**J. Request for Injunctive Relief**

107. Plaintiff seeks an order of the Court permanently enjoining Defendants from filing any instruments in the deed records of Dallas County, Texas identifying MERS or any other person or entity as a "mortgagee" or "beneficiary" of any mortgage in which such person or entity does not have a beneficial interest or other legally sufficient interest.

108. Plaintiff further seeks an order of this court requiring Defendants, jointly and severally, to correct the false and deceptive filings described herein by causing the recordation of corrective instruments setting forth the entire chain of title for each instrument described herein.

**K. Exemplary Damages – All Defendants**

109. The conduct of each Defendant as set forth herein constituted fraud, malice, or gross negligence such that each Defendant is liable for exemplary damages for which Plaintiff seeks judgment of the Court.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

## VII.
## CONSPIRACY

110. Defendants MERSCORP, MERS, BOA, Stewart, and Stewart Title conspired together in the actionable conduct alleged herein so as to make each of MERSCORP, MERS, BOA, Stewart, and Stewart Title liable for all damages suffered by Dallas County, Texas. The conspiracy included these Defendants establishing an object to be accomplished; a meeting of minds on the object or course of action; one or more unlawful, overt acts; and damages to Dallas County, Texas as the proximate result. As a result, Dallas County, Texas seeks damages against these Defendants jointly and severally.

## VIII.
## REQUESTS FOR DISCLOSURE

111. Plaintiff requests that Defendants disclose within 30 days of service of this request the information or material described in Rule 194.2(a)-(l) of the Texas Rules of Civil Procedure.

## IX.
## NO FEDERAL QUESTIONS

112. Dallas County, Texas expressly affirms that no federal questions, claims, or causes of action are asserted against any defendant.

## X.
## JURY DEMAND

113. Plaintiff requests trial by jury.

## XI.
## PRAYER

114. Wherefore, premises considered, Plaintiff requests that Defendants be cited to appear and answer herein and, upon trial of this matter, Plaintiff be awarded damages as set forth above, costs of bringing this action, including all court costs, attorney's fees, and related

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

expenses of bringing the action (including investigative expenses), pre- and post-judgment interest at the highest rate allowed by law, and for such other and further relief, in law and in equity, to which Plaintiff may show itself justly entitled.

115. Plaintiff further seeks an order of this court requiring Defendants, jointly and severally, to correct the false and deceptive filings described herein by causing the recordation of corrective instruments setting forth the entire chain of title for each instrument described herein.

## XII.
## DESIGNATION OF LEAD COUNSEL

116. Pursuant to Rule 8 of the Texas Rules of Civil Procedure, Plaintiff Dallas County, Texas designates Stephen F. Malouf as Attorney in Charge for Plaintiff. Mr. Malouf will work under the direct supervision of District Attorney Craig Watkins.

Respectfully Submitted,

**DALLAS COUNTY DISTRICT ATTORNEY**
Craig Watkins
SBN 00791886
Gordon R. Hikel
Chief, Civil Division
SBN 00787696
Frank Crowley Courts Building
133 N. Industrial Blvd., LB19
Dallas, Texas 75207-4399
214-653-3600 (Telephone)
214-653-5774 (Facsimile)

**MALOUF & NOCKELS LLP**
Stephen F. Malouf
SBN 12888100
Jonathan Nockels
SBN 24056047
Sarah Shulkin
SBN 24057720
3811 Turtle Creek Blvd., Suite 800
Dallas, Texas 75219
214-969-7373 (Telephone)
214-969-7648 (Facsimile)

**BARON & BLUE**
Lisa Blue
SBN 02510500
3811 Turtle Creek Blvd., Suite 800
Dallas, Texas 75219
214-969-7373 (Telephone)
214-969-7648 (Facsimile)

Barbara Radnofsky
SBN 16457000
303 Timber Terrace Rd.
Houston Texas 77024
713- 858-8509 (Telephone)

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

**THE LAW OFFICES OF TERRI MOORE**
Terri Moore
SBN 14377780
1407 Texas St., Suite 102
Ft Worth, Texas 76102
(817) 817-877-4700

**KAESKE LAW FIRM**
Mike Kaeske
SBN 00794061
1301 W. 25th St., Suite 406
Austin, TX 78705
512-366-7300 (Telephone)
512-366-7767 (Facsimile)

Mark White
SBN 21318000
72 E. Briar Oaks Dr.
Houston, Texas 77056
713-906-6848 (Telephone)

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

# MALOUF & NOCKELS LLP

Turtle Creek Centre
3811 Turtle Creek Blvd., Suite 800
Dallas, Texas 75219
Telephone: (214) 969-7373
Telecopier: (214) 969-7648
www.smalouf.com

September 20, 2011

FILED
2011 SEP 20 PM 4:24
JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

**Via Hand Delivery**
Mr. John F. Warren
Dallas County Clerk
Records Building, 2nd Floor
509 Main Street, Suite 200
Dallas, Texas 75202-3551

Re: Original Petition Filing;
*Dallas County, Texas v. MERSCorp, Inc.; Mortgage Electronic Registration Systems, Inc.; Stewart Title Guaranty Company; Stewart Title Company; Bank of America, National Association; and Aspire Financial, Inc. d/b/a Texaslending.com*

Dear Mr. Warren:

Enclosed please find the original and seven copies of Plaintiff's Original Petition, Jury Demand, and Requests for Disclosure. Please file the original with the appropriate court, returning a file-marked copy to the waiting courier. Additionally enclosed is this firm's check in the amount of $303.00 for the filing fee and the issuance of citation upon Defendants, as listed in paragraph 1 of the petition.

Please call me once the citation has been issued for pick up by private process.

Thank you for your kind assistance in this matter. Please call me should you have any questions or concerns.

Sincerely,

Jenny McKenzie, Paralegal

:jm

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

# CIVIL CASE INFORMATION SHEET

CAUSE NUMBER (FOR CLERK USE ONLY): CC-11-06571-E COURT (FOR CLERK USE ONLY): 5

STYLED ______________________
(e.g., John Smith v. All American Insurance Co; In re Mary Ann Jones; In the Matter of the Estate of George Jackson)

A civil case information sheet must be completed and submitted when an original petition or application is filed to initiate a new civil, family law, probate, or mental health case or when a post-judgment petition for modification or motion for enforcement is filed in a family law case. The information should be the best available at the time of filing. This sheet, approved by the Texas Judicial Council, is intended to collect information that will be used for statistical purposes only. It neither replaces nor supplements the filings or service of pleading or other documents as required by law or rule. The sheet does not constitute a discovery request, response, or supplementation, and it is not admissible at trial.

**1. Contact information for person completing case information sheet:**

Name: CRAIG WATKINS
Email: CRwatkins@ Dallas County.org
Address: 133 N. Riverside
Telephone: 217-653-3606
City/State/Zip: Dallas, Tx.
Fax: 00791886
Signature: [signature]
State Bar No:

**Names of parties in case:**

Plaintiff(s)/Petitioner(s): Dallas County

Defendant(s)/Respondent(s): MERSCORP INC. / Bank America / Stewart Title

[Attach additional page as necessary to list all parties]

**Person or entity completing sheet is:**
- [X] Attorney for Plaintiff/Petitioner
- [ ] *Pro Se* Plaintiff/Petitioner
- [ ] Title IV-D Agency
- [ ] Other: ______

Additional Parties in Child Support Case:
Custodial Parent:
Non-Custodial Parent:
Presumed Father:

**2. Indicate case type, or identify the most important issue in the case *(select only 1)*:**

***Civil***

**Contract**
*Debt/Contract*
- [ ] Consumer/DTPA
- [ ] Debt/Contract
- [ ] Fraud/Misrepresentation
- [ ] Other Debt/Contract:

*Foreclosure*
- [ ] Home Equity—Expedited
- [ ] Other Foreclosure
- [ ] Franchise
- [ ] Insurance
- [ ] Landlord/Tenant
- [ ] Non-Competition
- [ ] Partnership
- [ ] Other Contract:

**Injury or Damage**
- [ ] Assault/Battery
- [ ] Construction
- [ ] Defamation

*Malpractice*
- [ ] Accounting
- [ ] Legal
- [ ] Medical
- [ ] Other Professional Liability:
- [ ] Motor Vehicle Accident
- [ ] Premises

*Product Liability*
- [ ] Asbestos/Silica
- [ ] Other Product Liability List Product:
- [ ] Other Injury or Damage:

**Real Property**
- [ ] Eminent Domain/ Condemnation
- [ ] Partition
- [ ] Quiet Title
- [ ] Trespass to Try Title
- [X] Other Property:

**Related to Criminal Matters**
- [ ] Expunction
- [ ] Judgment Nisi
- [ ] Non-Disclosure
- [ ] Seizure/Forfeiture
- [ ] Writ of Habeas Corpus—Pre-indictment
- [ ] Other:

**Employment**
- [ ] Discrimination
- [ ] Retaliation
- [ ] Termination
- [ ] Workers' Compensation
- [ ] Other Employment:

**Other Civil**
- [ ] Administrative Appeal
- [ ] Antitrust/Unfair Competition
- [ ] Code Violations
- [ ] Foreign Judgment
- [ ] Intellectual Property
- [ ] Lawyer Discipline
- [ ] Perpetuate Testimony
- [ ] Securities/Stock
- [ ] Tortious Interference
- [ ] Other:

***Family Law***

**Marriage Relationship**
- [ ] Annulment
- [ ] Declare Marriage Void

*Divorce*
- [ ] With Children
- [ ] No Children

**Post-judgment Actions (non-Title IV-D)**
- [ ] Enforcement
- [ ] Modification—Custody
- [ ] Modification—Other

**Title IV-D**
- [ ] Enforcement/Modification
- [ ] Paternity
- [ ] Reciprocals (UIFSA)
- [ ] Support Order

**Other Family Law**
- [ ] Enforce Foreign Judgment
- [ ] Habeas Corpus
- [ ] Name Change
- [ ] Protective Order
- [ ] Removal of Disabilities of Minority
- [ ] Other:

**Parent-Child Relationship**
- [ ] Adoption/Adoption with Termination
- [ ] Child Protection
- [ ] Child Support
- [ ] Custody or Visitation
- [ ] Gestational Parenting
- [ ] Grandparent Access
- [ ] Parentage/Paternity
- [ ] Termination of Parental Rights
- [ ] Other Parent-Child:

**Tax**
- [ ] Tax Appraisal
- [ ] Tax Delinquency
- [ ] Other Tax

***Probate & Mental Health***

*Probate/Wills/Intestate Administration*
- [ ] Dependent Administration
- [ ] Independent Administration
- [ ] Other Estate Proceedings
- [ ] Guardianship—Adult
- [ ] Guardianship—Minor
- [ ] Mental Health
- [ ] Other:

FILED 2011 SEP 20 AM 8:53 JOHN F. WARREN COUNTY CLERK DALLAS COUNTY

**3. Indicate procedure or remedy, if applicable *(may select more than 1)*:**
- [ ] Appeal from Municipal or Justice Court
- [ ] Arbitration-related
- [ ] Attachment
- [ ] Bill of Review
- [ ] Certiorari
- [ ] Class Action
- [ ] Declaratory Judgment
- [ ] Garnishment
- [ ] Interpleader
- [ ] License
- [ ] Mandamus
- [ ] Post-judgment
- [ ] Prejudgment Remedy
- [ ] Protective Order
- [ ] Receiver
- [ ] Sequestration
- [ ] Temporary Restraining Order/Injunction
- [ ] Turnover

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE



THE COUNTY OF DALLAS
STATE OF TEXAS

**JUDGE MARK GREENBERG**
**COUNTY COURT AT LAW NO. 5**
**GEORGE L ALLEN, SR. COURTS BUILDING**
**600 COMMERCE STREET, 5th FLOOR**
**DALLAS, TEXAS 75202-5792**
**214-653-6503**

Chambers of Mark Greenberg

September 22, 2011

CRAIG WATKINS
2535 M L K DRIVE
DALLAS TX 75215

Re: Cause No CC-11-06571-E

Cause Style: DALLAS COUNTY, TEXAS vs. MERSCORP, BILL BECKMANN, MALCOM S MORRIS.et al

Dear Attorney:

The above case is set for dismissal, pursuant to Rule 165A, Texas Rule of Civil Procedure, on: January 30, 2012 **at 9:00 a.m.**

If no answer has been filed, or if the answer filed is insufficient as a matter of law to place any of the facts alleged in your petition in issue, you will be expected to have moved for, and to have had heard, a summary judgment or to have proved up a default judgment on or prior to that date. Your failure to have done so will result in the dismissal of the case on the above date.

If an answer has been filed that is sufficient to create a fact issue that prevents disposition of the entire case, or if you have been unable to obtain service of process, you should plan to notify the court to obtain a reset of the dismissal date or a trial setting as appropriate.

In no event will live witnesses be required unless the default prove-up is for an un-liquidated claim. Liquidated claims and attorneys fees may be proved up by affidavit with a form of judgment.

If you should have any questions, please feel free to call us.

Very Truly Yours,

Judge Mark Greenberg
County Court at Law No. 5
Dallas County, Texas

*IF A *JURY DEMAND* IS REQUESTED, IT MUST BE MADE IN WRITING AND SUBMITED WITH **$57.OO** FOR THE JURY AND BAILIFF FEES TO: MR. JOHN WARREN, DALLAS COUNTY CLERK, 600 COMMERCE, #101, DALLAS, TEXAS 75202*

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE



**JUDGE MARK GREENBERG**
**COUNTY COURT AT LAW NO. 5**
**GEORGE L ALLEN, SR. COURTS BUILDING**
**600 COMMERCE STREET, 5th FLOOR**
**DALLAS, TEXAS 75202-5792**
**214-653-6503**

Chambers of Mark Greenberg

September 22, 2011

STEPHEN F MALOUF
TURTLE CREEK CENTRE
3811 TURTLE CREEK BLVD
SUITE 800
DALLAS TX 75219

Re: Cause No CC-11-06571-E

Cause Style: DALLAS COUNTY, TEXAS vs. MERSCORP, BILL BECKMANN, MALCOM S MORRIS.et al

Dear Attorney:

The above case is set for dismissal, pursuant to Rule 165A, Texas Rule of Civil Procedure, on: January 30, 2012 **at 9:00 a.m.**

If no answer has been filed, or if the answer filed is insufficient as a matter of law to place any of the facts alleged in your petition in issue, you will be expected to have moved for, and to have had heard, a summary judgment or to have proved up a default judgment on or prior to that date. Your failure to have done so will result in the dismissal of the case on the above date.

If an answer has been filed that is sufficient to create a fact issue that prevents disposition of the entire case, or if you have been unable to obtain service of process, you should plan to notify the court to obtain a reset of the dismissal date or a trial setting as appropriate.

In no event will live witnesses be required unless the default prove-up is for an un-liquidated claim. Liquidated claims and attorneys fees may be proved up by affidavit with a form of judgment.

If you should have any questions, please feel free to call us.

Very Truly Yours,

Judge Mark Greenberg
County Court at Law No. 5
Dallas County, Texas

*IF A *JURY DEMAND* IS REQUESTED, IT MUST BE MADE IN WRITING AND SUBMITED WITH **$57.OO** FOR THE JURY AND BAILIFF FEES TO: MR. JOHN WARREN, DALLAS COUNTY CLERK, 600 COMMERCE, #101, DALLAS, TEXAS 75202*

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

ATTORNEY

2011 SEP 29 AM 11:13
COUNTY CLERK
DALLAS COUNTY, TEXAS

# CITATION

**Cause #: CC-11-06571-E**

The State of Texas
County Court at Law No. 5
Dallas County, Texas

**SERVE:**

**MERSCORP**
**C/O ITS REGISTERED AGENT**
**CT CORPORATION SYSTEM**
**350 N. ST. PAUL ST., SUITE 2900**
**DALLAS, TX. 75201-4234**

**PLAINTIFF(S) ATTORNEY:**
**STEPHEN F MALOUF**

**TURTLE CREEK CENTRE**
**3811 TURTLE CREEK BLVD**
**SUITE 800**
**DALLAS TX 75219**
**214-969-7373**

"You have been sued. You may employ an attorney. If you or your attorney do not file a WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and ORIGINAL Petition, a default judgment may be taken against you." Your answer should be addressed to the clerk of County Court at Law No. 5 of Dallas County, Texas, at the George Allen Courts Building of said County 600 Commerce Street, Suite 101, Dallas, Texas 75202.

*Plaintiff(s),*
**DALLAS COUNTY, TEXAS**
**vs.**
**MERSCORP, BILL BECKMANN, MALCOM S MORRIS.et al**
*Defendant(s)*

filed in said Court on the 20th day of September, 2011 a copy of which accompanies this citation.

**WITNESS: JOHN F. WARREN**, Clerk of the County Courts of Dallas County, Texas. **GIVEN UNDER MY HAND AND SEAL OF OFFICE**, at Dallas, Texas, and issued this 21st day of September, 2011 A.D.

JOHN F. WARREN
Dallas County Clerk

A. Espinoza
Alina Espinoza, Deputy

## OFFICER'S RETURN

Came to hand on the 21 day of September A.D., 2011, at 1:00 o'clock P. M. and executed by delivering to

______________________________________________

(Name, Address where served including: City, State and Zip) on the 22 day of September A.D., 2011, at 10:40 o'clock A. M., the within named Defendant, in person, a true copy of this Citation, together with a copy of the ORIGINAL Petition with date of service marked thereon.

______________________ County, Texas

Lamont Aldridge 214500-4639
~~Deputy~~ Process Server SCH3920

(Must be verified if served outside the State of Texas, or if served in Texas by anyone other than a Sheriff or Constable.)

______________________________________________

Signed and sworn to by the said ______________________ before me this _____ day of ______________ ,20_____ , to certify which witness my hand and seal of office.

______________________________________________

Notary Public ______________ County ______________

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

Cause No. ______________

FILED

2011 SEP 20 PM 4:29

JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

| | |
|---|---|
| DALLAS COUNTY, TEXAS,<br><br>PLAINTIFF,<br><br>VS.<br><br>MERSCORP, INC.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; STEWART TITLE GUARANTY COMPANY; STEWART TITLE COMPANY; BANK OF AMERICA, NATIONAL ASSOCIATION; AND ASPIRE FINANCIAL, INC. D/B/A TEXASLENDING.COM,<br><br>DEFENDANTS. | IN COUNTY COURT AT LAW NO. ______<br><br>DALLAS COUNTY, TEXAS |

**PLAINTIFF'S ORIGINAL PETITION, JURY DEMAND, AND REQUESTS FOR DISCLOSURE**

TO THE HONORABLE JUDGE OF THE COURT:

COMES NOW Dallas County, Texas complaining of MERSCORP, INC.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; STEWART TITLE GUARANTY COMPANY; STEWART TITLE COMPANY; BANK OF AMERICA, NATIONAL ASSOCIATION; AND ASPIRE FINANCIAL, N.A., D/B/A TEXASLENDING.COM ("Defendants") and would show the Court as follows:

## I. PARTIES

1. The Plaintiff in this action is Dallas County, Texas ("Dallas County, Texas" or "Plaintiff").

2. Defendant MERSCORP, INC. ("MERSCORP") is a Delaware corporation that may be served with citation by serving its registered agent in Texas by certified mail, return receipt requested, addressed to:

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

MERSCORP
C/o Its Registered Agent
CT Corporation System
350 N. St. Paul Street
Suite 2900
Dallas, Texas 75201-4234

At all times material hereto Defendant MERSCORP has engaged in business in Dallas County, Texas or committed a tort, in whole or in part, in Dallas County, Texas and the claims made herein arise out of such activities in Dallas County, Texas.

3. Defendant MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. ("MERS") is a Delaware corporation and wholly-owned subsidiary of Defendant MERSCORP. MERS engages in business in Dallas County, Texas but does not maintain a regular place of business in this state or a designated agent for service of process for proceedings that arise out of MERS' business done in this state. MERS may therefore be served with citation by certified mail, return receipt requested, addressed to:

Bill Beckmann
President and Chief Executive Officer
Mortgage Electronic Registration Systems, Inc.
1818 Library Street, Suite 300
Reston, Virginia 20190

At all times material hereto Defendant MERS has engaged in business in Dallas County, Texas or committed a tort, in whole or in part, in Dallas County, Texas and the claims made herein arise out of such activities in Dallas County, Texas.

4. Defendant STEWART TITLE GUARANTY COMPANY ("Stewart") is a Texas corporation with its principal place of business in Houston, Harris County, Texas. Stewart may be served with citation by serving its Chairman and Chief Executive Officer by certified mail, return receipt requested, addressed to:

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

Malcolm S. Morris
Chairman and Chief Executive Officer
Stewart Title Guaranty Company
1980 Post Oak Boulevard
Suite 800
Houston, Texas 77252 -2029

Upon information and belief, Stewart was at all times material hereto and currently is a shareholder in MERSCORP, an affiliate of Defendant Stewart Title Company, and a subsidiary of Stewart Information Services Corporation.

5. Defendant STEWART TITLE COMPANY ("Stewart Title") is a Texas corporation with its principal place of business in Houston, Harris County, Texas. Stewart may be served with citation by serving its registered agent by certified mail, return receipt requested, addressed to:

STEWART TITLE COMPANY
C/o Its Registered Agent
CT Corporation System
350 N. St. Paul Street
Suite 2900
Dallas, Texas 75201-4234

Upon information and belief, Stewart Title was at all times material hereto and currently is an affiliate of Stewart and a subsidiary of Stewart Information Services Corporation.

6. Defendant BANK OF AMERICA, NATIONAL ASSOCIATION ("BOA") is a Delaware corporation that may be served with citation by serving its registered agent in Texas by certified mail, return receipt requested, addressed to:

BANK OF AMERICA, NATIONAL ASSOCIATION
C/o Its Registered Agent
CT Corporation System
350 N. St. Paul Street
Suite 2900
Dallas, Texas 75201-4234

COUNTY CLERK'S OFFICE

At all times material hereto BOA has engaged in business in Dallas County, Texas or committed a tort, in whole or in part, in Dallas County, Texas; and the claims made herein arise out of such activities in Dallas County, Texas. Upon information and belief, BOA was at all times material hereto and currently is a shareholder in MERSCORP.

7. Defendant ASPIRE FINANCIAL, INC. d/b/a TEXASLENDING.COM ("Aspire") is a Texas corporation with its principal place of business located at 4100 Alpha Road Suite 400 Dallas, Dallas County, Texas 75244. Aspire may be served with citation by serving its registered agent by certified mail, return receipt requested, addressed to:

Kevin C. Miller
President, Aspire Financial, Inc.
4100 Alpha Road
Suite 400
Dallas, Texas 75244

## II.
## JURISDICTION AND VENUE

8. Jurisdiction herein is based upon section 24.007 of the Texas Government Code; Article V, Section 8, of the Texas Constitution; and section 12.004 of the Texas Civil Practice & Remedies Code.

9. Venue herein is based upon sections 15.002(a)(1)-(2) and 15.005 of the Texas Civil Practice & Remedies Code.

## III.
## AGENCY AND CORPORATE VEIL/ALTER-EGO

10. At all times material hereto, each Defendant was acting by and through its actual, apparent, ostensible, or by estoppel agents and/or employees.

11. Plaintiff moves the Court pierce the MERSCORP and MERS corporate veils and impose liability upon Defendants Stewart and BOA as shareholders in MERSCORP for the activities of MERSCORP and MERS alleged herein. Recognizing the corporate existence of

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

# TEXAS SECRETARY of STATE
# HOPE ANDRADE

UCC | Business Organizations | Trademarks | Notary | Account | Help/Fees | Briefcase | Logout

**FIND GLOBAL NAME SEARCH**

This search was performed on with the following search parameter:
**ENTITY NAME :** merscorp

| Mark | Filing Number | Name | Entity Type | Entity Status | Name Type | Name Status |
|---|---|---|---|---|---|---|
| ○ | 12822206 | MERSCORP, INC. | Foreign For-Profit Corporation | Withdrawn | Legal | Inactive |
| ○ | 800954544 | MERSCORP, Inc. | Foreign For-Profit Corporation | Withdrawn | Legal | Inactive |

---

Instructions:

- To view additional information pertaining to a particular filing select the number associated with the name.
- To place an order for additional information about a filing select the radial button listed under 'Mark' that is associated with the entity and press the 'Order' button.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

# TEXAS SECRETARY of STATE
# HOPE ANDRADE

**BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY**

| | | | |
|---|---|---|---|
| **Filing Number:** | 12822206 | **Entity Type:** | Foreign For-Profit Corporation |
| **Original Date of Filing:** | August 20, 1999 | **Entity Status:** | Withdrawn |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 15219483961 | **FEIN:** | |

| | |
|---|---|
| **Name:** | MERSCORP, INC. |
| **Address:** | 1595 SPRINGHILL ROAD SUITE 310<br>Vienna, VA 22182 USA |
| **Fictitious Name:** | N/A |
| **Jurisdiction:** | DE, USA |
| **Foreign Formation Date:** | N/A |

REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES

| Name | Address | Inactive Date |
|---|---|---|
| Serve Secretary of State for mailing to | P. O. Box 2026<br>Flint, MI 48501-2026 USA | |

Order | Return to Search

Instructions:

- To place an order for additional information about a filing press the 'Order' button.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE



# TEXAS SECRETARY of STATE
# HOPE ANDRADE

UCC | Business Organizations | Trademarks | Notary | Account | Help/Fees | Briefcase | Logout

**BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY**

| | | | |
|---|---|---|---|
| **Filing Number:** | 800954544 | **Entity Type:** | Foreign For-Profit Corporation |
| **Original Date of Filing:** | March 20, 2008 | **Entity Status:** | Withdrawn |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 15219483961 | **FEIN:** | 521948396 |

| | |
|---|---|
| **Name:** | MERSCORP, Inc. |
| **Address:** | 1595 Spring Hill Road, Suite 310<br>Vienna, VA 22182 USA |
| **Fictitious Name:** | N/A |
| **Jurisdiction:** | DE, USA |
| **Foreign Formation Date:** | June 30, 1998 |

REGISTERED AGENT | FILING HISTORY | NAMES | MANAGEMENT | ASSUMED NAMES | ASSOCIATED ENTITIES

| Name | Address | Inactive Date |
|---|---|---|
| Serve Secretary of State for mailing to | 1818 Library Street, Suite 300<br>Reston, VA 20190 USA | |

Order | Return to Search

Instructions:

- To place an order for additional information about a filing press the 'Order' button.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS





CT Corporation

350 North St. Paul Street
Suite 2900
Dallas, TX 75201

214 979 9450 tel
214 754 0921 fax
www.ctcorporation.com

September 26, 2011

Craig Watkins
Dallas County District Attorney
Frank Crowley Courts Building,
133 N Industrial Blvd.,
LB 19
Dallas, TX 75219

Re: Dallas County, Texas, Pltf vs Merscorp, Inc., et al., Dfts.

Case No CC1106571E

Dear Sir/Madam:

We are herewith returning the Citation, Original Petition, Jury Demand and Request for Disclosure which we received regarding the above captioned matter.

MERSCORP, Inc withdrew to do business in the State of TX on 11/10/2010. When an entity withdraws, the designation of the registered agent is revoked. Service can no longer be taken on behalf of this entity

Very truly yours,

Tracie Hollywood
Corporate Operations Specialist - Temp

Log# 519210154

FedEx Tracking# 795227737589

cc: County Court at Law No. 5 Dallas County
Cynthia Calhoun, Clerk,
600 Commerce St.,
Dallas, TX 75202-4606

en

2011 SEP 29 AM 11:19

DALLAS COUNTY, TEXAS
COUNTY CLERK

COUNTY CLERK'S OFFICE

# AFFIDAVIT OF SERVICE

**State of Texas** **County of Dallas** **Law No. 5 Court**

Case Number: CC-11-06571-E

SYC2011000288

Plaintiff:
**Dallas County, Texas**

vs.

Defendant:
**Merscorp, Inc.; Mortgage Electronic Registrations Systems, Inc.; Stewart Title Guaranty Company; Stewart Title Company; Bank of America, National Association; and Aspire Financial, Inc. D/B/A Texaslending.com,**

For:
Sarah Shulkin
Malouf & Nockels LLP
3811 Turtle Creek Blvd., Suite 800
Dallas, TX 75219

Received these papers on the 21st day of September, 2011 at 1:00 pm to be served on **Kevin C Miller, President Aspire Financial Inc, 4100 Alpha Road #400, Dallas, TX 75244**.

I, Lamont Aldridge, being duly sworn, depose and say that on the **24th day of September, 2011** at **11:25 am, I:**

**I SERVED** an **Corporation,** by **Certified Mail/Return Receipt** via United States Postal Service, a true copy of the *Citation and Plaintiff's Original Petition, Jury Demand and Request for Disclosure*, **with the date of mailing endorsed thereon by me, to:Tammy Rutledge,** as a person authorized to accept certified mail on behalf of **Kevin C Miller, President Aspire Financial Inc** located at: **4100 Alpha Road #400, Dallas, TX 75244,** in compliance with state statues.

**Additional Information pertaining to this Service:**
70093410000037424811

I certify that I am over the age of 21 and have no interest in the above action and competent to testify. I am an Authorized Process Server in good standing. I have never been convicted of a felony or misdemeanor involving moral turpitude in any state. I have studied and am familiar with the Texas Rules of Court, Vernon's Civil Statutes, and Texas Rules of Civil Procedure regarding service of process. All statements contained herein based on my personal knowledge are true and correct

Subscribed and Sworn to before me on the 29 day of September 2011 by the affiant who is personally known to me.

NOTARY PUBLIC

**Lamont Aldridge**
Texas Supreme Court ID SCH3970

Our Job Serial Number: SYC-2011000288
Ref: MERS (1666-1)

Copyright © 1992-2011 Database Services, Inc. - Process Server's Toolbox V6.4t



# AFFIDAVIT OF SERVICE

**State of Texas** **County of Dallas** **Law No. 5 Court**

Case Number: CC-11-06571-E

Plaintiff:
**Dallas County, Texas**

vs.

Defendant:
**Merscorp, Inc.; Mortgage Electronic Registrations Systems, Inc.; Stewart Title Guaranty Company; Stewart Title Company; Bank of America, National Association; and Aspire Financial, Inc. D/B/A Texaslending.com,**

For:
Sarah Shulkin
Malouf & Nockels LLP
3811 Turtle Creek Blvd., Suite 800
Dallas, TX 75219

Received these papers on the 21st day of September, 2011 at 1:00 pm to be served on **Bank of America National Association C/O CT Corporation System, 350 N. Saint Paul Street #2900, Dallas, TX 75201**.

I, Lamont Aldridge, being duly sworn, depose and say that on the **26th day of September, 2011** at **9:37 am, I:**

I **SERVED** an **Corporation,** by **Certified Mail/Return Receipt** via United States Postal Service, a true copy of the *Citation and Plaintiff's Original Petition, Jury Demand and Request for Disclosure*, **with the date of mailing endorsed thereon by me, to:Mica Minor,** as a person authorized to accept certified mail on behalf of **Bank of America National Association C/O CT Corporation System** located at: **350 N. Saint Paul Street #2900, Dallas, TX 75201,** in compliance with state statues.

**Additional Information pertaining to this Service:**
70093410000037424804

I certify that I am over the age of 21 and have no interest in the above action and competent to testify. I am an Authorized Process Server in good standing. I have never been convicted of a felony or misdemeanor involving moral turpitude in any state. I have studied and am familiar with the Texas Rules of Court, Vernon's Civil Statutes, and Texas Rules of Civil Procedure regarding service of process. All statements contained herein based on my personal knowledge are true and correct

Subscribed and Sworn to before me on the 27 day of September, 2011 by the affiant who is personally known to me.

Patricia Ann Gryn
NOTARY PUBLIC

Lamont Aldridge
Texas Supreme Court ID SCH3970

Our Job Serial Number: SYC-2011000289
Ref: MERS (1666-1)

Copyright © 1992-2011 Database Services, Inc - Process Server's Toolbox V6 4t



**ATTORNEY**

# CITATION

**Cause #: CC-11-06571-E**

The State of Texas
County Court at Law No. 5
Dallas County, Texas

**SERVE:**

**KEVIN C MILLER**
**PRESIDENT ASPIRE FINANCIAL INC**
**4100 ALPHA RD.**
**SUITE 400**
**DALLAS, TX. 75244**

**PLAINTIFF(S) ATTORNEY:**
**STEPHEN F MALOUF**

**TURTLE CREEK CENTRE**
**3811 TURTLE CREEK BLVD**
**SUITE 800**
**DALLAS TX 75219**
**214-969-7373**

"You have been sued. You may employ an attorney. If you or your attorney do not file a WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and ORIGINAL Petition, a default judgment may be taken against you." Your answer should be addressed to the clerk of County Court at Law No. 5 of Dallas County, Texas, at the George Allen Courts Building of said County 600 Commerce Street, Suite 101, Dallas, Texas 75202.

***Plaintiff(s),***
**DALLAS COUNTY, TEXAS**
**vs.**
**MERSCORP, BILL BECKMANN, MALCOM S MORRIS.et al**
***Defendant(s)***

filed in said Court on the 20th day of September, 2011 a copy of which accompanies this citation.

**WITNESS: JOHN F. WARREN**, Clerk of the County Courts of Dallas County, Texas. **GIVEN UNDER MY HAND AND SEAL OF OFFICE**, at Dallas, Texas, and issued this 21st day of September, 2011 A.D.

JOHN F. WARREN
Dallas County Clerk

A. Espinoza
Alina Espinoza, Deputy

---

## OFFICER'S RETURN

Came to hand on the ____ day of ______________ A.D., 20___, at ___ o'clock ___. M. and executed by delivering to

______________________________________________

(Name, Address where served including: City, State and Zip)
on the ___ day of ___________ A.D., 20___, at _____ o'clock ___. M., the within named Defendant, in person, a true copy of this Citation, together with a copy of the ORIGINAL Petition with date of service marked thereon.

______________________________County, Texas

______________________________
Deputy

(Must be verified if served outside the State of Texas, or if served in Texas by anyone other than a Sheriff or Constable.)

______________________________________________

Signed and sworn to by the said ______________________________ before me this _____ day of ______________ ,20_____ , to certify which witness my hand and seal of office.

______________________________________________

**AFFIDAVIT ATTACHED** Notary Public County ____________



# AFFIDAVIT OF SERVICE

**State of Texas** **County of Dallas** **Law No. 5 Court**

Case Number: CC-11-06571-E

Plaintiff:
**Dallas County, Texas**

vs.

Defendant:
**Merscorp, Inc.; Mortgage Electronic Registrations Systems, Inc.; Stewart Title Guaranty Company; Stewart Title Company; Bank of America, National Association; and Aspire Financial, Inc. D/B/A Texaslending.com,**

For:
Sarah Shulkin
Malouf & Nockels LLP
3811 Turtle Creek Blvd., Suite 800
Dallas, TX 75219

Received these papers on the 21st day of September, 2011 at 1:00 pm to be served on **Bank of America National Association C/O CT Corporation System, 350 N. Saint Paul Street #2900, Dallas, TX 75201**.

I, Lamont Aldridge, being duly sworn, depose and say that on the **26th day of September, 2011** at **9:37 am, I:**

**I SERVED** an **Corporation**, by **Certified Mail/Return Receipt** via United States Postal Service, a true copy of the *Citation and Plaintiff's Original Petition, Jury Demand and Request for Disclosure*, **with the date of mailing endorsed thereon by me, to:Mica Minor,** as a person authorized to accept certified mail on behalf of **Bank of America National Association C/O CT Corporation System** located at: **350 N. Saint Paul Street #2900, Dallas, TX 75201,** in compliance with state statues.

**Additional Information pertaining to this Service:**
70093410000037424804

I certify that I am over the age of 21 and have no interest in the above action and competent to testify. I am an Authorized Process Server in good standing. I have never been convicted of a felony or misdemeanor involving moral turpitude in any state. I have studied and am familiar with the Texas Rules of Court, Vernon's Civil Statutes, and Texas Rules of Civil Procedure regarding service of process. All statements contained herein based on my personal knowledge are true and correct

Subscribed and Sworn to before me on the 27 day of September, 2011 by the affiant who is personally known to me.

Patricia Ann Gryn
NOTARY PUBLIC

**Lamont Aldridge**
Texas Supreme Court ID SCH3970

Our Job Serial Number: SYC-2011000289
Ref: MERS (1666-1)

Copyright © 1992-2011 Database Services, Inc - Process Server's Toolbox V6.4t

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE



**ATTORNEY**

# CITATION

**Cause #: CC-11-06571-E**
The State of Texas
County Court at Law No. 5
Dallas County, Texas

**SERVE:**

**BANK OF AMERICA NATIONAL ASSOCIATION**
**C/O ITS REGISTERED AGENT**
**CT CORPORATION SYSTEM**
**350 N. ST. PAUL ST., SUITE 2900**
**DALLAS, TX. 75201-4234**

**PLAINTIFF(S) ATTORNEY:**
**STEPHEN F MALOUF**

**TURTLE CREEK CENTRE**
**3811 TURTLE CREEK BLVD**
**SUITE 800**
**DALLAS TX 75219**
**214-969-7373**

"You have been sued. You may employ an attorney. If you or your attorney do not file a WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and ORIGINAL Petition, a default judgment may be taken against you." Your answer should be addressed to the clerk of County Court at Law No. 5 of Dallas County, Texas, at the George Allen Courts Building of said County 600 Commerce Street, Suite 101, Dallas, Texas 75202.

***Plaintiff(s),***
**DALLAS COUNTY, TEXAS**
**vs.**
**MERSCORP, BILL BECKMANN, MALCOM S MORRIS.et al**
***Defendant(s)***

filed in said Court on the 20th day of September, 2011 a copy of which accompanies this citation.

**WITNESS: JOHN F. WARREN,** Clerk of the County Courts of Dallas County, Texas. **GIVEN UNDER MY HAND AND SEAL OF OFFICE,** at Dallas, Texas, and issued this 21st day of September, 2011 A.D.

JOHN F. WARREN
Dallas County Clerk

A. Espinoza
Alina Espinoza, Deputy

---

## OFFICER'S RETURN

Came to hand on the ____ day of ______________ A.D., 20___, at ___ o'clock ___. M. and executed by delivering to

______________________________________________________________

(Name, Address where served including: City, State and Zip)
on the ___ day of ___________ A.D., 20___, at _____ o'clock ___. M., the within named Defendant, in person, a true copy of this Citation, together with a copy of the ORIGINAL Petition with date of service marked thereon.

______________________________ County, Texas

______________________________
Deputy

(Must be verified if served outside the State of Texas, or if served in Texas by anyone other than a Sheriff or Constable.)

______________________________________________________________

Signed and sworn to by the said ______________________ before me this _____ day of ______________ ,20_____ , to certify which witness my hand and seal of office.

______________________________

**AFFIDAVIT ATTACHED** Notary Public County ____________





Cause No. CC-11-06571-E

| | |
|---|---|
| DALLAS COUNTY, TEXAS,<br>PLAINTIFF,<br>VS.<br>MERSCORP, INC.; MORTGAGE ELECTRONIC REGISTRATON SYSTEMS, INC.; STEWART TITLE GUARANTY COMPANY; STEWART TITLE COMPANY; BANK OF AMERICA, NATIONAL ASSOCIATION; AND ASPIRE FINANCIAL, INC. D/B/A TEXASLENDING.COM,<br>DEFENDANTS. | IN COUNTY COURT AT LAW NO. 5<br>DALLAS COUNTY, TEXAS |

**PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION, JURY DEMAND, AND REQUESTS FOR DISCLOSURE**

TO THE HONORABLE JUDGE OF THE COURT:

COMES NOW Dallas County, Texas complaining of MERSCORP, INC.; MORTGAGE ELECTRONIC REGISTRATON SYSTEMS, INC.; STEWART TITLE GUARANTY COMPANY; STEWART TITLE COMPANY; BANK OF AMERICA, NATIONAL ASSOCIATION; AND ASPIRE FINANCIAL, N.A., D/B/A TEXASLENDING.COM ("Defendants") and would show the Court as follows:

## I.
## PARTIES

1. Plaintiff is Dallas County, Texas ("Dallas County, Texas" or "Plaintiff").

2. Defendant MERSCORP, INC. ("MERSCORP") is a Delaware corporation. MERSCORP is a nonresident who engages in business in this state, but does not maintain a regular place of business in this state or a designated agent for service of process. Plaintiff's claims against MERSCORP arise out of MERSCORP's activities in Texas. Pursuant to section

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

17.044(b) of the Texas Civil Practice & Remedies Code MERSCORP may be served with citation by serving the Secretary of State of the State of Texas. Citation should be forwarded to:

> Bill Beckmann
> President and Chief Executive Officer
> MERSCORP
> 1818 Library Street, Suite 300
> Reston, Virginia 20190

At all times material hereto Defendant MERSCORP has engaged in business in Dallas County, Texas or committed a tort, in whole or in part, in Dallas County, Texas and the claims made herein arise out of such activities in Dallas County, Texas. And, until November 10, 2010, MERSCORP was registered to do business in the State of Texas.

3. Defendant MORTGAGE ELECTRONIC REGISTRATON SYSTEMS, INC. ("MERS") is a Delaware corporation and wholly-owned subsidiary of Defendant MERSCORP. MERS engages in business in Dallas County, Texas but does not maintain a regular place of business in this state or a designated agent for service of process for proceedings that arise out of MERS' business done in this state. MERS may therefore be served with citation by certified mail, return receipt requested, addressed to:

> Bill Beckmann
> President and Chief Executive Officer
> Mortgage Electronic Registration Systems, Inc.
> 1818 Library Street, Suite 300
> Reston, Virginia 20190

At all times material hereto Defendant MERS has engaged in business in Dallas County, Texas or committed a tort, in whole or in part, in Dallas County, Texas and the claims made herein arise out of such activities in Dallas County, Texas.

4. Defendant STEWART TITLE GUARANTY COMPANY ("Stewart") is a Texas corporation with its principal place of business in Houston, Harris County, Texas. Stewart may

TRUE AND CORRECT
FILED IN DALLAS

be served with citation by serving its Chairman and Chief Executive Officer by certified mail, return receipt requested, addressed to:

Malcolm S. Morris
Chairman and Chief Executive Officer
Stewart Title Guaranty Company
1980 Post Oak Boulevard
Suite 800
Houston, Texas 77252 -2029

Upon information and belief, Stewart was at all times material hereto and currently is a shareholder in MERSCORP, an affiliate of Defendant Stewart Title Company, and a subsidiary of Stewart Information Services Corporation.

5. Defendant STEWART TITLE COMPANY ("Stewart Title") is a Texas corporation with its principal place of business in Houston, Harris County, Texas. Stewart may be served with citation by serving its registered agent by certified mail, return receipt requested, addressed to:

STEWART TITLE COMPANY
c/o Its Registered Agent
CT Corporation System
350 N. St. Paul Street
Suite 2900
Dallas, Texas 75201-4234

Upon information and belief, Stewart Title was at all times material hereto and currently is an affiliate of Stewart and a subsidiary of Stewart Information Services Corporation.

6. Defendant BANK OF AMERICA, NATIONAL ASSOCIATION ("BOA") is a Delaware corporation that may be served with citation by serving its registered agent in Texas by certified mail, return receipt requested, addressed to:

BANK OF AMERICA, NATIONAL ASSOCIATION
C/o Its Registered Agent
CT Corporation System
350 N. St. Paul Street
Suite 2900

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

Dallas, Texas 75201-4234

At all times material hereto BOA has engaged in business in Dallas County, Texas or committed a tort, in whole or in part, in Dallas County, Texas; and the claims made herein arise out of such activities in Dallas County, Texas. Upon information and belief, BOA was at all times material hereto and currently is a shareholder in MERSCORP.

7. Defendant ASPIRE FINANCIAL, INC. d/b/a TEXASLENDING.COM ("Aspire") is a Texas corporation with its principal place of business located at 4100 Alpha Road Suite 400 Dallas, Dallas County, Texas 75244. Aspire may be served with citation by serving its registered agent by certified mail, return receipt requested, addressed to:

Kevin C. Miller
President, Aspire Financial, Inc.
4100 Alpha Road
Suite 400
Dallas, Texas 75244

## II.
## JURISDICTION AND VENUE

8. Jurisdiction herein is based upon section 24.007 of the Texas Government Code; Article V, Section 8, of the Texas Constitution; and section 12.004 of the Texas Civil Practice & Remedies Code.

9. Venue herein is based upon sections 15.002(a)(1)-(2) and 15.005 of the Texas Civil Practice & Remedies Code.

## III.
## AGENCY AND CORPORATE VEIL/ALTER-EGO

10. At all times material hereto, each Defendant was acting by and through its actual, apparent, ostensible, or by estoppel agents and/or employees.

11. Plaintiff moves the Court pierce the MERSCORP and MERS corporate veils and impose liability upon each Defendant shareholder in MERSCORP and MERS for the actionable

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

conduct of MERSCORP and MERS alleged herein. Recognizing the corporate existence of MERSCORP and MERS separate from their shareholders, including MERSCOPR as a shareholder in MERS and Stewart and BOA as shareholders in MERSCORP, would cause an inequitable result or injustice, or would be a cloak for fraud or illegality. MERSCORP and MERS were undercapitalized in light of the nature and risk of their business. The corporate fiction is being used to justify wrongs, as a means of perpetrating fraud, as a mere tool or business conduit for others, as a means of evading existing legal obligations, to perpetrate monopoly and unlawfully gain monopolistic control over the real property recording system in the State of Texas, and to circumvent statutory obligations.

## IV.
## INTRODUCTION

12. On January 27, 2011, the Financial Crisis Inquiry Commission ("FCIC") issued its final report on the causes of the financial collapse of 2008. According to the FCIC:

> The profound events of 2007 and 2008 were neither bumps in the road nor an accentuated dip in the financial and business cycles we have come to expect in a free market economic system. This was a fundamental disruption—a financial upheaval, if you will—that wreaked havoc in communities and neighborhoods across this country.
>
> As this report goes to print, there are more than 26 million Americans who are out of work, cannot find full-time work, or have given up looking for work. About four million families have lost their homes to foreclosure and another four and a half million have slipped into the foreclosure process or are seriously behind on their mortgage payments. Nearly $11 trillion in household wealth has vanished, with retirement accounts and life savings swept away. Businesses, large and small, have felt the sting of a deep recession. There is much anger about what has transpired, and justifiably so. Many people who abided by all the rules now find themselves out of work and uncertain about their future prospects. The collateral damage of this crisis has been real people and real communities. The impacts of this crisis are likely to be felt for a generation. And the nation faces no easy path to renewed economic strength.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

**We conclude this financial crisis was avoidable.** The crisis was the result of human action and inaction, not of Mother Nature or computer models gone haywire. The captains of finance and the public stewards of our financial system ignored warnings and failed to question, understand, and manage evolving risks within a system essential to the well-being of the American public. Theirs was a big miss, not a stumble. While the business cycle cannot be repealed, a crisis of this magnitude need not have occurred. To paraphrase Shakespeare, the fault lies not in the stars, but in us.

Despite the expressed view of many on Wall Street and in Washington that the crisis could not have been foreseen or avoided, there were warning signs. The tragedy was that they were ignored or discounted. There was an explosion in risky subprime lending and securitization, an unsustainable rise in housing prices, widespread reports of egregious and predatory lending practices, dramatic increases in household mortgage debt, and exponential growth in financial firms' trading activities, unregulated derivatives, and short-term "repo" lending markets, among many other red flags. Yet there was pervasive permissiveness; little meaningful action was taken to quell the threats in a timely manner.

The prime example is the Federal Reserve's pivotal failure to stem the flow of toxic mortgages, which it could have done by setting the prudent mortgage-lending standards. The Federal Reserve was the one entity empowered to do so and it did not. The record of our examination is replete with evidence of other failures: financial institutions made, bought, and sold mortgage securities they never examined, did not care to examine, or knew to be defective; firms depended on tens of billions of dollars of borrowing that had to be renewed each and every night, secured by subprime mortgage securities; and major firms and investors blindly relied on credit rating agencies as their arbiters of risk. What else could one expect on a highway where there were neither speed limits nor neatly painted lines?

****

**We conclude there was a systemic breakdown in accountability and ethics.** The integrity of our financial markets and the public's trust in those markets are essential to the economic well-being of our nation. The soundness and the sustained prosperity of the financial system and our economy rely on the notions of fair dealing, responsibility, and transparency. In our economy, we expect businesses and individuals to pursue profits, at the same

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

time that they produce products and services of quality and conduct themselves well.

Unfortunately—as has been the case in past speculative booms and busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis. This was not universal, but these breaches stretched from the ground level to the corporate suites. They resulted not only in significant financial consequences but also in damage to the trust of investors, businesses, and the public in the financial system.

For example, our examination found, according to one measure, that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007. This data indicates they likely took out mortgages that they never had the capacity or intention to pay. You will read about mortgage brokers who were paid "yield spread premiums" by lenders to put borrowers into higher-cost loans so they would get bigger fees, often never disclosed to borrowers. The report catalogues the rising incidence of mortgage fraud, which flourished in an environment of collapsing lending standards and lax regulation. The number of suspicious activity reports—reports of possible financial crimes filed by depository banks and their affiliates—related to mortgage fraud grew 20-fold between 1996 and 2005 and then more than doubled again between 2005 and 2009. One study places the losses resulting from fraud on mortgage loans made between 2005 and 2007 at $112 billion.

Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

****

In an interview with the Commission, Angelo Mozilo, the longtime CEO of Countrywide Financial—a lender brought down by its risky mortgages—said that a "gold rush" mentality overtook the country during these years, and that he was swept up in it as well: "Housing prices were rising so rapidly - at a rate that I'd never seen in my 55 years in the business - that people, regular people, average people got caught up in the mania of buying a house, and flipping it, making money. It was happening. They buy a house,

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

> make $50,000 . . . and talk at a cocktail party about it . . . Housing suddenly went from being part of the American dream to house my family to settle down - it became a commodity. That was a change in the culture . . . . It was sudden, unexpected."

The bubble that was the genesis of the Financial Crisis of 2008 burst when the collapse of the primary and secondary mortgage markets triggered a liquidity shortfall in the U.S. banking system. This collapse was a direct result of the financial system's commoditization, packaging, securitization, and sale of tens of millions of mortgages throughout the U.S. – activities in which the Defendants actively participated. Without the fiction of the MERS System, these activities would not have been possible.

## V.
## FACTS

### A. The U.S. Mortgage System

13. In the most common residential lending scenario, there are two parties to a real property mortgage – the mortgagee, *i.e.*, a lender, and the mortgagor, *i.e.*, a borrower. When a mortgage lender loans money to a home buyer, it obtains two documents: 1) a promissory note in the form of a negotiable instrument from the borrower; and 2) a "mortgage" or a "deed of trust"[1] granting to the mortgage lender a security interest in the property as collateral to repay the note. The mortgage, as distinguished from the note, establishes the lien on the property securing repayment of the loan. For the lien to be perfected and inoculate the property against subsequent efforts by the mortgagor to sell the property or borrow against it, however, the mortgage

[1] The law of the state in which property is located generally will determine whether a "mortgage" or a "deed of trust" is used to pledge real property as security on a note. In lien theory states such as Texas, a "deed of trust" is used and only creates a lien on the property - the title remains with the borrower. The lien is removed when all the payments have been made. *See Taylor v. Brennan*, 621 S.W.2d 592, 593 (Tex. 1981). In title theory states, a "mortgage" is used and it conveys ownership to the lender. A clause in the mortgage provides that title reverts back to the borrower when the loan is paid. In common parlance, the term "mortgage" is generally used to refer to the instrument creating the security interest, whether formally denominated as a "mortgage" or a "deed of trust." Unless noted, the terms "mortgage" and "deed of trust" are used interchangeably herein.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

instrument must be filed in the deed records of the county in which the property is located.

### 1. The Public Recording System

14. The origins and reasons for public recordation of mortgage interests in the U.S. dates back to at least the middle of the 17th Century. According to one commentator:

> One of the most striking features of Anglo-American law is the requirement to file notice in public files of a nonpossessory secured transaction in order to enforce the transaction in the court against third parties. The transaction of interest first developed during the early seventeenth century. English mortgage law developed for real estate. Originally, the parties structured mortgages with the secured-mortgagee in possession of the landed collateral, not the debtor-mortgagor. But by the early seventeenth century, the English had developed the technique of leaving the debtor-mortgagor in possession of the land to work off the loan.
>
> ****
>
> Not all legal systems have the filing requirement. Roman law recognized the transaction, but did not require a filing. The Napoleonic Code banned the transaction. The modern explanation of these three different legal rules involves the secret lien. When debtors retain possession of the personalty serving as collateral under the nonpossessory secured transaction, subsequent lenders and purchasers have no way of discovering the prior ownership interest of the earlier secured creditors unless the debtor's honesty forces disclosure. Without that disclosure, the debtor could borrow excessively offering the same collateral as security several times, possibly leaving some of the debtor's creditors without collateral sufficient to cover their loan upon the debtor's financial demise. Roman law solved the problem by providing a fraud remedy against the debtor. The Napoleonic Code solved the problem by banning the transactions. Anglo-American law solved the problem by requiring a filing. Potential subsequent lenders and purchasers could then become aware of the debtor's prior obligation by examining the public files and protect themselves by taking the action they deemed appropriate, either not lending or charging higher interest.[2]

15. Mortgage recordation in Texas is governed by Chapter 12 of the Texas Property Code. Section 12.001 of the Property Code provides, in part, that "[a]n instrument concerning

[2] George Lee Flint, Jr. and Marie Juliet Alfaro, *Secured Transactions History: The First Chattel Mortgage Act in the Anglo-American World*, 30:4 William Mitchell Law Review 1403, 1404-05.



real or personal property may be recorded if it has been acknowledged, sworn to with a proper jurat, or proved according to law." Although recordation of a security instrument in real property is not mandatory, once a security interest is recorded, "[t]o release, transfer, assign, or take another action relating to an instrument that is filed, registered, or recorded in the office of the county clerk, a person must file, register, or record another instrument relating to the action in the same manner as the original instrument was required to be filed, registered, or recorded."[3]

16. Once properly filed, a mortgage is "notice to all persons of the existence of the instrument," protects the mortgagee's (lender's) security interest against creditors of the mortgagor, and places subsequent purchasers on notice that the property is encumbered by a mortgage lien. Unless the mortgage is recorded, the "mortgage or deed of trust is void as to a creditor or to a subsequent purchaser for a valuable consideration without notice."[4]

17. Until recently, when a loan secured by a mortgage was sold, the assignee would record the assignment of the mortgage to protect the security interest. If a servicing company serviced the loan and the servicing rights were sold – an event that could occur multiple times during the life of a single mortgage loan – multiple assignments were recorded to ensure that the proper servicer and/or note-holder appeared in the land records in the County Clerk's office.[5] With some nuances and allowances for the needs of modern finance, this model has been followed throughout the U.S. for over three hundred years to provide the public with notice of the ownership of, and liens encumbering, real property throughout the U.S. Defendants and others similarly situated have changed all of this and collapsed the public recordation system in Dallas County and throughout the U.S.

---

[3] TEX. LOC. GOV'T CODE § 192.007.

[4] TEX. PROP. CODE § 13.001(a).

[5] Some sources estimate that mortgage loans or servicing rights are transferred an average of five times or more during the life of a mortgage - transfers which would necessitate recordation.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

18. The MERS business plan, as envisioned and implemented by Wall Street, is based in large part on amending the traditional model of recording security interests in real property and changes thereto and introducing a third party into the equation - MERS. The motivation for creating MERS was Wall Street's desire to alleviate what Wall Street considered to be the "inconvenience" of the public recording system and create its own privately owned shadow electronic recording system – the MERS System. According to one court, the MERS system was designed "as a replacement for our traditional system of public recordation of mortgages."[6] The MERS System fails to comply in several respects with Texas law.

**2. Mortgage Origination**

19. In order to fully understand the genesis of the MERS System, one must consider the historical context in which it was created.

20. For most Americans, a mortgage is the largest and most serious financial obligation ever undertaken. Mortgages are originated by a variety of financial institutions.

21. Depository institutions, which accept deposits from the public and lend that money to households and businesses, are one type of originator. Depository institutions include commercial banks as well as credit unions, savings and loan associations, and mutual savings banks. Depository institutions are regulated by a set of federal and/or state agencies charged with ensuring the safety and soundness of these institutions.

22. Non-depository institutions, called mortgage companies or mortgage banks, also originate mortgages. Mortgage companies borrow money from banks (or by issuing bonds) and lend that money to consumers in the form of mortgage loans. They typically then sell those loans to other financial institutions and use that money to originate additional mortgages.

23. Mortgage lenders are sometimes owned by holding companies or other financial

[6] *In Re Agard*, 444 BR 231, 247 (E.D.N.Y. 2011).

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

institutions. Some mortgage companies are owned by depository institutions, and are therefore subsidiaries of a depository. Others are owned by holding companies that also own a depository institution and are therefore an affiliate of a depository. Mortgage companies that are not a subsidiary or an affiliate of a depository institution are called independent mortgage companies.

24. Federal Housing Administration ("FHA") loans are made by private lenders and insured by the FHA. They are usually made to low-income or moderate-income borrowers, often with weaker credit histories, and require smaller down payments. Historically, the size limits on these loans were low.

25. Veterans' Administration ("VA") loans are offered to military personnel and are guaranteed by the Department of Veteran Affairs. These too require little or no down payment.

26. One common type of mortgage is a 30-year fixed rate mortgage ("FRM"), in which the interest rate is fixed for the entire term of the loan and the borrower is required to make a series of equal monthly payments until the loan is paid off. The fixed payment amount that results in the loan being fully paid off at the end of the term is called the fully amortizing payment amount. In contrast, an adjustable rate mortgage ("ARM") has an interest rate that is specified in terms of a margin above some interest rate index. For example, "Prime + 3%" means that the borrower is charged interest based on an interest rate equal to the prime rate plus 3 percentage points. The interest rate on an ARM adjusts at regular intervals. Other mortgages are hybrids of FRMs and ARMs in which the interest rate is fixed for some introductory period and then adjusts at regular periods according to some interest rate index. Other types of mortgages involve the borrower paying less than the fully amortizing amount each month.

27. For example, a balloon mortgage is one in which the borrower pays less than the fully amortizing payment amount but must then pay some relatively large fixed sum at the end of the term – ("balloon payment") - to pay off the mortgage. Interest-only mortgages allow the

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

borrower to pay only the interest accrued each month and make no payments toward principal for some period. Option ARMs, also called negative amortization ARMs, allow the borrower to pay less than the interest charged for some period so that the balance on the loan grows over time before the required payment amount resets to the fully amortizing rate. Interest-only mortgages grew from only 2 percent in 2004 to 20 percent by 2007. Option ARMs and balloon mortgages also grew in this period.

**B. <u>The Commoditization of Mortgages</u>**

28. In the decades leading up to the early 1970s, the housing finance system was relatively simple: banks and savings and loan associations made mortgage loans to households and held them until they were repaid. Deposits provided the major source of funding for these lenders, as most were depository institutions.

29. In the 1970s, the housing finance system began to shift from depository-based funding to capital markets-based funding. By 1998, 64 percent of originated mortgage loans were sold by originators to large financial institutions that package bundles of mortgages and sell the right to receive borrowers' payments of principal and interest directly to investors. Key to this shift to capital markets-based funding of mortgage lending were Fannie Mae and Freddie Mac, the government-sponsored enterprises ("GSEs"), created by the federal government to develop a secondary mortgage market. The GSEs did this in two ways:

a. by issuing debt to raise capital and using those funds to purchase mortgages to hold in their portfolios; and

b. by securitizing mortgages, that is, by selling to investors the rights to the principal and interest payments made by borrowers on pools of mortgages through what is referred to as mortgage-backed securities ("MBS").

30. MBS are securities that give the holders the right to receive the principal and interest payments from borrowers on a particular pool of mortgage loans. The GSEs purchase

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS

mortgages to hold in portfolios and to securitize into MBS that the GSEs guarantee against default. MBS issued by the GSEs or Ginnie Mae are referred to as agency MBS.

31. Fannie Mae and Freddie Mac provide a guarantee that investors in their MBS will receive timely payments of principal and interest. If the borrower for one of the underlying mortgages fails to make his payments, the GSE that issued the MBS will pay to the trust the scheduled principal and interest payments. In return for providing this guarantee, Fannie Mae and Freddie Mac deduct an ongoing guarantee fee, which is charged by setting the pass-through annual interest rate (*i.e.*, the interest rate received by holders of the MBS) about 20-25 basis points (*i.e.*, 0.20 - 0.25 percentage points) below the weighted average interest rate of the mortgages in the pool. Because the GSEs were perceived to be implicitly backed by the federal government, their guarantee was perceived by investors to have essentially removed the credit risk from their MBS.

32. Other financial institutions also create MBS, referred to as non-agency MBS, which have a structure similar to agency MBS but typically have no guarantee against default risk. In a non-agency securitization, the sponsor of the securitization, which could be an investment bank, commercial bank, thrift, or mortgage bank, first acquired a set of mortgages, either by originating them or by buying them from an originator. The sponsor then would create a new entity, a "special purpose vehicle" ("SPV"), and transfer the mortgages to the SPV.[7]

[7] These SPVs often took the form of Real Estate Mortgage Investment Conduits, or "REMICs." REMICs are investment vehicles that hold commercial and residential mortgages in trust and issue securities representing an undivided interest in these mortgages. A REMIC assembles qualified mortgages into pools and issues pass-through certificates, multiclass bonds similar to a collateralized mortgage obligation (CMO), or other securities to investors in the secondary mortgage market. Mortgage-backed securities issued through a REMIC can be debt financings of the issuer or a sale of assets.

Qualified mortgages encompass several types of obligations and interests. Qualified mortgages are defined as "(1) any obligation (including any participation or certificate of beneficial ownership therein) which is principally secured by an interest in real property, and is either transferred to the REMIC

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

33. The principal and interest payments on the pool of mortgages would provide the underlying set of cash flows for the SPV. The SPV could then enter into contracts in order to manage the risk it faced. For example, to reduce interest rate-related risks, the SPV could enter into interest rate swap agreements that provided floating interest rate-based payments to the SPV in exchange for a fixed set of payments from the SPV. The SPV then would issue various classes of mortgage-backed securities that gave investors who were holders of the securities rights to the cash flows available to the SPV. Each class of securities was referred to as a tranche.

34. Unlike agency MBS, non-agency MBS are not typically guaranteed against credit loss. A crucial goal of the capital structure of the SPV was to create some tranches that were deemed low risk and could receive the highest investment- grade ratings, such as AAA, from the rating agencies. This was done using a set of credit enhancements, ways of structuring the MBS so that some of its tranches received high credit ratings.

35. One key credit-enhancement tool was subordination. The classes of securities issued by the SPV were ordered according to their priority in receiving distributions from the SPV. The structure was set up to operate like a waterfall, with the holders of the more senior tranches being paid prior to the more junior (or subordinate) tranches. The most senior set of tranches - referred to simply as senior securities - represented the lowest risk and consequently paid the lowest interest rate. They were set up to be paid prior to any of the classes below and were typically rated AAA. The next most senior tranches were the mezzanine tranches. These

on the startup day in exchange for regular or residual interests, or purchased within three months after the startup day pursuant to a fixed-price contract in effect on the startup day, (2) any regular interest in another REMIC which is transferred to the REMIC on the startup day in exchange for regular or residual interests in the REMIC, (3) any qualified replacement mortgage, or (4) certain FASIT regular interests."

Several class actions have been filed against various sponsors of REMICs alleging that the REMIC structure was used unlawfully because a REMIC can never be the owner of a mortgage loan and that, in any event, many mortgages purportedly owned by various REMICs were not timely transferred to the REMIC thereby eliminating the REMIC's favorable tax treatment.

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

carried higher risk and paid a correspondingly higher interest rate. The most junior tranche in the structure was called the equity or residual tranche and was set up to receive whatever cash flow was left over after all other tranches had been paid. These tranches, which were typically not rated, suffered the first losses on any defaults of mortgages in the pool.

36. The payments of principal and interest by borrowers flow first to make the promised payments to the AAA senior bondholders, then down to pay the AA bonds, and so forth. If there is any money left over after all bondholders have been paid, it flows to the residual tranche of securities.

37. An example of a typical subprime MBS in which cumulative losses on mortgages in the SPV were expected to amount to 4 percent of the total principal amount is as follows. Assume that AAA senior bonds make up 92 percent of the principal amount of debt issued by the SPV, AA bonds account for 3 percent, mezzanine BBB bonds make up 4 percent, and the residual tranche amounts to 1 percent. If the MBS does indeed experience such a 4 percent loss on its mortgage assets, then 4 percent of the total principal amount on its bonds would default. Because of the SPV's subordination structure, these losses would first be applied to the residual tranche. The residual tranche, which accounts for 1 percent of the principal amount of the SPV's bonds, would fully default, paying nothing. That would leave 3 percent more of the total principal amount in losses to apply to the next most junior tranche, the mezzanine BBB tranche. Since the mezzanine BBB tranche totals 4 percent of the deal, the 3 percent left in losses would reduce its actual payments to 1 percent, meaning that 75 percent of the BBB bonds' principal value would be lost. The AA and AAA bonds, however, would pay their holders in full. In this simple example, the junior tranches below the AA and AAA bonds would be large enough to fully absorb the expected loss on the SPV's mortgages.

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

38.     Another credit enhancement technique was overcollateralization. The principal balance of the underlying mortgages often exceeded the principal balance of the debt securities issued by the SPV. Thus, some underlying mortgages could default without any of the MBS bonds defaulting on their promised payments to investors.

39.     Similarly, the weighted average coupon interest rate on the underlying mortgage pool would typically exceed the weighted average coupon interest rate paid on the SPV's debt securities by an amount sufficient to provide a further buffer before the debt tranches incur losses. In essence, the SPV received a higher interest rate from mortgage borrowers than it paid to investors in its bonds. The resulting excess spread gave the SPV extra cash flow to pay its bond holders, further insulating the MBS from credit risk in the underlying mortgages.

40.     With both over-collateralization and excess spread, the total amount of cash that had been promised to be paid to the SPV by mortgage borrowers was greater than the total amount of cash that the SPV had promised to pay out to investors. This gave the SPV a cushion in case some of the mortgage borrowers defaulted on their promised payments.

41.     The prospectus for an MBS would include a description of the mortgages held by the SPV, such as information about the distribution of borrowers' credit scores and loan-to-value ratios, and the geographic distribution of the homes that serve as collateral for the mortgages. The underwriting practices used by the originators usually would also be described. For example, Goldman Sachs disclosed the following about the underwriting standards used by the originator - New Century Mortgage - of the mortgages it packaged in a 2006 MBS offering:

> The mortgage loans will have been originated in accordance with the underwriting guidelines established by New Century. On a case-by-case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist. It is expected that a substantial portion of the mortgage loans will represent these exceptions. All of the mortgage loans were also underwritten with a view toward the resale of the mortgage loans


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

> in the secondary mortgage market. As a result of New Century' underwriting criteria, changes in the values of [homes securing the mortgage loans] may have a greater effect on the delinquency, foreclosure and loss experience on the mortgage loans than these changes would be expected to have on mortgage loans that are originated in a more traditional manner.

42. The originators of the mortgages also generally made representations and warranties to the SPV, described in the prospectus, regarding the nature of the mortgages in the pool. For example, they typically represented that the mortgages had never been delinquent and that they complied with all national and state laws in their origination practices. Moreover, in the event that any of the representations and warranties were breached, or if any of the mortgages defaulted early (within some fixed period after being transferred to the SPV), the originator typically agreed to repurchase the mortgage from the SPV.

43. The SPV would contract with a firm to service the mortgages in the pool, i.e., to collect payments from borrowers. The mortgage servicer would also handle defaults in the mortgage pool, including negotiating modifications and settlements with the borrowers and initiating foreclosure proceedings. In exchange, the mortgage servicer would get an ongoing servicing fee from the flow of interest payments from borrowers of typically between 25 and 50 basis points, or 0.25 and 0.50 percentage points, at an annual rate.

44. Servicers also typically would retain late fees charged to delinquent borrowers and would be reimbursed for expenses related to foreclosing on a loan. The borrowers would be informed by the originator or the new servicer when servicing rights to their mortgages were transferred so that they knew how to make payments to the new servicer.

45. The sponsor of an MBS typically approached Fitch, Standard & Poor's, or Moody's to obtain credit ratings on the classes of debt securities issued in the deal. The credit rating agencies analyzed the probability distribution of cash flows associated with each tranche



using proprietary models based on historical data and assigned a credit rating to each debt tranche. These ratings were intended to represent the riskiness of the securities and were used by investors to inform their decision whether to invest in the security. Sponsors of MBS typically structured them to produce as many bonds with the highest credit rating (*e.g.* AAA) while offering attractive yields. AAA-rated bonds were in demand by investors who required low-risk assets in their portfolio. The internal credit enhancements used in non-agency securitizations, discussed above, enabled the transformation of mortgages, including relatively risky mortgages to borrowers with low credit scores or with little equity, into bonds that were considered to be low risk but relatively high yield.

46. The junior tranches of an MBS typically received lower ratings because they were more likely to default than the senior tranches. This is because, as discussed above, senior securities would be paid before the junior securities would be paid, so that the more junior a tranche, the more likely it would be to bear losses if the underlying mortgages defaulted.

47. The same credit-enhancement techniques that produced highly rated tranches out of a pool of mortgages were used to create highly rated securities out of pools of junior tranches of MBS. This was done using a product known as a collateralized debt obligation ("CDO").

48. The sponsor of such a CDO assembled a pool of junior tranches from many different MBS, for example mezzanine tranches rated BBB, transferred them to an SPV, and using the same tools of subordination, over-collateralization, and excess spreads issued AAA-rated senior securities from that SPV, along with junior tranches and a first-loss residual tranche.

49. Credit default swaps (CDS) were used to protect against the risk of an MBS defaulting. In a CDS, the buyer agreed to pay the seller a fixed stream of payments. In return, the seller agreed to pay the buyer a fixed amount if the "reference entity" of the CDS experienced a "credit event," which was typically some sort of default. For MBS- and CDO-based CDSs, the

TRUE AND CORRECT COPY OF ORIGINAL FILED IN ELLIS COUNTY CLERK'S OFFICE

reference entity was the trust that issued the MBS or CDO security. CDS were used by holders of MBS and CDOs for the purpose of reducing their exposure to credit risk of MBS and CDOs.

50. The following chart demonstrates that the 2000s saw a large increase in the market share of non-agency securitization. It shows the fraction of total residential mortgage originations in each year that were securitized into non-agency MBS, GSE MBS, and Ginnie Mae MBS, as well as the fraction non-securitized (i.e., held as whole loans by banks, thrifts, the GSEs, and other institutions).

51. Four trends are notable. Non-securitized mortgage originations declined steadily from half the market in 1995 to under 20 percent in 2008. Non-agency MBS hovered between 8 and 12 percent until 2003; non-agency MBS then more than trebled in market share to a peak of 38 percent in 2006. During the growth years for non-agency MBS, Ginnie Mae's market share dropped considerably. Finally, both GSEs and Ginnie Mae rapidly escalated their market share

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

as non-agency securitization dropped in 2008.

52. The following chart plots the volume of prime, subprime,[8] and alt-A[9] (self-identified as such by the sponsors) non-agency MBS issued from 1995-2008.

53. The chart reveals that early in the period covered, the prime non-agency MBS, which contained largely jumbo mortgages, were the biggest of the three types of non-agency MBS. But, by 2006 the subprime and alt-A non-agency MBS had each surpassed prime non-agency MBS in volume. In particular, subprime non-agency MBS showed a dramatic increase from 2003 to 2005. Alt-A non-agency MBS saw its largest jump in volume in 2005.

[8] The term "subprime" refers to mortgage loans made to borrowers with relatively poor credit histories. These loans are therefore riskier than prime loans, which are made to borrowers with stronger credit. The marketing, underwriting, and servicing of subprime loans is different than that of prime loans.

[9] The term "alt-A" generally refers to loans made to borrowers with strong credit scores but which have other characteristics that make the loans riskier than prime loans. For example, the loan may have no or limited documentation of the borrower's income, a high loan-to-value ratio (LTV), or may be for an investor-owned property.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

Notably, the non-agency MBS market was nearly nonexistent in 2008.

C. **The Collapse**

54. By 2004, commercial banks, thrifts, and investment banks caught up with Fannie Mae and Freddie Mac in securitizing home loans. By 2005, they had taken the lead. The two government-sponsored enterprises maintained their monopoly on securitizing prime mortgages below their loan limits, but the wave of home refinancing by prime borrowers spurred by very low, steady interest rates petered out. Meanwhile, Wall Street focused on the higher-yield loans that the GSEs could not purchase and securitize—loans too large, called jumbo loans, and nonprime loans that didn't meet the GSEs' standards. The nonprime loans soon became the biggest part of the market—"subprime" loans for borrowers with weak credit and "Alt-A" loans, with characteristics riskier than prime loans, to borrowers with strong credit.

55. By 2005 and 2006, Wall Street was securitizing one-third more loans than Fannie and Freddie. In just two years, private-label mortgage-backed securities had grown more than 30%, reaching 1.15 trillion in 2006; 71% were subprime or Alt-A.

56. "Securitization could be seen as a factory line," former Citigroup CEO Charles Prince told the FCIC. "As more and more and more of these subprime mortgages were created as raw material for the securitization process, not surprisingly in hind-sight, more and more of it was of lower and lower quality. And at the end of that process, the raw material going into it was actually bad quality, it was toxic quality, and that is what ended up coming out the other end of the pipeline. Wall Street obviously participated in that flow of activity." One theory for the demand Wall Street was so intent on satisfying pointed to foreign money.

57. Developing countries were booming and—vulnerable to financial problems in the past—encouraged strong saving. Investors in these countries placed their savings in apparently safe and high-yield securities in the United States. Fed Chairman Bernanke called it a "global

COUNTY CLERK'S OFFICE

savings glut." As the United States ran a large current account deficit, flows into the country were unprecedented. Over six years from 2000 to 2006, U.S. Treasury debt held by foreign official public entities rose from $0.6 trillion to $1.43 trillion; as a percentage of U.S. debt held by the public, these holdings increased from 18.2% to 28.8%. According to former federal governor Frederic Mishkin, "You had a huge inflow of liquidity. A very unique kind of situation where poor countries like China were shipping money to advanced countries because their financial systems were so weak that they [were] better off shipping [money] to countries like the United States rather than keeping it in their own countries." The demand for what was perceived to be the safety of MBS created a surplus in liquidity, thereby helping to lower long-term interest rates and providing easy money to mortgage originators.

58.     According to Paul Krugman, an economist at Princeton University, "It's hard to envisage us having had this crisis without considering international monetary capital movements. The U.S. housing bubble was financed by large capital inflows. So were Spanish and Irish and Baltic bubbles. It's a combination of, in the narrow sense, a less regulated financial system and a world that was increasingly wide open for big international capital movements." And as more and more foreign capital became available, underwriting standards were lowered to extend credit to borrowers who represented a new risk paradigm.

59.     As 2007 went on, increasing mortgage delinquencies and defaults compelled the ratings agencies to downgrade first mortgage-backed securities, then CDOs. Alarmed investors sent prices plummeting. Hedge funds faced with margin calls from their repo lenders were forced to sell at distressed prices; many would shut down. Banks wrote down the value of their holdings by tens of billions of dollars.


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

60. Predictably, borrowers who had been extended credit without having been adequately qualified began to default on their loans in escalating numbers beginning in late 2006. As demonstrated by the following chart, defaults peaked in 2010.

61. The summer of 2007 also saw a near halt in many securitization markets, including the market for non-agency mortgage securitizations. For example, a total of $75 billion in subprime securitizations were issued in the second quarter of 2007 (already down from prior quarters). That figure dropped precipitously to $27 billion in the third quarter and to only $12 billion in the fourth quarter of 2007. Alt-A issuance topped $100 billion in the second quarter, but fell to $13 billion in the fourth quarter of 2007. Once-booming markets were now gone—only $14 billion in subprime or Alt-A mortgage-backed securities were issued in the first half of 2008, and almost none after that. Simply stated, Wall Street's system made virtually unlimited funds available to unqualified buyers to feed the MBS demand. More buyers in the market


caused housing prices to rise thereby creating a housing bubble. Pretty soon, there simply were not enough buyers, qualified or not, to sustain the model and the entire system collapsed. The ease with which non-agency MBS were created, and mortgages transferred into them, would not have been possible without the MERS System.

**D. Wall Street Ignores 300 Years of History and Creates the "MERS System"**

62. To facilitate the commoditization of mortgages and resulting explosion in non-agency MBS, Wall Street needed to create a mechanism that would enable it to buy and sell mortgages and mortgage servicing rights multiple times, packaged with tens of thousands of other mortgages, without the "inconvenience," expense, or time associated with recording each transfer. In order to issue MBS, however, the issuer was and is required by law and industry standards to record (and pay recording fees on) every assignment of a mortgage loan from origination through deposit in a securitization trust. Faced with this dilemma Wall Street simply wrote its own rules and created MERSCORP and MERS, ignoring property laws throughout the United States.

**1. How MERS Works**

63. MERS is a subsidiary of MERSCORP. MERSCORP is owned by various mortgage banks, title companies, and title insurance companies, including Defendants BOA and Stewart. When a lender which is a "member" of MERS makes a mortgage loan, the lender instructs the title company to show not only the lender, but MERS, as "beneficiary" or "mortgagee" under the mortgage. MERS then shows up in the deed records as a "grantee."

64. When the lender sells the note, or transfers the servicing rights, MERS remains as a "mortgagee" or "beneficiary" under the mortgage and "grantee" in the deed records. The purchaser of the note, or successor servicer, agrees at the time of acquisition of its rights to notify

