MERS when the note is paid so that MERS can "release" its lien and the lien of the original lender. MERS has described its role as follows:

> [MERS] and MERSCORP, Inc. were developed by the real estate industry to serve as the mortgagee of record and operate an electronic registration system for tracking interests in mortgage loans. . . . Specifically, the MERS® System tracks the transfers of mortgage servicing rights and beneficial ownership interests in mortgage loans on behalf of MERS Members.

> The promissory note is a negotiable instrument under Article 3 of the Uniform Commercial Code, and originating lenders routinely sell these notes on the secondary markets to investors. (citation omitted). "The ability of lender to replenish their capital by selling loans in the secondary market is what makes money accessible for home ownership." (citation omitted).

> ****

> At the origination of the loan by a lender who is a MERS Member, the lender takes possession of the note (and becomes the holder of the note), and the borrower and lender designate MERS (as the lender's nominee) to serve as the mortgagee or beneficiary of record. The lender's secured interest is thus held by MERS. . . . Rules, which are incorporated into all MERS' agreements with its members, provide that members "shall cause Mortgage Electronic Registration System, Inc. to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System." (citation omitted).

> Accordingly, when a MERS Member originates a loan, the original lender and the borrower contractually agree in the mortgage that MERS will be the mortgagee and will serve as nominee for the lender and its successors and assigns. (citation omitted).  In the event of a default on the loan, MERS as the beneficiary or mortgagee, is authorized to foreclose on the home. After the borrower signs the mortgage agreement, it is recorded in the public, local land records with MERS as the named beneficiary or mortgagee. (citation omitted).

> The MERS Member then registers the mortgage loan information from the security instrument on the MERS® System. Id. When the beneficial interest in a loan is sold, the promissory note is still transferred by an endorsement and delivery from the buyer to the seller, but MERS Members are obligated to update the MERS®

---



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS

System to reflect the change in ownership of the promissory note. (citation omitted).

So long as the sale of the note involves a MERS Member, MERS remains the named mortgagee of record, and continues to act as the mortgagee, as the nominee for the new beneficial owner of the note (and MERS' Member). The seller of the note does not and need not assign the mortgage because under the terms of that security instrument, MERS remains the holder of title to the mortgage, that is, the mortgagee, as the nominee for the purchaser of the note, who is then the lender's successor and/or assign. (citation omitted). Accordingly, there is no splitting of the note and mortgage for loans in the MERS® System. If, however, a MERS' Member is no longer involved with the note after it is sold, an assignment from MERS to the party who is not a MERS Member is executed by MERS, that assignment is recorded in the County Clerk's office where the real estate is located, and the mortgage is "deactivated" from the MERS® System. (citation omitted).[10]

65.    MERS' assertion that subsequent assignment of notes secured by a deed of trust does not trigger a duty to file a notice of the assignment is false. Texas law requires that in order to release, transfer, assign or take any other action "relating to an instrument that is filed, registered, or recorded in the office of the county clerk," a person must "file, register, or record another instrument relating to the action in the same manner as the original instrument was required to be filed, registered, or recorded." Upon information and belief, MERS has violated this duty millions of times in Texas alone.

2.    *And after all, what is a lie? 'Tis but the truth in masquerade[11] – The MERS Lie*

66.    According to MERS, it is the "mortgagee" or "beneficiary" of record in more than 65 million mortgages filed in the deed records of counties throughout the U.S. MERS is, however, neither a borrower nor a lender and, indeed, in MERS' own words:

MERS has no interest at all in the promissory note evidencing the

---

[10]    *Mortgage Electronic Registration Systems, Inc. v. Nebraska Dept. of Bnkng and Fin.,* 704 N.W.2d 784 (Neb. 2005), Brief of Appellant at 11-12.
[11]    George Gordon Noel Byron, Lord Byron (1788–1824), *Don Juan.* Canto xi. Stanza 37.

---



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

mortgage loan. MERS has no financial or other interest in whether or not a mortgage loan is repaid. . . .

****

MERS is not the owner of the promissory note secured by the mortgage and has no rights to the payments made by the debtor on such promissory note. . . . MERS is not the owner of the servicing rights relating to the mortgage loan and MERS does not service loans. **The beneficial interest in the mortgage (or the person or entity whose interest is secured by the mortgage) runs to the owner and holder of the promissory note.** In essence, MERS immobilizes the mortgage lien while transfers of the promissory notes and servicing rights continue to occur. (citation omitted).[12]

67.   MERS has also admitted that under its agreement with its mortgage-lender members, MERS **"cannot exercise, and is contractually prohibited from exercising, any of the rights or interests in the mortgages or other security documents"** and that MERS has **"no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans."**[13]

68.   At this point one might ask how MERS can be the "mortgagee" in or "beneficiary" of a mortgage as to which the beneficial interest "runs to the owner and holder of the promissory note."[14] Simply stated, it cannot. As one court has observed:

MERS and its partners made the decision to create and operate under a business model that was designed in large part to avoid the requirements of the traditional mortgage recording process. This

---

[12]   *Mortgage Electronic Registration Systems, Inc. Nebraska Dept. of Bnkng and Fin.*, 704 N.W.2d 784 (Neb. 2005), Brief of Appellant at 11-12 (emphasis added). MERS does not explain how it can be a "mortgage lien" holder or "inoculate" loans "against future assignments" while simultaneously insisting that "MERS is not the owner of the promissory note secured by the mortgage and has no rights to the payments made by the debtor on such promissory note. . . . " and "is not the owner of the servicing rights relating to the mortgage loan and MERS does not service loans."

Also in question in cases pending in other jurisdictions is MERS' assertion that it has the authority to assign the note and mortgage to subsequent purchasers and the authority to appoint substitute trustees under the deeds of trust in which MERS appears as the "beneficiary" or "mortgagee."

[13]   *Id.* at 10 (emphasis added).

[14]   *Id.* at 11-12.



Court does not accept the argument that because MERS may be involved with 50% of all residential mortgages in the country, that is reason enough for this Court to turn a blind eye to the fact that this process does not comply with the law.

**\*\*\*\***

Aside from the inappropriate reliance upon the statutory definition of "mortgagee," MERS's position that it can be both the mortgagee and an agent of the mortgagee is absurd, at best.

**\*\*\*\***

This Court finds that MERS's theory that it can act as a "common agent" for undisclosed principals is not supported by the law. The relationship between MERS and its lenders and its distortion of its alleged "nominee" status was appropriately described by the Supreme Court of Kansas as follows: "The parties appear to have defined the word [nominee] in much the same way that the blind men of Indian legend described an elephant – their description depended on which part they were touching at any given time." *Landmark Nat'l Bank v. Kesler*, 216 P.3d 158, 166-67 (Kan. 2010).[15]

69.   One scholar has observed with regards to the legal accuracy of MERS' recitation that it is the "mortgage" or "beneficiary" one scholar has stated:

> MERS and its member use false documents to avoid paying recording fees to county governments. At the most simple level, mortgages and deeds of trust recorded at origination represent that MERS is the mortgagee or deed of trust beneficiary. Taking the appellate decisions in Arkansas, Kansas, Maine, and Missouri at face value, MERS recorded mortgages contain a false statement. While it is true that MERS recorded mortgages and deeds of trust also have qualifying language suggesting that MERS is also a "nominee," the representation that MERS is the owner of the lien is not some innocuous legalism. It causes county recorders that maintain grantor-grantee indexes to list MERS in the chain of title for the land. The false designation of MERS as a mortgagee or beneficiary creates a false lead in the true chain of title defeating an essential purpose of recording mortgages and deeds of trust.
>
> But perhaps even more troubling are the documents recorded in the name of MERS later in the life of mortgage loans. Recall that MERS' business model does not include actually recording documents relating to its purported ownership itself. Instead, it

---

[15] *In Re Agard*, 444 BR 231 (E.D.N.Y. 2011).


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

allows employees of mortgage servicing companies and law firms to do so on its behalf. MERS has an internet web page where mortgage servicers and law firms can enter names of their own employees to automatically produce a boilerplate "corporate resolution" that purports to designate the servicers' and law firms' employees as certifying officers of MERS with the job title of assistant secretary and/or vice president. These servicer and law firm employees then sign and record documents such as mortgage assignments, substitution of deed of trust trustees, and substitutions of deed of trust beneficiaries—all including the representation that they are a MERS vice president or assistant secretary. Some states require that the individual signing a document conveying an interest in land have the job title of vice president or higher. Surely this policy is to prevent mistakes, confusion, and disputes over land ownership. But many servicer and law firm employees use the "vice president" title even when it is not required—perhaps because it just sounds better.

Only, it is not true. The representation that employees of mortgage servicing companies and foreclosure law firms are "vice presidents" of MERS is false. In the English language the words vice president primarily mean: "an officer next in rank to a president and usually empowered to serve as president in that officer's absence or disability." Sometimes, vice president can mean "any of several officers serving as a president's deputies in charge of particular locations or functions." (citation omitted). The reality of what MERS "vice presidents" actually do, from whom they receive their paychecks, and their actual job titles are fundamentally inconsistent with a corporate officer than serves as president when the president is disabled, or acts as the president's deputy. A deposition transcript taken from a foreclosure case brought by a Florida debt collection law firm is illustrative. The deponent was a non-attorney employee of the firm that was claiming MERS certifying officer status. The employee was responsible for signing 20-40 mortgage assignments that would be recorded with county officials per day. (citation omitted). The firm's rationale for allowing this was one of the boilerplate "corporate resolutions" taken off of MERS' website that stated: "The attached list of candidates are employees of Florida Default Law Group and are hereby appointed as assistant secretaries and vice-presidents of MERS." When this "Vice President" of MERS was asked about her relationship with MERS she responded:

Q.     Did you have to have any sort of training to become a Certified Officer?

A.     No.

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERKS OFFICE

Q.   Do you know where MERS is located?

A.   No.

Q.   Have you ever been there?

A.   No.

Q.   Have you ever spoken with anyone at MERS?

A.   No.

Q.   Have you ever had e-mail transmissions back and forth with anyone from MERS?

A.   No.

Q.   Do you file any reports with MERS relating to assignments?

A.   No.

Q.   Do you know who the president of MERS is?

A.   No.

****

Q.   And I guess at some point, somebody explained to you that you were a Certified Officer is that correct? . . . .

A.   Yes.

Q.   And what do you remember as to their explanation as to what that meant?

A.   Why I was being chosen as a Certified Officer?

Q.   Yes.

A.   That it was actually a group of us, we had one meeting and they explained that people that had an understanding of what an assignment was were going to go ahead and become certified officers because we then had authorization to execute on behalf of MERS.



It is inconsistent with even the most expansive definition of the term vice president, that an individual who is not an employee of the company, has never been to the company's location, does not even know where the company is located, has never met the company's president, does not know who the president is, and has never personally communicated with the company in any way can be considered a vice-president of that company. It does not follow that because a belief is convenient, it is also true.

Perhaps the designation of servicer and law firm employees as "assistant secretaries" of MERS is less absurd, but it is also still false. While many of these servicer and law firm employees are secretarial workers in the businesses that they actually work for, they are not assistant secretaries of MERS in any meaningful economic sense. They have no more contact with MERS than vice presidents do. Indeed the fact that MERS' boilerplate resolutions allow the employees to just pick which title they want to use is compelling evidence that the whole concept is twaddle. MERS Assistant secretaries are not paid by MERS. They receive no health benefits from MERS. In yet one more example of Orwellian doublespeak, it is the financial institutions and law firms that pay MERS to allow them to pretend that they have MERS employees.100 Who pays to be an assistant secretary? (citation omitted). While mortgage brokers and financiers may be keen on entrusting the nation's real property records to a company with these standard business practices, one can imagine that this might make the democratically elected county recorders that have dedicated their professional careers to preservation of land ownership rights somewhat uncomfortable.

County recorders deserve a fair hearing if they were to request payment of recording fees for assignments avoided through use of documents containing these false statements. Recording of these legally and factually false statements caused a reduction in the revenue that county governments would have collected from mortgage financiers. MERS itself used projections of this reduction in revenue in its sales pitches and marketing material. Indeed the studies done by accountants that justified the creation of MERS show how use of the MERS system—which entailed recording false documents—would cause a reduction in fees paid to counties.

But perhaps most compelling, pooling and servicing agreements packaging mortgage loans into securities legally require finance companies to record (and pay recording fees on) every assignment of a mortgage loan from origination through deposit in a securitization trust. A 2005 Pooling and Servicing Agreement

---


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

between J.P. Chase Morgan's subprime subsidiary as a depositor, J.P. Chase Morgan's actual bank as servicer, and Wachovia Bank as trustee Chase's subprime subsidiary provides a typical example. The pool included both non-MERS and MERS loans, but had different assignment recording warranties for each. In the agreement Chase's subprime subsidiary promised to turn over to the securitization trustee "Originals of all recorded intervening Assignments of Mortgage, or copies thereof, certified by the public recording office in which such Assignments or Mortgage have been recorded showing a complete chain of title from the originator to the Depositor, with evidence of recording . . . ." (citation omitted). Conversely, in the case of MERS-recorded loans, the same agreement does not require recording of intermediate assignments. Instead it only requires the depositor to take "such actions as are necessary to cause the Trustee to be clearly identified as the owner of each such Mortgage Loan on the records of MERS. . . ." (citation omitted). In this typical securitization deal, Chase used the MERS system to duck a contractual obligation to produce recorded assignments for every non-MERS loan included in the pool—even though counties depend on the revenue produced by those assignments.[16]

70.     Recording of deeds of trust containing these legally and factually false statements caused a reduction in the revenue that county governments, including Dallas County, Texas would have collected had Defendants complied with Texas law and recorded all subsequent transfers, assignments, transfers, and other activities related to the original deed of trust identifying MERS as the "beneficiary" of the deed of trust. MERS itself used projections of this reduction in revenue in its sales pitches and marketing material. Indeed the studies done by accountants that justified the creation of MERS show how use of the MERS system—which entailed recording false documents—would cause a reduction in fees paid to counties. And it has. By some estimates, the MERS system has cost counties nationwide in excess of $10 billion.

71.     In a nutshell, when Wall Street "financiers talk to investors, they claim to own mortgages in order to convey the sense that they own what they are selling. But when financiers

---

[16]   Christopher L. Peterson, *Two Faces: Demystifying the Mortgage Electronic Registration System's Land Title Theory*, 53 WILLIAM & MARY L. REV. (forthcoming 2011) (available at: www.papers.ssrn.com/sol3/papers.cfm?abstract_id=1684729).


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

talk to the government they claim not to own what they are selling so as to not be obliged to pay fees associated with owning it. MERS and its members prevent recording fees from being paid on assignments—that was the whole point of MERS—but then attempt to avail themselves of the protection that having taken such an action would have afforded."[17]

72.     The havoc wrought by MERS was summarized aptly in an April 6, 2011, letter from the Guilford County, North Carolina Register of Deeds and Southern Essex District of Massachusetts Register of Deeds to Iowa Attorney General Tom Miller, leader of the Mortgage Foreclosure Multistate Group, comprised of state attorneys general in all 50 states. The letter outlines the concerns shared by county clerks and recorders nationwide and states, in part:

> As County Land Record Recorders in Massachusetts and North Carolina, we have been gravely concerned about the role of the Mortgage Electronic Registration Systems (MERS) in not only foreclosure proceedings, but as it undermines the legislative intent of our offices as stewards of land records. MERS tracks more than 60 million mortgages across the United States and we believe it has assumed a role that has put constructive notice and the property rights system at risk. We believe MERS undermines the historic purpose of land record recording offices and the "chain of title" that assures ownership rights in land records.
>
> As a result, we are asking as part of your probe, that this task force and the National Association of Attorney Generals require that all past and present MERS assignments of deeds of trust/mortgages be filed in local recording offices throughout the United States immediately. Assignments are required by statute to be filed in Massachusetts, however they are not currently required to be recorded in North Carolina. We feel, that it is important that the Registers of Deeds should have representatives at the table before any settlement is discussed or agreed to as it relates to MERS failure to record assignments and pay the proper fees.
>
> This action would serve three specific purposes. First, the filing of all assignments would help recover the chain of title that determines property ownership rights that has been lost and clouded over during the past 13 years because of the scheme that MERS has set in place. Second, transparency and confidence in

---

[17] *Id.*

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

ownership rights would be restored and this would prevent the infringement upon those rights by others. Third, this action would support a return to sound fundamentals in our economy between the financial services industry and public recording offices.

MERS has defended their practices by saying that they were helping the registries of deeds by reducing the amount of paperwork that needed to be recorded. This claim is outrageous. This is help we did not ask for, nor was it help that we needed. It is very clear that the only ones that they were helping were themselves. Over the past 10-12 years, recording offices across the United States have upgraded their internal and external technology to meet the demands of lenders, title underwriters, title searchers and citizens. In fact, in 1998 the Southern Essex District Registry of Deeds in Massachusetts became the first registry of deeds to provide both document images and indices available to the public, 24 hours a day, free of charge on the world-wide-web. In doing so, the Registry received a Computerworld Smithsonian Award which recognized the innovative use of technology to benefit society. In 2009, the Guilford County Register of Deeds was given a local Government Federal Credit Union Productivity Award by the North Carolina Association of County Commissioners for their technological innovations. Nationally, over 93% of the public land records are up to date and current, according to Ernest Publishing.

As of today, there are over 600 recording jurisdictions, covering 43% of the US population that have incorporated an eRecording model into their document recording operations. We believe these jurisdictions cover nearly 80% of the volume of assignments that should be recorded. The remaining areas could be covered quickly, with legislation requiring such action by state legislatures.

Quite frankly, we believe this can and should be done. It's the right thing to do.

In the coming weeks, we will be working with our national organizations, the National Association of County Recorders, Election Officials and Clerks (NACRC) and the International Association of Clerks, Recorders, Election Officials, and Treasurers (IACREOT) to take the same position. We are also sending a copy of this Letter to the National Conference on State Legislatures (NCSL) and the National Association of Counties (NACO).[18]

---

[18]  http://www.co.guilford.nc.us/departments/rod/ROD_Letter_To_AG_Miller.pdf.


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

73.    According to many observers the MERS System has created massive confusion as to the true owners of beneficial interests in mortgage loans and mortgages throughout the U.S. And the loss of revenues to counties throughout the U.S., including Dallas County, has resulted in blight and other harms.

**E.    The Dallas County Deed Records**

74.    Section 11.004 of the Texas Property Code requires that County Clerks throughout the State of Texas, including Dallas County: (1) correctly record, as required by law, within a reasonable time after delivery, any instrument authorized or required to be recorded in that clerk's office that is proved, acknowledged, or sworn to according to law; (2) give a receipt, as required by law, for an instrument delivered for recording; (3) record instruments relating to the same property in the order the instruments are filed; and (4) provide and keep in the clerk's office the indexes required by law.

75.    Section 193.003 of the Texas Local Government Code requires that a county clerk maintain "a well-bound alphabetical index to all recorded deeds, powers of attorney, mortgages, and other instruments relating to real property" with "a cross-index that contains the names of the grantors and grantees in alphabetical order." Under policies in effect for many years, employees of the Dallas County Clerk's Office record as a grantee any person identified in a deed of trust as a "beneficiary." As of midnight on Sunday, September 11, 2011, MERS was shown as the "grantee" in 157,319 records and "grantor" in 128,206 on the Dallas County, Texas Clerk's ROAM website.

76.    MERS is described as follows in many of the deeds of trust filed by MERS or on MERS' behalf in Dallas County, Texas:

> The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.

In yet another section of these deeds of trust MERS is identified as follows:[19]

"MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument**. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P,O, Box 2026, Flint, MI 48501-2026, tel. (888) 679·MERS.

Despite its denomination as such, MERS is not the beneficiary of such deeds of trust as the word "beneficiary" has been used in deeds of trust in Texas for over 100 years. And MERS' attempt to qualify that denomination by including the notation that it is the "beneficiary" solely as "nominee for Lender and Lender's successors and assigns" does not cure this infirmity.

77.     The explanation for why MERS decided to identify itself as the "beneficiary" of a security interest in property pledged as security on a debt as to which MERS is not the obligee is simple - in order for the MERS System to work, MERS had to misrepresent its interests in the deeds of trust of which it purports to be a beneficiary.

78.     For over 100 years, Texas law has provided that the grantee or beneficiary of a deed of trust is the lender on the note secured by the deed of trust.[20] So long as a debt exists, the "security will follow the debt," and the assignment of the debt carries with it the rights created by

---

[19] If this description of MERS status under deeds of trust in which it appears as the "beneficiary" seems somewhat imprecise, that is because it is. Simply stated, MERS cannot be the "beneficiary" of deed of trust which secures to **another**, the Lender: "(i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note."

[20] *See Lawson v. Gibbs*, 591 S.W.2d 292, 294 (Tex. Civ. App.-Houston [1st. Dist.] 1979, writ ref'd n.r.e.).

---



the deed of trust securing the note.[21]

79.     Deed records in Texas were created to provide public notice of the identity of the person whose interest is protected by a deed of trust. Once properly filed, a deed of trust is "notice to all persons of the existence of the instrument," protects the lender's security interest against creditors of the mortgagor, and places subsequent purchasers on notice that the property is encumbered by a mortgage lien.

80.     In order to be shown in deed records as a "grantee," and therefore a party whose interest is protected by recording, one must be identified on a deed of trust as either a "mortgagee," "grantee," or "beneficiary" of the deed of trust. As noted above, however, MERS has admitted that it is none of these:

> MERS has no interest at all in the promissory note evidencing the mortgage loan. MERS has no financial or other interest in whether or not a mortgage loan is repaid. . . .
>
> ****
>
> MERS is not the owner of the promissory note secured by the mortgage and has no rights to the payments made by the debtor on such promissory note. . . . MERS is not the owner of the servicing rights relating to the mortgage loan and MERS does not service loans. **The beneficial interest in the mortgage (or the person or entity whose interest is secured by the mortgage) runs to the owner and holder of the promissory note.** In essence, MERS immobilizes the mortgage lien while transfers of the promissory notes and servicing rights continue to occur. (citation omitted).[22]

81.     Acting only in its capacity as a "nominee" of the lender, MERS has no rights which qualify it to assert that it is a beneficiary of a deed of trust. But unless MERS identifies itself as a "beneficiary," MERS will not be denominated as a "grantee" in the deed records. And

---

[21]  A deed of trust in Texas creates a lien in favor of the lender – it does not operate as a transfer of title. This has been the law in Texas for more than 100 years. *See McLane v. Paschal*, 47 Tex. 365, 369 (1877); *see also Johnson v. Snell*, 504 S.W.2d 397, 399 (Tex. 1973).

[22]  *Mortgage Electronic Registration Systems, Inc. Nebraska Dept. of Bnkng and Fin.*, 704 N.W.2d 784 (Neb. 2005), Brief of Appellant at 11-12 (emphasis added).


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

unless MERS is identified as a "grantee" in the deeds records, the MERS System does not work because the protections of the recording statutes are not extended to MERS. For MERS the solution was simple – ignore the law and identify itself as a "beneficiary" of an instrument in which it holds no beneficial interest. In that way, county clerks, including the Dallas County Clerk, would identify MERS as a "grantee" in the deed records and MERS and its associates could take advantage of the recording system.

82.     As demonstrated by the criminal and civil penalties for filing false or deceptive real estate liens, Texas public policy favors a reliable functioning public recordation system to avoid destructive breaks in title, confusion as to true identity of the holder of a note, fraudulent foreclosures, and uncertainty as to title when a home is sold. The MERS System has all but collapsed this system throughout the U.S., including Dallas County, Texas.[23]

**F.     Other Conduct of Defendants**

83.     **MERSCORP:** MERSCORP is the operating company that owns and operates the MERS System; charges and receives all fees for use of the MERS System; establishes and

---

[23] To understand the scale and seriousness of the institutional failures MERS and MERSCORP and the role of these entities in creating a morass of the recordation systems in the U.S., one need look no further than the disaster MERS has made of the foreclosure process in the U.S. On April 12, 2011, MERSCORP and MERS entered into a *Consent Order* with several federal agencies. According to the findings contained in the *Consent Order*, MERS and MERSCORP "a) have failed to exercise appropriate oversight, management supervision and corporate governance, and have failed to devote adequate financial, staffing, training, and legal resources to ensure proper administration and delivery of services to Examined Members; (b) have failed to establish and maintain adequate internal controls, policies, and procedures, compliance risk management, and internal audit and reporting requirements with respect to the administration and delivery of services to Examined Members" and, that "MERS and MERSCORP engaged in unsafe or unsound practices that expose[d] them and Examined Members to unacceptable operational, compliance, legal, and reputational risks." *Consent Order*, April 12, 2011, OCC No. AA-EC-11-20; Board of Governors Docket Nos. 11-051-B-SC-1 and 11-051-B-SC-2; FDIC-11-194b; OTS No. 11-040; FHFA No. EAP-11-01 at 4-5.

In response to the hundreds of cases filed nationwide against MERSCORP and MERS for wrongful foreclosure, MERSCORP and MERS recently promulgated new policies that include the mandate that "[n]o foreclosure proceeding may be initiated, and no Proof of Claim or Motion for Relief from Stay (Legal Proceedings) in a bankruptcy may be filed, in the name of Mortgage Electronic Registration Systems, Inc. (MERS)."

---



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

promulgates Rules of Membership in MERSCORP for those lenders and loan servicers desiring to become members for purposes of utilizing the MERS System; determines the *bona fides* of membership applications in MERSCORP; and is responsible for the day-to-day operation of the MERS System. Accordingly, the acts of misconduct alleged herein against MERS are alleged as well against MERSCORP as the owner and operator of MERS.

84.     Pleading further, Dallas County, Texas would show that at all times material hereto, MERS has been a wholly-owned subsidiary of MERSCORP. MERS has been utilized by MERSCORP to shift liability away from MERSCORP and its shareholders for the violations of Texas statutes and law as set forth herein, to perpetrate a fraud in the form of wrongfully identifying MERS as the "beneficiary," "mortgagee," or "grantee" of deeds of trust and other documents filed in the Dallas County Deed Records; evade the ongoing obligation to maintain the accuracy of deeds of trust and other documents filed in the Dallas County Deed Records; and justify the wrongs set forth herein. Accordingly, MERSCORP is liable for all of the acts of misconduct alleged against MERS herein.

85.     MERSCORP established MERS without sufficient capitalization in view of the business in which MERS engaged. Moreover, MERSCORP failed to retain an appropriate number of employees opting instead to direct MERS' member to have the members' employees appointed as "Vice-Presidents" or "Secretaries" of MERS for purposes of having the members, including BOA, purport to take actions as "MERS" through members' employees falsely or improperly denominated as offices of MERS.

86.     **BOA:** Defendant BOA's actionable conduct related to MERS and the other activities made the basis of this action included, but was and is not limited to, originating loans secured by deeds of trust recorded in Dallas County, Texas listing MERS as "mortgagee" or "beneficiary" and which BOA knew or should have known would result in the Dallas County

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

Clerk's Office improperly listing MERS each as "grantee" in the deed records index. The denomination of MERS as "mortgagee" or beneficiary" or "grantee" is false.

87.     Upon information and belief, BOA has released, transferred, assigned, or taken other action relating to the instruments identified herein that BOA has filed or caused to be filed, but in violation of Texas law BOA failed to file, register, or record another instrument relating to such actions in the same manner as the original instrument was required to be filed, registered, or recorded.

88.     In addition to BOA's direct liability for its conduct alleged herein, Plaintiff seeks a determination of the court that it is appropriate to pierce the MERSCORP and MERS corporate veils in this instance and hold BOA as a shareholder of MERSCORP liable for the conduct of MERSCORP and its subsidiary, MERS.

89.     Recognizing the corporate existence of MERSCORP and MERS separate from their shareholders, including BOA, would bring about an inequitable result or injustice, or would be a cloak for fraud or illegality. MERSCORP and MERS were undercapitalized in light of the nature and risk of their business. The corporate fiction is being used to justify wrongs; as a means of perpetrating fraud; as a mere tool or business conduit for others; as a means of evading existing legal obligations; to perpetrate monopoly and unlawfully gain monopolistic control over the real property recording system in the State of Texas; and to circumvent statutory obligations.

90.     **ASPIRE:** Defendant Aspire's actionable conduct related to MERS and the other activities made the basis of this action included, but was and is not limited to, originating loans secured by deeds of trust recorded in Dallas County, Texas listing MERS as "mortgagee" or "beneficiary" and which Aspire knew or should have known would result in the Dallas County Clerk's Office improperly listing MERS each as "grantee" in the deed records index. The denomination of MERS as "mortgagee" or beneficiary" or "grantee" is false. Upon information


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

and belief, Aspire has released, transferred, assigned, or taken other action relating to the instruments it has filed or caused to be filed but in violation of Texas law failed to file, register, or record another instrument relating to such actions in the same manner as the original instrument was required to be filed, registered, or recorded.

91.   **STEWART TITLE:** Defendant Stewart Title's actionable conduct related to MERS and the other activities made the basis of this action included, but was and is not limited to, directing the preparation and filing of thousands of deeds of trust in the deed records of Dallas County, Texas listing MERS as "mortgagee" or "beneficiary" and which Stewart Title knew or should have known would result in the Dallas County Clerk's Office improperly listing MERS each as "grantee" in the deed records index. The denomination of MERS as "mortgagee" or beneficiary" or "grantee" is false. Upon information and belief, many of the notes and mortgages securing such notes have been sold, assigned, or transferred without notice of such sales, assignments, or transfers being recorded in the deed records of Dallas County, Texas, all in violation of Texas law.

92.   Stewart Title also marketed MERS through Stewart Title's established sales and marketing forces thereby encouraging others to utilize the defective MERS System.

93.   **STEWART:** Stewart is a Texas-based title insurance underwriter. It is relatively unique within the industry in that it only insures title risks, and does not generally conduct title examinations or perform closing-related services such as document preparation and acting as an escrow agent. Instead, Stewart contracts with independent and affiliated agents for these functions, including Stewart Title.[24]

---

[24]   Stewart is the successor-in-interest of Stewart Title North Texas, Inc. which merged into Stewart on or about October 1, 2008.


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

94.    Plaintiff seeks a determination of the court that it is appropriate to pierce the MERSCORP and MERS corporate veils in this instance and hold Stewart as a shareholder of MERSCORP liable for the conduct of MERSCORP and its subsidiary, MERS.

95.    Recognizing the corporate existence of MERSCORP and MERS separate from their shareholders, including Stewart, would bring about an inequitable result or injustice, or would be a cloak for fraud or illegality. MERSCORP and MERS were undercapitalized in light of the nature and risk of their business. The corporate fiction is being used to justify wrongs; as a means of perpetrating fraud; as a mere tool or business conduit for others; as a means of evading existing legal obligations; to perpetrate monopoly and unlawfully gain monopolistic control over the real property recording system in the State of Texas; and to circumvent statutory obligations.

## VI.
## CAUSES OF ACTION

**A.**    <u>**Violation of § 12.002 of the Texas Civil Practice & Remedies Code – All Defendants**</u>

96.    Section 12.002 of the Texas Civil Practice & Remedies Code ("CPRC") provides:

    (a)    A person may not make, present, or use a document or other record with:

        (1)    knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property;

        (2)    intent that the document or other record be given the same legal effect as a court record or document of a court created by or established under the constitution or laws of this state or the United States or another entity listed in Section 37.01, Penal Code, evidencing a valid lien or claim against real or personal property or an interest in real or personal property; and

        (3)    intent to cause another person to suffer:


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

(B)    financial injury . . . .

(b)    A person who violates Subsection (a) or (a-1) is liable to
each injured person for:

(1)    the greater of:

(A)    $10,000; or

(B)    the actual damages caused by the violation;

(2)    court costs;

(3)    reasonable attorney's fees; and

(4)    exemplary damages in an amount determined by the
court.

97.    The records filed or caused to be filed by Defendants in the Dallas County Deed

Records and described herein falsely represent MERS' security interest in the real property that

is the subject of such instruments; Defendants knew at the time of filing that such instruments

falsely represented MERS' security interest in the real property that is the subject of such

instruments; Defendants filed or caused to be filed the instruments with the intent that they be

given the same legal effect as a court record or document of a court created by or established

under the constitution or laws of this state or the United States or another entity listed in Section

37.01, Penal Code, evidencing a valid lien or claim against real or personal property or an

interest in real or personal property; and intended by such conduct to financially injure Dallas

County, Texas by avoiding the costs and filing fees associated with filing, registering, or

recording subsequent releases, transfers, assignments, or other action relating to such instrument

as required by Texas law.

98.    Defendants conduct described herein violated section 12.002 of the CPRC for

which Plaintiff seeks judgment against Defendants, jointly and severally, in the amount of

---


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

$10,000 per violation, together with attorney's fees, court costs, and exemplary damages in an amount determined by the court.

**B. Violation of Texas Local Government Code § 192.007**

99. For almost 300 years, common law and statute have required or permitted the recording of instruments affecting title to real property for the primary purpose of giving notice of their contents to the public. One of the primary purposes of recording documents affecting the title to real property is to make information pertaining to that property available to the general public and thus to protect persons from fraud. And because real estate is so tightly woven into the fabric of the U.S. financial system, stability and certainty regarding titles to real property is essential to the efficient functioning of the markets.

100. In order to perfect a security interest in real property in Texas, the instrument creating the security interest must be filed of record. But filing is not mandatory. Once a record of a security interest is filed of record, however, it must by statute be kept current in order to ensure continued accuracy of the real property records.

101. Section 192.007 of the Texas Local Government Code provides:

**§ 192.007 LOC. GOV'T Records of Releases and Other Actions**

(a) To release, transfer, assign, or take another action relating to an instrument that is filed, registered, or recorded in the office of the county clerk, a person must file, register, or record another instrument relating to the action in the same manner as the original instrument was required to be filed, registered, or recorded.

(b) An entry, including a marginal entry, may not be made on a previously made record or index to indicate the new action.

102. Defendants violated section 192.007 of the Texas Local Government Code by failing to record all releases, transfers, assignments, and other actions relating to the deeds of trust in which they, separately or jointly, identified MERS as the "beneficiary."

---


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

103.    Damages to Dallas County, Texas have been proximately caused by the conduct of Defendants described herein as measured by the filing fees that would have been received by Dallas County, Texas had all of the releases, transfers, assignments and other actions relating to the deeds of trust and other instruments described herein been filed, registered, or recorded in the office of the county clerk in the same manner as the original instrument was required to be filed, registered, or recorded as required by law.

### C.    Unjust Enrichment – MERSCORP, MERS, BOA, and STEWART

104.    MERSCORP and MERS have been unjustly enriched by their conduct described above by their receipt of fees charged to MERS members for MERS to track mortgage loan and mortgage transfers which would otherwise have been recorded in the deed records of Dallas County, Texas. BOA and Stewart are liable to Dallas County, Texas for these damages alleged herein as shareholders in MERSCORP and/or MERS under a theory of alter-ego or otherwise piercing the corporate veil of MERSCORP and/or MERS.

105.    Damages to Dallas County, Texas have been proximately caused by the conduct of Defendants described herein as measured by the filing fees that would have been received by Dallas County, Texas had all of the transfers described herein been recorded or, in the alternative as to MERS and MERSCORP, as measured by the fees received by MERSCORP and MERS for tracking the mortgage loans and mortgages tracked by MERS but not recorded in the deed records of Dallas County, Texas, for which damages Dallas County, Texas seeks judgment of the Court.

### D.    Unjust Enrichment – BOA and Aspire

106.    Defendants BOA and Aspire have been unjustly enriched by avoiding the filing fees associated with recordation of transfers that would otherwise have been recorded, but for their participation in the MERS System and violation of Texas law.

---


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

107.   Damages to Dallas County, Texas have been proximately caused by the conduct of BOA and Aspire described herein as measured by the filing fees that would have been received by Dallas County, Texas had all of the transfers described herein and in which BOA or Aspire participated, been recorded rather than tracked exclusively on the MERS database, for which damages Dallas County, Texas seeks judgment of the court.

### E.   Negligent Misrepresentation – All Defendants

108.   Defendants negligently misrepresented the true beneficial owner of notes and related mortgages filed by them in Dallas County, Texas for the purpose of avoiding the recordation of subsequent transfers and payment of attendant filing fees.

109.   Defendants negligently failed to properly record all releases, transfers, assignments, or other actions relating to instruments Defendants filed, registered, or recorded in the office of the Dallas County Clerk in the same manner as the original instrument was required to be filed, registered, or recorded.

110.   The negligence of Defendants set forth herein was a proximate cause of damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.

### F.   Grossly Negligent Misrepresentation – All Defendants

111.   Defendants were grossly negligent in misrepresenting the true beneficial owner of notes and related mortgages filed by them in Dallas County, Texas for the purpose of avoiding the recordation of subsequent transfers and payment of attendant filing fees.

112.   Defendants grossly negligently failed to properly record all releases, transfers, assignments, or other actions relating to instruments Defendants filed, registered, or recorded in the office of the Dallas County Clerk in the same manner as the original instrument was required to be filed, registered, or recorded.

113.   The gross negligence of Defendants set forth herein was a proximate cause of


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.

### G.  Negligent Undertaking – All Defendants

114.  Defendants negligently undertook the misconduct alleged herein. Such negligence included, but was and is not limited to, filing false and deceptive records in the deed records of Dallas County, Texas and failing to properly record all releases, transfers, assignments, or other actions relating to instruments Defendants filed or caused to be filed, registered, or recorded in the office of the Dallas County Clerk in the same manner as the original instrument was required to be filed, registered, or recorded.

115.  The negligent undertaking of Defendants set forth herein was a proximate cause of damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.

### H.  Grossly Negligent Undertaking – All Defendants

116.  Defendants were grossly negligent in the misconduct alleged herein. Such gross negligence included, but was and is not limited to, filing false and deceptive records in the deed records of Dallas County, Texas and failing to properly record all releases, transfers, assignments, or other actions relating to instruments Defendants filed or caused to be filed, registered, or recorded in the office of the Dallas County Clerk in the same manner as the original instrument was required to be filed, registered, or recorded.

117.  The grossly negligent undertaking of Defendants set forth herein was a proximate cause of damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.

### I.  Fraudulent Misrepresentation – All Defendants

118.  Defendants fraudulently misrepresented the true beneficial owner of notes and related mortgages filed by them in Dallas County, Texas for the purpose of avoiding the recordation of subsequent transfers and payment of attendant filing fees.

---


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

119.   Defendants' fraudulent misrepresentations described herein were a proximate cause of damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.

### J.   Declaratory Judgment

120.   Dallas County hereby seeks a judicial declaration that the filing of deeds of trust identifying MERS as a "mortgagee" or "beneficiary" under the deed of trust, when in fact MERS has no beneficial interest in the note secured by such deed of trust, constitutes a violation of section 51.901 of the Texas Government Code.

121.   Dallas County also seeks a judicial declaration that the Defendants and each of them is liable for having failed to properly record all releases, transfers, assignments, or other actions relating to instruments Defendants filed or caused to be filed, registered, or recorded in the office of the Dallas County Clerk in the same manner as the original instrument was required to be filed, registered, or recorded.

### K.   Request for Injunctive Relief

122.   Plaintiff seeks an order of the Court permanently enjoining Defendants from filing any instruments in the deed records of Dallas County, Texas identifying MERS or any other person or entity as a "mortgagee" or "beneficiary" of any mortgage in which such person or entity does not have a beneficial interest or other legally sufficient interest.

123.   Plaintiff further seeks an order of this court requiring Defendants, jointly and severally, to correct the false and deceptive filings described herein by causing the recordation of corrective instruments setting forth the entire chain of title for each instrument described herein.

### L.   Exemplary Damages – All Defendants

124.   The conduct of each Defendant as set forth herein constituted fraud, malice, or gross negligence such that each Defendant is liable for exemplary damages for which Plaintiff seeks judgment of the Court.

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

## VII.
## CONSPIRACY

125.   Defendants and each of them conspired together in the actionable conduct alleged herein so as to make each of MERSCORP, MERS, BOA, Stewart, and Stewart Title liable for all damages suffered by Dallas County, Texas.   The conspiracy included these Defendants establishing an object to be accomplished; a meeting of minds on the object or course of action; one or more unlawful, overt acts; and damages to Dallas County, Texas as the proximate result. As a result, Dallas County, Texas seeks damages against these Defendants jointly and severally.

## VIII.
## REQUESTS FOR DISCLOSURE

126.   Plaintiff requests that Defendants disclose the information or material described in Rule 194.2(a)-(l) of the Texas Rules of Civil Procedure.

## IX.
## NO FEDERAL QUESTIONS

127.   Dallas County, Texas expressly affirms that no federal questions, claims, or causes of action are asserted against any defendant.

## X.
## JURY DEMAND

128.   Plaintiff requests trial by jury.

## XI.
## PRAYER

129.   Wherefore, premises considered, Plaintiff requests that Defendants be cited to appear and answer herein and, upon trial of this matter, Plaintiff be awarded damages as set forth above, costs of bringing this action, including all court costs, attorney's fees, and related expenses of bringing the action (including investigative expenses), pre- and post-judgment

---

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

interest at the highest rate allowed by law, and for such other and further relief, in law and in equity, to which Plaintiff may show itself justly entitled.

130.   Plaintiff further requests the Court order Defendants, jointly and severally, to file, register, or record another instrument relating to any release, transfer, assignment, or any other action relating to any instrument that was filed or caused to be filed by any Defendant in the office of the Dallas County Clerk and to do so in the same manner as the original instrument was required to be filed, registered, or recorded.

## XII.
## DESIGNATION OF ATTORNEY IN CHARGE

131.   Pursuant to Rule 8 of the Texas Rules of Civil Procedure, Plaintiff Dallas County, Texas designates Stephen F. Malouf as Attorney in Charge for Plaintiff. Mr. Malouf will work under the direct supervision of District Attorney Craig Watkins.



Respectfully Submitted,



**MALOUF & NOCKELS LLP**
Stephen F. Malouf
SBN 12888100
Jonathan Nockels
SBN 24056047
Sarah Shulkin
SBN 24057720
3811 Turtle Creek Blvd., Suite 800
Dallas, Texas 75219
214-969-7373 (Telephone)
214-969-7648 (Facsimile)

**BARON & BLUE**
Lisa Blue
SBN 02510500
3811 Turtle Creek Blvd., Suite 800
Dallas, Texas 75219
214-969-7373 (Telephone)
214-969-7648 (Facsimile)

Mark White
SBN 21318000
72 E. Briar Oaks Dr.
Houston, Texas 77056
713-906-6848 (Telephone)

**THE LAW OFFICES OF TERRI MOORE**
Terri Moore
SBN 14377780
1407 Texas St., Suite 102
Ft Worth, Texas 76102
(817) 817-877-4700

**DALLAS COUNTY DISTRICT ATTORNEY**
Craig Watkins
SBN 00791886
Gordon R. Hikel
Chief, Civil Division
SBN 00787696
Frank Crowley Courts Building
133 N. Industrial Blvd., LB19
Dallas, Texas 75207-4399
214-653-3600 (Telephone)
214-653-5774 (Facsimile)

Barbara Radnofsky
SBN 16457000303
Timber Terrace Rd.
Houston Texas 77024
713- 858-8509 (Telephone)

**KAESKE LAW FIRM**
Mike Kaeske
SBN 00794061
1301 W. 25th St., Suite 406
Austin, TX 78705
512-366-7300 (Telephone)
512-366-7767 (Facsimile)


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

# MALOUF & NOCKELS LLP

Turtle Creek Centre
3811 Turtle Creek Blvd., Suite 800
Dallas, Texas 75219
Telephone: (214) 969-7373
Telecopier: (214) 969-7648
www.smalouf.com

September 30, 2011



**Via Hand Delivery**
Mr. John F. Warren
Dallas County Clerk
Records Building, 2nd Floor
509 Main Street, Suite 200
Dallas, Texas 75202-3551

Re:   Original Petition Filing;
      *Dallas County, Texas v. MERSCorp, Inc.; Mortgage Electronic Registration*
      *Systems, Inc.; Stewart Title Guaranty Company; Stewart Title Company; Bank of*
      *America, National Association; and Aspire Financial, Inc. d/b/a Texaslending.com*

Dear Mr. Warren:

Enclosed please find the original and eight copies of *Plaintiff's First Amended Original
Petition, Jury Demand, and Requests for Disclosure.* Please file the original with the appropriate
court, returning two file-marked copies to the waiting courier. Additionally enclosed is this firm's
check in the amount of $24.00 for the issuance of citation upon Defendants, as listed in paragraph
1 of the petition.

Please call me once the citation has been issued for pick up by private process.

Thank you for your kind assistance in this matter. Please call me should you have any
questions or concerns.

Sincerely,

Jenny McKenzie, Paralegal

:jm


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

# AFFIDAVIT OF SERVICE

| | | |
|---|---|---|
| **State of Texas** | **County of Dallas** | **Law No. 5 Court** |

Case Number: CC-11-06571-E

SYC2011000291

Plaintiff:
**Dallas County, Texas**

vs.

Defendant:
**Merscorp, Inc.; Mortgage Electronic Registrations Systems, Inc.;
Stewart Title Guaranty Company; Stewart Title Company; Bank of
America, National Association; and Aspire Financial, Inc. D/B/A
Texaslending.com,**

For:
Sarah Shulkin
Malouf & Nockels LLP
3811 Turtle Creek Blvd., Suite 800
Dallas, TX 75219

Received these papers on the 21st day of September, 2011 at 1:00 pm to be served on **Merscorp C/O CT Corporation System, 350 N. Saint Paul Street #2900, Dallas, TX 75201**.

I, Lamont Aldridge, being duly sworn, depose and say that on the **26th day of September, 2011 at 9:37 am, I:**

I **SERVED** an **Corporation, by Certified Mail/Return Receipt** via United States Postal Service, a true copy of the *Citation and Plaintiff's Original Petition, Jury Demand and Request for Disclosure*, **with the date of mailing endorsed thereon by me, to:Mica Minor,** as a person authorized to accept certified mail on behalf of **Merscorp C/O CT Corporation System** located at: **350 N. Saint Paul Street #2900, Dallas, TX 75201,** in compliance with state statues.

**Additional Information pertaining to this Service:**
70093410000037424774

I certify that I am over the age of 21 and have no interest in the above action and competent to testify. I am an Authorized Process Server in good standing. I have never been convicted of a felony or misdemeanor involving moral turpitude in any state. I have studied and am familiar with the Texas Rules of Court, Vernon's Civil Statutes, and Texas Rules of Civil Procedure regarding service of process. All statements contained herein based on my personal knowledge are true and correct

Subscribed and Sworn to before me on the 2 5 day
of _September 2011_ by the affiant who is
personally known to me.

NOTARY PUBLIC

PATRICIA ANN GRYN
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
02-15-2015

**Lamont Aldridge**
Texas Supreme Court ID SCH3970

Our Job Serial Number: SYC-2011000291
Ref: MERS (1666-1)

Copyright © 1992-2011 Database Services, Inc. - Process Server's Toolbox V6.4t


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

**ATTORNEY**

# CITATION

### Cause #: CC-11-06571-E

The State of Texas
County Court at Law No. 5
Dallas County, Texas



**SERVE:**

**MERSCORP**
**C/O ITS REGISTERED AGENT**
**CT CORPORATION SYSTEM**
**350 N. ST. PAUL ST., SUITE 2900**
**DALLAS, TX. 75201-4234**

**PLAINTIFF(S) ATTORNEY:**
**STEPHEN F MALOUF**

**TURTLE CREEK CENTRE**
**3811 TURTLE CREEK BLVD**
**SUITE 800**
**DALLAS TX 75219**
**214-969-7373**

"You have been sued. You may employ an attorney. If you or your attorney do not file a WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and ORIGINAL Petition, a default judgment may be taken against you." Your answer should be addressed to the clerk of County Court at Law No. 5 of Dallas County, Texas, at the George Allen Courts Building of said County 600 Commerce Street, Suite 101, Dallas, Texas 75202.

*Plaintiff(s),*
**DALLAS COUNTY, TEXAS**
**vs.**
**MERSCORP, BILL BECKMANN, MALCOM S MORRIS.et al**
*Defendant(s)*

filed in said Court on the 20th day of September, 2011 a copy of which accompanies this citation.

**WITNESS: JOHN F. WARREN**, Clerk of the County Courts of Dallas County, Texas. **GIVEN UNDER MY HAND AND SEAL OF OFFICE**, at Dallas, Texas, and issued this 21st day of September, 2011 A.D.

JOHN F. WARREN
Dallas County Clerk

*A. Espinoza*
Alina Espinoza, Deputy

---

## OFFICER'S RETURN

Came to hand on the ____ day of _____ A.D. , 20___ , at _____ o'clock ___. M. and executed by delivering to

_____
(Name, Address where served including: City, State and Zip)
on the ___ day of _____ A.D. , 20___ , at _____ o'clock ___. M., the within named Defendant, in person, a true copy of this Citation, together with a copy of the ORIGINAL Petition with date of service marked thereon.

_____County, Texas

_____
Deputy

(Must be verified if served outside the State of Texas, or if served in Texas by anyone other than a Sheriff or Constable.)

_____

Signed and sworn to by the said _____ before me this _____ day of _____
,20_____ , to certify which witness my hand and seal of office.

## AFFIDAVIT ATTACHED

Notary Public _____ County _____


TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

## AFFIDAVIT OF SERVICE

FILED

**State of Texas**
County of Dallas

Law No. 5 Court

Case Number: CC-11-06571-E

2011 OCT -6  PH 2: 46

JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY



SYC2011000292

Plaintiff:
**Dallas County, Texas**
vs.

Defendant:
**Merscorp, Inc.; Mortgage Electronic Registrations Systems, Inc.;
Stewart Title Guaranty Company; Stewart Title Company; Bank of
America, National Association; and Aspire Financial, Inc. D/B/A
Texaslending.com,**

For:
Sarah Shulkin
Malouf & Nockels LLP
3811 Turtle Creek Blvd., Suite 800
Dallas, TX 75219

Received these papers on the 21st day of September, 2011 at 1:00 pm to be served on **Stewart Title Guaranty
Company, 1980 Post Oak Blvd #800, Houston, TX 75252.**

I, Lamont Aldridge, being duly sworn, depose and say that on the **26th day of September, 2011 at 4:41 pm, I:**

I **SERVED** an **Corporation,** by **Certified Mail/Return Receipt** via United States Postal Service, a true copy of the
*Citation and Plaintiff's Original Petition, Jury Demand and Request for Disclosure,* **with the date of mailing endorsed
thereon by me, to:T Austin,** as a person authorized to accept service on behalf of **Stewart Title Guaranty Company**
located at: **1980 Post Oak Blvd #800, Houston, TX 75252,** in compliance with state statues.

**Additional Information pertaining to this Service:**
70093410000037424828

I certify that I am over the age of 21 and have no interest in the above action and competent to testify. I am an
Authorized Process Server in good standing. I have never been convicted of a felony or misdemeanor involving
moral turpitude in any state. I have studied and am familiar with the Texas Rules of Court, Vernon's Civil Statutes,
and Texas Rules of Civil Procedure regarding service of process. All statements contained herein based on my
personal knowledge are true and correct

Subscribed and Sworn to before me on the ___6___ day
of _October_, _2011_ by the affiant who is
personally known to me.

_Patricia Ann Gryn_
NOTARY PUBLIC

**Lamont Aldridge**
Texas Supreme Court ID SCH3970

Our Job Serial Number: SYC-2011000292
Ref: MERS (1666-1)



PATRICIA ANN GRYN
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
**02-15-2015**

Copyright © 1992-2011 Database Services, Inc. - Process Server's Toolbox V6.4t

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

**ATTORNEY**

# CITATION

### Cause #:  CC-11-06571-E

The State of Texas
County Court at Law No. 5
Dallas County, Texas

FILED

2011 OCT -6  PH 2: 4(

JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

**SERVE:**

**MALCOM S MORRIS**
**CHAIRMAN AND CHIEF EXECUTIVE OFFICER**
**STEWART TITLE GUARANTY COMPANY**
1980 POST OAK BLVD., SUITE 800
HOUSTON, TX. 75252-2029

PLAINTIFF(S) ATTORNEY:
STEPHEN F MALOUF

TURTLE CREEK CENTRE
3811 TURTLE CREEK BLVD
SUITE 800
DALLAS TX 75219
214-969-7373

"You have been sued. You may employ an attorney. If you or your attorney do not file a WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and ORIGINAL Petition, a default judgment may be taken against you." Your answer should be addressed to the clerk of County Court at Law No. 5 of Dallas County, Texas, at the George Allen Courts Building of said County 600 Commerce Street, Suite 101, Dallas, Texas 75202.

*Plaintiff(s),*
**DALLAS COUNTY, TEXAS**
**vs.**
**MERSCORP, BILL BECKMANN, MALCOM S MORRIS.et al**
*Defendant(s)*

filed in said Court on the 20th day of September, 2011 a copy of which accompanies this citation.

**WITNESS:  JOHN F. WARREN**, Clerk of the County Courts of Dallas County, Texas.  **GIVEN UNDER MY HAND AND SEAL OF OFFICE**, at Dailes, Texas, and issued this 21st day of September, 2011 A.D.

JOHN F. WARREN
Dallas County Clerk

Alina Espinoza, Deputy

---

## OFFICER'S RETURN

Came to hand on the _____ day of _____ A.D. , 20___ , at ___ o'clock ___. M. and executed by delivering to

_____

(Name, Address where served including:  City, State and Zip)
on the ___ day of _____ A.D. , 20___ , at _____ o'clock ___. M., the within named Defendant, in person, a true copy of this Citation, together with a copy of the ORIGINAL Petition with date of service marked thereon.

_____County, Texas

_____
Deputy

(Must be verified if served outside the State of Texas, or if served in Texas by anyone other than a Sheriff or Constable.)

_____

Signed and sworn to by the said _____before me this _____ day of _____ ,20_____ , to certify which witness my hand and seal of office.

## AFFIDAVIT ATTACHED County _____


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

## AFFIDAVIT OF SERVICE

**State of Texas**

FILED

County of Dallas

**Law No. 5 Court**

Case Number: CC-11-06571-E

2011 OCT -6 PM 2:46

JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY



SYC2011000293

Plaintiff:
**Dallas County, Texas**
vs.

Defendant:
**Merscorp, Inc.; Mortgage Electronic Registrations Systems, Inc.;
Stewart Title Guaranty Company; Stewart Title Company; Bank of
America, National Association; and Aspire Financial, Inc. D/B/A
Texaslending.com,**

For:
Sarah Shulkin
Malouf & Nockels LLP
3811 Turtle Creek Blvd., Suite 800
Dallas, TX 75219

Received these papers on the 21st day of September, 2011 at 1:00 pm to be served on **Mortgage Electronic
Registration Systems, Inc, 1818 Library Street #300, Reston, VA 20190.**

I, Lamont Aldridge, being duly sworn, depose and say that on the **26th day of September, 2011 at 11:56 am, I:**

I **SERVED an Corporation, by Certified Mail/Return Receipt** via United States Postal Service, a true copy of the
*Citation and Plaintiff's Original Petition, Jury Demand and Request for Disclosure*, with the date of mailing endorsed
thereon by me, to:**Bill Beckmann**, as President and Chief Executive Officer on behalf of **Mortgage Electronic
Registration Systems, Inc** located at: **1818 Library Street #300, Reston, VA 20190,** in compliance with state statues.

Additional Information pertaining to this Service:
70093410000037424781

I certify that I am over the age of 21 and have no interest in the above action and competent to testify. I am an
Authorized Process Server in good standing. I have never been convicted of a felony or misdemeanor involving
moral turpitude in any state. I have studied and am familiar with the Texas Rules of Court, Vernon's Civil Statutes,
and Texas Rules of Civil Procedure regarding service of process. All statements contained herein based on my
personal knowledge are true and correct

Subscribed and Sworn to before me on the __6__ day
of __October__, __2011__ by the affiant who is
personally known to me.

_____
NOTARY PUBLIC

_____
**Lamont Aldridge**
Texas Supreme Court ID SCH3970

Our Job Serial Number: SYC-2011000293
Ref: MERS (1666-1)

PATRICIA ANN GRYN
NOTARY PUBLIC STATE OF TEXAS
COMMISSION EXPIRES:
02-15-2016

Copyright © 1992-2011 Database Services, Inc - Process Server's Toolbox V6.4f

ATTORNEY

# CITATION

**Cause #:  CC-11-06571-E**

The State of Texas
County Court at Law No. 5
Dallas County, Texas

FILED *at*

2011 OCT -6 PM 2: 46

JOHN F. WARREN
COUNTY CLERK
DALLAS COUNTY

SERVE:

**BILL BECKMANN**
**PRESIDENT AND CHIEF EXECUTIVE OFFICER**
**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.**
**1818 LIBRARY ST., SUITE 300**
**RESTON, VA. 20190**

PLAINTIFF(S) ATTORNEY:
STEPHEN F MALOUF

**TURTLE CREEK CENTRE**
**3811 TURTLE CREEK BLVD**
**SUITE 800**
**DALLAS TX  75219**
**214-969-7373**

"You have been sued.  You may employ an attorney.  If you or your attorney do not file a WRITTEN ANSWER with the clerk who issued this citation by 10:00 A.M. on the Monday next following the expiration of twenty days after you were served this citation and ORIGINAL Petition, a default judgment may be taken against you."  Your answer should be addressed to the clerk of County Court at Law No. 5 of Dallas County, Texas, at the George Allen Courts Building of said County 600 Commerce Street, Suite 101, Dallas, Texas 75202.

*Plaintiff(s),*
**DALLAS COUNTY, TEXAS**
*vs.*
**MERSCORP, BILL BECKMANN, MALCOM S MORRIS.et al**
*Defendant(s)*

filed in said Court on the 20th day of September, 2011 a copy of which accompanies this citation.

**WITNESS:  JOHN F. WARREN**, Clerk of the County Courts of Dallas County, Texas.  **GIVEN UNDER MY HAND AND SEAL OF OFFICE.** at Dallas, Texas, and issued this 21st day of September, 2011 A.D.

JOHN F. WARREN
Dallas County Clerk

Alina Espinoza, Deputy

---

## OFFICER'S RETURN

Came  to  hand  on  the _____ day of _____ A.D. , 20___ , at ___ o'clock ___. M. and executed  by delivering to
_____

(Name, Address where served including:  City, State and Zip)
on the ___ day of _____ A.D. , 20___ , at _____ o'clock ___. M., the within named Defendant, in person, a true copy of this Citation, together with a copy of the ORIGINAL Petition with date of service marked thereon.

_____County, Texas

_____
Deputy

(Must be verified if served outside the State of Texas, or if served in Texas by anyone other than a Sheriff or Constable.)

_____

Signed and sworn to by the said _____before me this _____ day of _____ ,20_____ , to certify which witness my hand and seal of office.

_____



## AFFIDAVIT ATTACHED County _____





**JOHN F. WARREN**
**Dallas County Clerk**
**George Allen Sr. Court Bldg.**
**600 Commerce St, Ste 101**
**Dallas, Texas  75202-3551**

STATE OF TEXAS

COUNTY OF DALLAS

I, John F. Warren, Clerk of the County Court of Dallas County Court at Law No. 5, Dallas County, Texas do hereby certify that the foregoing is a true and correct copy of document in Cause No. CC-11-06571-E.

DALLAS COUNTY, TEXAS, **PLAINTIFF (S)**

**VS**

MERSCORP, INC.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.; STEWART TITLE GUARANTY COMPANY; STEWART TITLE COMPANY; BANK OF AMERICA, NATIONAL ASSOCIATION; ASPIRE FINANCIAL, INC.,

**DEFENDANT (S)**

SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS filed on 10th day of October, 2011 in the Dallas County Court at Law No. 5, Dallas County, Texas.

**WITNESS MY HAND AND SEAL** of said Court this 12th day of October, 2011.

John F. Warren, County Clerk

By: _Sharon Jennings_

Sharon Jennings, Deputy

Cause No. CC-11-06571-E



| | |
|---|---|
| **DALLAS COUNTY, TEXAS,** | |
| Plaintiff, | |
| **vs.** | **IN COUNTY COURT AT LAW** |
| | **No. 5** |
| **MERSCORP, INC.; MORTGAGE ELECTRONIC REGISTRATON SYSTEMS, INC.; STEWART TITLE GUARANTY COMPANY; STEWART TITLE COMPANY; BANK OF AMERICA, NATIONAL ASSOCIATION; and ASPIRE FINANCIAL, INC. D/B/A TEXASLENDING.COM,** | **DALLAS COUNTY, TEXAS** |
| Defendants. | |

---

## SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS

---

TO THE HONORABLE JUDGE OF THE COURT:

COMES NOW Plaintiff Dallas County, Texas, complaining of MERSCORP, INC.; MORTGAGE ELECTRONIC REGISTRATON SYSTEMS, INC.; STEWART TITLE GUARANTY COMPANY; STEWART TITLE COMPANY; BANK OF AMERICA, NATIONAL ASSOCIATION; and ASPIRE FINANCIAL, INC.d/b/a TEXASLENDING.COM (collectively, "*Defendants*"), and would show the Court as follows:

### I.
### DISCOVERY CONTROL PLAN

1.    Plaintiff intends that discovery be conducted under a Level 3 Discovery Control Plan and moves the Court enter such a plan.

---

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE



## II.
## PARTIES

2.      Plaintiff is Dallas County, Texas ("**Dallas County, Texas**" or "**Plaintiff**").

3.      Defendant MERSCORP, INC. ("**MERSCORP**") is a Delaware corporation. MERSCORP is a nonresident who engages in business in this state, but it does not maintain a regular place of business in this state or a designated agent for service of process. Plaintiff's claims against MERSCORP arise out of MERSCORP's activities in Texas. Pursuant to section 17.004(d) of the Texas Civil Practice & Remedies Code MERSCORP has been served with citation by serving the Secretary of State of the State of Texas.

> Bill Beckmann
> President and Chief Executive Officer
> MERSCORP, INC.
> 1818 Library Street, Suite 300
> Reston, Virginia 20190

At all times material heretoDefendant MERSCORP has engaged in businessin Dallas County, Texas or committed a tort, in whole or in part, in Dallas County, Texas and the claims made herein arise out of such activities in Dallas County, Texas. And, until November 10, 2010, MERSCORP was registered to do business in the State of Texas.

4.      Defendant MORTGAGE ELECTRONIC REGISTRATON SYSTEMS, INC. ("**MERS**") is a Delaware corporation and wholly-owned subsidiary of Defendant MERSCORP. MERS engages in business in DallasCounty, Texas but does not maintain a regular place of business in this state or a designated agent for service of process for proceedings that arise out of MERS's business done in this state. MERS has been served.

> Bill Beckmann, President and Chief Executive Officer
> Mortgage Electronic Registration Systems, Inc.
> 1818 Library Street, Suite 300
> Reston, Virginia 20190



TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

---

**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**                    **Page 2**

At all times material hereto Defendant MERShas engaged in business in Dallas County, Texas or committed a tort, in whole or in part, in Dallas County, Texas and the claims made herein arise out of such activities in Dallas County, Texas.

5.     Defendant STEWART TITLE GUARANTY COMPANY ("*Stewart*") is a Texas corporation with its principal place of business in Houston, Harris County, Texas. Stewart has been served with citation by serving its Chairman and Chief Executive Officer by certified mail, return receipt requested.

> Malcolm S. Morris, Chairman and Chief Executive Officer
> Stewart Title Guaranty Company
> 1980 Post Oak Boulevard, Suite 800
> Houston, Texas 77252 -2029

Upon information and belief, Stewart was at all times material hereto and currently is a shareholder in MERSCORP, an affiliate of Defendant Stewart Title Company, and a subsidiary of Stewart Information Services Corporation.

6.     Defendant STEWART TITLE COMPANY ("*Stewart Title*") is a Texas corporation with its principal place of business in Houston, Texas. Stewart has been served with citation by serving its registered agent by certified mail, return receipt requested.

> STEWART TITLE COMPANY
> C/o CT Corporation System
> 350 N. St. Paul Street, Suite 2900
> Dallas, Texas 75201-4234

Upon information and belief, Stewart Title was at all times material hereto and currently is an affiliate of Stewart and a subsidiary of Stewart Information Services Corporation.

7.     Defendant BANK OF AMERICA, NATIONAL ASSOCIATION ("*BOA*") is a Delaware corporation that has been served with citation by serving its registered agent in Texas by certified mail, return receipt requested.



BANK OF AMERICA, NATIONAL ASSOCIATION
C/o Its Registered Agent
CT Corporation System
350 N. St. Paul Street, Suite 2900
Dallas, Texas 75201-4234

At all times material hereto BOA has engaged in business in Dallas County, Texas or committed

a tort, in whole or in part, in Dallas County, Texas; and the claims made herein arise out of such

activities in Dallas County, Texas. Upon information and belief, BOA was at all times material

hereto and currently is a shareholder in MERSCORP.

    8.    Defendant   ASPIRE   FINANCIAL,   INC.   d/b/a   TEXASLENDING.COM

("*Aspire*") is a Texas corporation with its principal place of business located at 4100 Alpha Road

Suite 400 Dallas, Dallas County, Texas 75244. Aspire has been served with citation by serving

its registered agent by certified mail, return receipt requested.

Kevin C. Miller, President
Aspire Financial, Inc.
4100 Alpha Road, Suite 400
Dallas, Texas 75244

### III.
### JURISDICTION AND VENUE

    9.    Jurisdiction herein is based upon section 25.0592 of the Texas Government Code;

Article V, Section 16, of the Texas Constitution; and section 12.004 of the Texas Civil Practice

& Remedies Code.

    10.    Venue herein is based upon sections 15.002(a)(1)-(2) and 15.005 of the Texas

Civil Practice & Remedies Code.



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE



## IV.
## AGENCY AND CORPORATE VEIL/ALTER-EGO

11.     At all times material hereto, each Defendant was acting by and through its actual, apparent, ostensible, or by estoppel agents and/or employees.

12.     Plaintiff moves the Court to pierce the MERSCORP and MERS corporate veils and impose liability upon each Defendant shareholder in MERSCORP and MERS for the actionable conduct of MERSCORP and MERS alleged herein.Recognizing the corporate existence of MERSCORP and MERS separate from their shareholders, including MERSCORP as a shareholder in MERS and Stewart and BOA as shareholders in MERSCORP, would cause an inequitable result or injustice, or would be a cloak for fraud or illegality. MERSCORP and MERS were undercapitalized in light of the nature and risk of their business. The corporate fiction is being used to justify wrongs, as a means of perpetrating fraud, as a mere tool or business conduit for others, as a means of evading existing legal obligations, to perpetrate monopoly and unlawfully gain monopolistic control over the real property recording system in the State of Texas, and to circumvent statutory obligations.

## V.
## INTRODUCTION

13.     On January 27, 2011, the Financial Crisis Inquiry Commission ("*FCIC*") issued its final report on the causes of the financial collapse of 2008. According to the FCIC:

> The profound events of 2007 and 2008 were neither bumps in the road nor an accentuated dip in the financial and business cycles we have come to expect in a free market economic system. This was a fundamental disruption—a financial upheaval, if you will—that wreaked havoc in communities and neighborhoods across this country.
>
> As this report goes to print, there are more than 26 million Americans who are out of work, cannot find full-time work, or have given up looking for work. About four million families have





lost their homes to foreclosure and another four and a half million have slipped into the foreclosure process or are seriously behind on their mortgage payments. Nearly $11 trillion in household wealth has vanished, with retirement accounts and life savings swept away. Businesses, large and small, have felt the sting of a deep recession. There is much anger about what has transpired, and justifiably so. Many people who abided by all the rules now find themselves out of work and uncertain about their future prospects. The collateral damage of this crisis has been real people and real communities. The impacts of this crisis are likely to be felt for a generation. And the nation faces no easy path to renewed economic strength.

**We conclude this financial crisis was avoidable.** The crisis was the result of human action and inaction, not of Mother Nature or computer models gone haywire. The captains of finance and the public stewards of our financial system ignored warnings and failed to question, understand, and manage evolving risks within a system essential to the well-being of the American public. Theirs was a big miss, not a stumble. While the business cycle cannot be repealed, a crisis of this magnitude need not have occurred. To paraphrase Shakespeare, the fault lies not in the stars, but in us.

Despite the expressed view of many on Wall Street and in Washington that the crisis could not have been foreseen or avoided, there were warning signs. The tragedy was that they were ignored or discounted. There was an explosion in risky subprime lending and securitization, an unsustainable rise in housing prices, widespread reports of egregious and predatory lending practices, dramatic increases in household mortgage debt, and exponential growth in financial firms' trading activities, unregulated derivatives, and short-term "repo" lending markets, among many other red flags. Yet there was pervasive permissiveness; little meaningful action was taken to quell the threats in a timely manner.

The prime example is the Federal Reserve's pivotal failure to stem the flow of toxic mortgages, which it could have done by setting prudent mortgage-lending standards. The Federal Reserve was the one entity empowered to do so and it did not. The record of our examination is replete with evidence of other failures: financial institutions made, bought, and sold mortgage securities they never examined, did not care to examine, or knew to be defective; firms depended on tens of billions of dollars of borrowing that had to be renewed each and every night, secured by subprime mortgage securities; and major firms and investors blindly relied on credit



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE



---

rating agencies as their arbiters of risk. What else could one expect on a highway where there were neither speed limits nor neatly painted lines?

**\*\*\*\***

**We conclude there was a systemic breakdown in accountability and ethics.** The integrity of our financial markets and the public's trust in those markets are essential to the economic well-being of our nation. The soundness and the sustained prosperity of the financial system and our economy rely on the notions of fair dealing, responsibility, and transparency. In our economy, we expect businesses and individuals to pursue profits, at the same time that they produce products and services of quality and conduct themselves well.

Unfortunately—as has been the case in past speculative booms and busts—we witnessed an erosion of standards of responsibility and ethics that exacerbated the financial crisis. This was not universal, but these breaches stretched from the ground level to the corporate suites. They resulted not only in significant financial consequences but also in damage to the trust of investors, businesses, and the public in the financial system.

For example, our examination found, according to one measure, that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007. This data indicates they likely took out mortgages that they never had the capacity or intention to pay. You will read about mortgage brokers who were paid "yield spread premiums" by lenders to put borrowers into higher-cost loans so they would get bigger fees, often never disclosed to borrowers. The report catalogues the rising incidence of mortgage fraud, which flourished in an environment of collapsing lending standards and lax regulation. The number of suspicious activity reports—reports of possible financial crimes filed by depository banks and their affiliates—related to mortgage fraud grew 20-fold between 1996 and 2005 and then more than doubled again between 2005 and 2009. One study places the losses resulting from fraud on mortgage loans made between 2005 and 2007 at $112 billion.

Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE



certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

**\*\*\*\***

In an interview with the Commission, Angelo Mozilo, the longtime CEO of Countrywide Financial—a lender brought down by its risky mortgages—said that a "gold rush" mentality overtook the country during these years, and that he was swept up in it as well: "Housing prices were rising so rapidly - at a rate that I'd never seen in my 55 years in the business - that people, regular people, average people got caught up in the mania of buying a house, and flipping it, making money. It was happening. They buy a house, make $50,000 . . . and talk at a cocktail party about it . . . Housing suddenly went from being part of the American dream to house my family to settle down - it became a commodity. That was a change in the culture. . . It was sudden, unexpected."

The bubble that was the genesis of the Financial Crisis of 2008, burst when the collapse of the primary and secondary mortgage markets triggered a liquidity shortfall in the U.S. banking system. This collapse was a direct result of the financial system's commoditization, packaging, securitization, and sale of tens of millions of mortgages throughout the United States—activities in which Defendants actively participated. Without the fiction of the MERSSystem, these activities would not have been possible.

## VI.
## FACTS

### A.   The U.S. Mortgage System

14.   In the most common residential lending scenario, there are two parties to a real property mortgage – the mortgagee, *i.e.*, a lender, and the mortgagor, *i.e.*, a borrower. When a mortgage lender loans money to a home buyer, it obtains two documents: (1) a promissory note in the form of a negotiable instrument from the borrower and (2) a "mortgage" or "deed of


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE



trust"[1] granting the mortgage lender a security interest in the property as collateral to repay the note. The mortgage, as distinguished from the note, establishes the lien on the property securing repayment of the loan. For the lien to be perfected and inoculate the property against subsequent efforts by the mortgagor to sell the property or borrow against it, however, the mortgage instrument must be filed in the deed records of the county in which the property is located.

### 1.   The Public Recording System

15.   The origins and reasons for public recordation of mortgage interests in the United States dates back to at least the middle of the 17th Century. According to one commentator:

> One of the most striking features of Anglo-American law is the requirement to file notice in public files of a nonpossessory secured transaction in order to enforce the transaction in the court against third parties.  The transaction of interest first developed during the early seventeenth century.  English mortgage law developed for real estate.  Originally, the parties structured mortgages with the secured-mortgagee in possession of the landed collateral, not the debtor-mortgagor.  But by the early seventeenth century, the English had developed the technique of leaving the debtor-mortgagor in possession of the land to work off the loan.
>
> ****
>
> Not all legal systems have the filing requirement.  Roman law recognized the transaction, but did not require a filing.  The Napoleonic Code banned the transaction.  The modern explanation of these three different legal rules involves the secret lien.  When debtors retain possession of the personalty serving as collateral under the nonpossessory secured transaction, subsequent lenders and purchasers have no way of discovering the prior ownership interest of the earlier secured creditors unless the debtor's honesty forces disclosure. Without that disclosure, the debtor could borrow

---

[1]   The law of the state in which property is located generally will determine whether a "mortgage" or a "deed of trust" is used to pledge real property as security on a note.  In lien theory states such as Texas, a "deed of trust" is used and only creates a lien on the property — the title remains with the borrower. The lien is removed when all the payments have been made. *See Taylor v. Brennan*, 621 S.W.2d 592, 593 (Tex. 1981). In title theory states, a "mortgage" is used, and it conveys ownership to the lender. A clause in the mortgage provides that title reverts back to the borrower when the loan is paid. In common parlance, the term "mortgage" is generally used to refer to the instrument creating the security interest, whether formally denominated as a "mortgage" or a "deed of trust." Unless noted, the terms "mortgage" and "deed of trust" are used interchangeably herein.



TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**                                    Page 9

excessively offering the same collateral as security several times, possibly leaving some of the debtor's creditors without collateral sufficient to cover their loan upon the debtor's financial demise. Roman law solved the problem by providing a fraud remedy against the debtor. The Napoleonic Code solved the problem by banning the transactions. Anglo-American law solved the problem by requiring a filing. Potential subsequent lenders and purchasers could then become aware of the debtor's prior obligation by examining the public files and protect themselves by taking the action they deemed appropriate, either not lending or charging higher interest.[2]

16.     Mortgage recordation in Texas is governed by Chapter 12 of the Texas Property Code. Section 12.001 of the Property Code provides, in part, "An instrument concerning real or personal property may be recorded if it has been acknowledged, sworn to with a proper jurat, or proved according to law." Although recordation of a security instrument in real property is not mandatory, once a security interest is recorded, "[t]o release, transfer, assign, or take another action relating to an instrument that is filed, registered, or recorded in the office of the county clerk, a person must file, register, or record another instrument relating to the action in the same manner as the original instrument was required to be filed, registered, or recorded."[3]

17.     Once properly filed, a mortgage is "notice to all persons of the existence of the instrument," protects the mortgagee's (lender's) security interest against creditors of the mortgagor, and places subsequent purchasers on notice that the property is encumbered by a mortgage lien. Unless the mortgage is recorded, the "mortgage or deed of trust is void as to a creditor or to a subsequent purchaser for a valuable consideration without notice."[4]

18.     Until recently, when a loan secured by a mortgage was sold, the assignee wouldrecord the assignment of the mortgage to protect the security interest. If a servicing

---

[2] George Lee Flint, Jr. and Marie Juliet Alfaro, *Secured Transactions History: The First Chattel Mortgage Act in the Anglo-American World*, 30:4 William Mitchell Law Review 1403, 1404-05.

[3] TEX. LOC. GOV'T CODE § 192.007.

[4] TEX. PROP. CODE § 13.001(a).

**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**                    Page 10


TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

company serviced the loan and the servicing rights were sold—an event that could occur multiple times during the life of a mortgage loan—multiple assignments were recorded to ensure that the proper servicer and/or note-holder appeared in the land records in the County Clerk's office.[5] This basic model has been followed throughout the United States for over three hundred years to provide the public with notice of the ownership of, and liens encumbering, real property throughout the United States. Defendants and others similarly situated have changed all of this and collapsed the public recordation system in Dallas County, Texas and throughout the United States.

19.     The MERS business plan, as envisioned and implemented by Wall Street, is based in large part on amending the traditional model of recording security interests in real property and changes thereto and introducing a third party into the equation—MERS.  The motivation for creating MERS was Wall Street's desire to alleviate the "inconvenience" of the public recording system and create its own privately owned shadow electronic recording system—the MERS System. According to one court, the MERS System was designed "as a replacement for our traditional system of public recordation of mortgages."[6] The MERS System fails to comply with Texas law.

### 2.     Mortgage Origination

20.     In order to fully understand the genesis of the MERS System, one must consider the historical context in which it was created.

21.     For most Americans, a mortgage is the largest and most serious financial obligation ever undertaken. Mortgages are originated by a variety of financial institutions.

---

[5] Some sources estimate that mortgage loans or servicing rights are transferred an average of five times or more during the life of a mortgage — transfers which would necessitate recordation.
   [6] *In Re Agard*, 444 BR 231, 247 (E.D.N.Y. 2011).

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE


22.     Depository institutions, which accept deposits from the public and lend that moneyto households and businesses, are one type of originator. Depository institutionsinclude commercial banks as well as credit unions, savings and loan associations, andmutual savings banks. Depository institutions are regulated by a set of federal and/orstate agencies charged with ensuring the safety and soundness of these institutions.

23.     Non-depository institutions, called mortgage companies or mortgagebanks, also originate mortgages. Mortgage companies borrow money from banks (orby issuing bonds) and lend that money to consumers in the form of mortgage loans.They typically then sell those loans to other financial institutions and use that moneyto originate additional mortgages.

24.     Mortgage lenders are sometimes owned by holding companies or otherfinancial institutions. Some mortgage companies are owned by depositoryinstitutions, and are therefore subsidiaries of a depository. Others are owned byholding companies that also own a depository institution and are therefore anaffiliate of a depository. Mortgage companies that are not a subsidiary or an affiliate ofa depository institution are called independent mortgage companies.

25.     Federal Housing Administration (*"FHA"*) loans are made by privatelenders and insured by the FHA. They are usually made to low-income or moderate-incomeborrowers, often with weaker credit histories, and require smaller down payments.Historically, the size limits on these loans were low.

26.     Veterans' Administration (*"VA"*)loans are offered to military personnel and are guaranteed by the Department ofVeteran Affairs. These too require little or no down payment.

27.     One common type of mortgage is a 30-year fixed rate mortgage(*"FRM"*), in which the interest rate is fixed for the entire term of the loan and theborrower is required tomake a series of equal monthly payments until the loan ispaid off. The fixed payment amountthat

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE



**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**                    Page 12

results in the loan being fully paid off at the end of the term is called the fully amortizing payment amount. In contrast, an adjustable rate mortgage ("**ARM**") has an interest rate that is specified in terms of a margin above some interest rate index. For example, "Prime + 3%" means that the borrower is charged interest based on an interest rate equal to the prime rate plus 3 percentage points. The interest rate on an ARM adjusts at regular intervals. Other mortgages are hybrids of FRMs and ARMs in which the interest rate is fixed for some introductory period and then adjusts at regular periods according to some interest rate index. Other types of mortgages involve the borrower paying less than the fully amortizing amount each month.

28.     For example, a balloon mortgage is one in which the borrower pays less than the fully amortizing payment amount but must then pay some relatively large fixed sum at the end of the term – "balloon payment" –to pay off the mortgage. Interest-only mortgages allow the borrower to pay only the interest accrued each month and make no payments toward principal for some period. Option ARMs, also called negative amortization ARMs, allow the borrower to pay less than the interest charged for some period so that the balance on the loan grows over time before the required payment amount resets to the fully amortizing rate. Interest-only mortgages grew from only 2 percent in 2004 to 20 percent by 2007. Option ARMs and balloon mortgages also grew in this period.

## B.     The Commoditization of Mortgages

29.     In the decades leading up to the early 1970s, the housing finance system was relatively simple: banks and savings and loan associations made mortgage loans to households and held them until they were repaid. Deposits provided the major source of funding for these lenders, as most were depository institutions.

30.     In the 1970s, the housing finance system began to shift from depository-based


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE


funding to capital markets-based funding. By 1998, 64 percent of originated mortgage loans were sold by originators to large financial institutions that package bundles of mortgages and sell the right to receive borrowers' payments of principal and interest directly to investors. Key to this shift to capital markets-based funding of mortgage lending were Fannie Mae and Freddie Mac, the government-sponsored enterprises ("*GSEs*"), created by the federal government to develop a secondary mortgage market. The GSEs did this in two ways:

    a.    by issuing debt to raise capital and using those funds to purchase mortgages to hold in their portfolios; and

    b.    by securitizing mortgages, that is, by selling to investors the rights to the principal and interest payments made by borrowers on pools of mortgages through what is referred to as mortgage-backed securities ("*MBSs*").

31.    MBSs are securities that give the holders the right to receive the principaland interest payments from borrowers on a particular pool of mortgage loans. TheGSEs purchase mortgages to hold in portfolios and to securitize into MBSs that the GSEs guarantee against default. MBSs issued by the GSEs or Ginnie Mae are referred to asagency MBSs.

32.    Fannie Mae and Freddie Mac provide a guarantee that investors in theirMBSs will receive timely payments of principal and interest. If the borrower for oneof the underlying mortgages fails to make his payments, the GSE that issued the MBSwill pay to the trust the scheduled principal and interest payments. In return forproviding this guarantee, Fannie Mae and Freddie Mac deduct an ongoing guaranteefee, which is charged by setting the pass-through annual interest rate (*i.e.*, theinterest rate received by holders of the MBS) about 20-25 basis points (*i.e.*, 0.20 - 0.25 percentage points) below the weighted average interest rate of the mortgagesin the pool. GSEs were by investors to be implicitly backed by the federalgovernment, thereby removing their credit risk.



TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**        **Page 14**

33.     Other financial institutions also create MBSs, referred to as non-agencyMBSs, which have a structure similar to agency MBSs but typically have no guaranteeagainst default risk. In a non-agency securitization, the sponsor of the securitization,which could be an investment bank, commercial bank, thrift, or mortgage bank, firstacquires a set of mortgages, either by originating them or by buying them from anoriginator. The sponsor then creates a new entity, a "special purpose vehicle"("*SPV*"), and transfers the mortgages to the SPV.

34.     The principal and interest payments on the pool of mortgages provide the underlying set of cash flows for the SPV. The SPV may then enter intocontracts in order to manage the risk it faces. For example, to reduce interest rate-related risks, the SPV may enterinto interest rate swap agreements that providedfloating interest rate-based payments to the SPV in exchange for a fixed set ofpayments from the SPV. The SPV will then issue various classes of mortgage-backed securities that give investors who are holders of the securities rights to thecash flows available to the SPV.

35.     Two features of MBSs, in particular, boost their value relative to other investment options: bankruptcy-remoteness and favorable tax treatment as a real estate mortgage investment conduit ("*REMIC*") under the Internal Revenue Code. Bankruptcy remoteness means both that the trust that issues the mortgage-backed securities cannot file for bankruptcy and that the trust's assets cannot be brought into the bankruptcy estate of other entities in the mortgage loans' chain of title. These features have the effect of isolating the cash flows on the mortgages from claimants other than the MBSs' investors and the trustee, which thereby reduces the risks investors assume on the securities. REMIC status ensures that only the investors, who hold certificates issued by the trusts entitling them to payment, and not the trusts, are taxed.

36.     Generally, investors in a Subchapter C corporation (under the Internal Revenue



TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

Code) are subjectto double taxation because the corporation is taxed directly on its earnings, and then the investorsare taxed on any distributions from the corporation. If the trust qualifies as a REMIC, however, it istreated as a "pass-through" entity for federal tax purposes, so there is only a single layer oftaxation.

37.     In order for trusts to enjoy the benefits of bankruptcy remoteness and pass-throughtax status, they must beformed in a particular way, and their assets must betransferred to them in a particular manner. There are two documents in particular that needto be properly transferred to the trust –the promissory note and the mortgage or deed of trust. Possession of a note without a mortgage amounts to possession of unsecured debt. The term "mortgage loan" generally refers to the mortgage and note together, although colloquially the term "mortgage" is also often used to refer to both the mortgage and the note.

38.     The mortgage securitization process is often structured in a complex and detailed way to ensure that bankruptcy-remoteness and REMIC tax status are achieved. One form for the structure might be as follows. First, securitization of mortgage loans begins with origination of a loan by one of the types of lenders discussed above.  Second, a sponsoror sellerassembles a pool of mortgage loans that it originated and/or it that it purchased from unaffiliated third-party originating lenders. Third, the pool of loans is sold by the sponsor to an SPV subsidiary—the "depositor"—that has no other assets or liabilities. This step is executed to segregate the mortgage loans from the sponsor's assets and liabilities. Fourth, the depositor sells the loans to the trustSPVwhich issues pass-through securities certificates to investors entitling them to payment from performance of the underlying mortgageloans.

39.     These trusts are usually formed pursuant to, and governed by, contracts called Poolingand Servicing Agreements ("*PSAs*"), which are crafted to ensure that the benefits of


TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE



mortgagesecuritization flow to the trusts. In order for a trust to be bankruptcy-remote, there must be a "true sale" of the mortgage loans, which means that all rights to the mortgage loan aretransferred to the trust so that no other entity in the chain of title could claim control of the assetsin the event of bankruptcy. True sale status also leads to MBS trusts attaining higher ratingsfrom rating agencies than they otherwise would, which, in turn, means that the trust can charge ahigher issuing price for the securities relative to the interest rate paid on the securities. Theheightened value of the trust enables the Trustee to charge premium prices to investors.

40.     Each class of securities in an MBS offering is referred to as a tranche. Unlike agency MBSs, non-agency MBSs are not typically guaranteedagainst credit loss. A crucial goal of the capital structure of the SPV was to createsome tranches that were deemed low risk and could receive investment-grade ratings, such as AAA, from the rating agencies. Credit enhancements were used to achieve this goal.

41.     One key credit-enhancement tool was subordination. The classes ofsecurities issued by the SPV were ordered according to their priority in receivingdistributions from the SPV. The structure was set up to operate like a waterfall, withthe holders of the more senior tranches being paid prior to the more junior (orsubordinate) tranches. The most senior set of tranches—referred to simply as seniorsecurities—represented the lowest risk and consequently paid the lowest interestrate. They were set up to be paid prior to any of the classes below and were typicallyrated AAA. The next most senior tranches were the mezzanine tranches. Thesecarried higher risk and paid a correspondingly higher interest rate. The most juniortranche in the structure was called the equity or residual tranche and was set up toreceive whatever cash flow was left over after all other tranches had been paid.These tranches, which were typically not rated, suffered the first losses on anydefaults of mortgages in the pool.





TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**                          **Page 17**

42.     The payments of principal and interest by borrowers flow first to makethe promised payments to the AAA senior bondholders, then down to pay the AAbonds, and so forth. If there is any money left over after all bondholders have beenpaid, it flows to the residual tranche of securities.

43.     An example of a typical subprime MBS in which cumulative losses onmortgages in the SPV were expected to amount to 4 percent of the total principalamount is as follows. Assume that AAA senior bonds make up 92 percent of theprincipal amount of debt issued by the SPV, AA bonds account for 3 percent,mezzanine BBB bonds make up 4 percent, and the residual tranche amounts to 1percent.   If the MBS does indeed experience such a 4 percent loss on its mortgageassets, then 4 percent of the total principal amount on its bonds would default.Because of the SPV's subordination structure, these losses would first be applied tothe residual tranche. The residual tranche, which accounts for 1 percent of theprincipal amount of the SPV's bonds, would fully default, paying nothing. That wouldleave 3 percent more of the total principal amount in losses to apply to the next mostjunior tranche, the mezzanine BBB tranche. Since the mezzanine BBB tranche totals4 percent of the deal, the 3 percent left in losses would reduce its actual paymentsto 1 percent, meaning that 75 percent of the BBB bonds'principal value would belost. The AA and AAA bonds, however, would pay their holders in full. In this simpleexample, the junior tranches below the AA and AAA bonds would be large enoughto fully absorb the expected loss on the SPV's mortgages.

44.     Another credit enhancement technique was overcollateralization. Theprincipal balance of the underlying mortgages often exceeded the principalbalance of the debt securities issued by the SPV. Thus, some underlyingmortgages could defaultwithout anyof the MBS bonds defaulting on their promised payments to investors.

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

45.     Similarly, the weighted average coupon interest rate on the underlyingmortgage pool would typically exceed the weighted average coupon interest ratepaid on the SPV's debt securities by an amount sufficient to provide a further buffer before the debt tranches incur losses. In essence, the SPV received a higher interestrate from mortgage borrowers than it paid to investors in its bonds. The resultingexcess spread gave the SPV extra cash flow to pay its bond holders, further insulatingthe MBS from credit risk in the underlying mortgages.

46.     With both over-collateralization and excess spread, the total amount ofcash that had been promised to be paid to the SPV by mortgage borrowers wasgreater than the total amount of cash that the SPV had promised to pay out toinvestors. This gave the SPV a cushion in case some of the mortgage borrowersdefaulted on their promised payments.

47.     The prospectus for an MBS would include a description of the mortgagesheld by the SPV, such as information about the distribution of borrowers' creditscores and loan-to-value ratios, and the geographic distribution of the homes thatserve as collateral for the mortgages. The underwriting practices used by theoriginators usually would also be described. For example, Goldman Sachs disclosedthe following about the underwriting standards used by the originator - New CenturyMortgage - of the mortgages it packaged in a 2006 MBS offering:

> The mortgage loans will have been originated in accordance with the underwriting guidelines established by New Century. On a case-by-case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist. It is expected that a substantial portion of the mortgage loans will represent these exceptions. All of the mortgage loans were also underwritten with a view toward the resale of the mortgage loans in the secondary mortgage market. As a result of New Century's underwriting criteria, changes in the values of [homes securing the mortgage loans] may have a greater effect on the delinquency, foreclosure and loss experience on the mortgage loans than these changes would be expected to have on mortgage loans that are originated in a more traditional manner.




48.     The originators of the mortgages also generally made representationsand warranties to the SPV, described in the prospectus, regarding the nature of themortgages in the pool. For example, they typically represented that the mortgageshad never been delinquent and that they complied with all national and state lawsin their origination practices. Moreover, in the event that any of the representationsand warranties were breached, or if any of the mortgagesdefaulted early (withinsome fixed period after being transferred to the SPV), the originator typically agreedto repurchase the mortgage from the SPV.

49.     The SPV would contract with a firm to service the mortgages in the pool,i.e., to collect payments from borrowers. The mortgage servicer would also handledefaults in the mortgage pool, including negotiating modifications and settlementswith the borrowers and initiating foreclosure proceedings. In exchange, themortgage servicer would get an ongoing servicing fee from the flow of interestpayments from borrowers of typically between 25 and 50 basis points, or 0.25 and0.50 percentage points, at an annual rate.

50.     Servicers also typically would retain late fees charged to delinquentborrowers and would be reimbursed for expenses related to foreclosing on a loan.The borrowers would be informed by the originator or the new servicer whenservicing rights to their mortgages were transferred so that they knew how to makepayments to the new servicer.

51.     The sponsor of an MBS typically approached Fitch, Standard & Poor's,or Moody's to obtain credit ratings on the classes of debt securities issued in thedeal. The credit rating agencies analyzed the probability distribution of cash flowsassociated with each tranche using proprietary models based on historical data andassigned a credit rating to each debt tranche. These ratings were intended torepresent the riskiness of the securities and were used by investors to inform theirdecision whether to invest in the security. Sponsors of MBSs typically




TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

structured themto produce as many bonds with the highest credit rating (*e.g.*AAA) whileoffering attractive yields. AAA-rated bonds were in demand by investors whorequired low-risk assets in their portfolio. The internal credit enhancements used innon-agency securitizations, discussed above, enabled the transformation ofmortgages, including relatively risky mortgages to borrowers with low credit scoresor with little equity, into bonds that were considered to be low risk but relativelyhigh yield.

52.     The junior tranches of an MBS typically received lower ratings because they were more likely to default than the senior tranches.This is because, as discussed above, senior securities would be paid before the juniorsecurities would be paid, so that the more junior a tranche, the more likely it wouldbe to bear losses if the underlying mortgages defaulted.

53.     The same credit-enhancement techniques that produced highly ratedtranches out of a pool of mortgages were used to create highly rated securities outof pools of junior tranches of MBSs. This was done using a product known as acollateralized debt obligation ("**CDO**").

54.     The sponsor of such a CDO assembled a pool of junior tranches frommany different MBSs, for example mezzanine tranches rated BBB, transferred themto an SPV, and using the same tools of subordination, over-collateralization, andexcess spreads issued AAA-rated senior securities from that SPV, along with juniortranches and a first-loss residual tranche.

55.     A credit default swap ("**CDS**") was used to protect against the risk of an MBS defaulting. In a CDS, the buyer agreed to pay the seller a fixed stream of payments. In return, the seller agreed to pay the buyer a fixed amount if the "reference entity" of the CDS experienced a "credit event," which was typically some sort of default. For MBS-based and CDO-based CDSs, the reference entity was the trust that issued the MBS or CDO security.  CDSs were used by


TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE


---

holders of MBSs and CDOs for the purpose of reducing their exposure to credit risk of MBSs and CDOs.

56.     The following chart demonstrates that the 2000s saw a large increase in the market share of non-agency securitization. It shows the fraction of total residential mortgage originations in each year that were securitized into non-agency MBSs, GSE MBSs, and Ginnie Mae MBSs, as well as the fraction nonsecuritized (*i.e.*, held as whole loans by banks, thrifts, the GSEs, and other institutions).



57.     Four trends are notable. Non-securitized mortgage originations declined steadily from half the market in 1995 to under 20 percent in 2008. Non-agency MBSs hovered between 8 and 12 percent until 2003; non-agency MBSs then more than trebled in market share to a peak of 38 percent in 2006. During the growth years for non-agency MBSs, Ginnie Mae's market share




**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**                     **Page 22**

dropped considerably. Finally, both GSEs and Ginnie Mae rapidly escalated their market share as nonagency securitization dropped in 2008.

58.     The following chart plots the volume of prime, subprime,[7] and alt-A[8] (self-identified as such by the sponsors) non-agency MBSs issued from 1995-2008.



59.     The chart reveals that early in the period covered, the prime nonagency MBSs, which contained largely jumbo mortgages, were the biggest of the three types of non-agency MBSs. But by 2006 the subprime and alt-A non-agency MBSs had each surpassed prime

---

[7]    The term "subprime" refers to mortgage loans made to borrowers without credit histories or with relatively poor credit histories. These loans are therefore riskier than prime loans, which are made to borrowers with stronger credit. The marketing, underwriting, and servicing of subprime loans is different than that of prime loans.

[8]    The term "alt-A" generally refers to loans made to borrowers with strong credit scores but which have other characteristics that make the loans riskier than prime loans. For example, the loan may have no or limited documentation of the borrower's income, a high loan-to-value ratio ("*LTV*"), or may be for an investor-owned property.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE


non-agency MBS in volume. In particular, subprime non-agency MBSs showed a dramatic increase from 2003 to 2005. Alt-A non-agency MBSs saw their largest jump in volume in 2005. Notably, the non-agency MBS market was nearly nonexistent in 2008.

## C.   The Collapse

60.     By 2004, commercial banks, thrifts, and investment banks caught up with Fannie Mae and Freddie Mac in securitizing home loans. By 2005, they had taken the lead. The two government-sponsored enterprises maintained their monopoly on securitizing prime mortgages below their loan limits, but the wave of home refinancing by prime borrowers spurred by very low, steady interest rates petered out. Meanwhile, Wall Street focused on the higher-yield loans that the GSEs could not purchase and securitize—loans too large, called jumbo loans, and nonprime loans that didnot meet the GSEs' standards. The nonprime loans soon became the biggest part of the market—"subprime" loans for borrowers with weak credit and "Alt-A" loans, with characteristics riskier than prime loans, to borrowers with strong credit.

61.     By 2005 and 2006, Wall Street was securitizing one-third more loans than Fannie and Freddie. In just two years, private-label mortgage-backed securities had grown more than 30 percent, reaching 1.15 trillion in 2006; 71 percent were subprime or Alt-A.

62.     "Securitization could be seen as a factory line," former Citigroup CEO Charles Prince told the FCIC. "As more and more and more of these subprime mortgages were created as raw material for the securitization process, not surprisingly in hind-sight, more and more of it was of lower and lower quality. And at the end of that process, the raw material going into it was actually bad quality, it was toxic quality, and that is what ended up coming out the other end of the pipeline. Wall Street obviously participated in that flow of activity." One theory for the demand Wall Street was so intent on satisfying pointed to foreign money.



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE



63.     Developing countries were booming and, due to past financial vulnerabilities, strongly encouraged saving. Investors in these countries placed their savings in apparently safe and high-yield securities in the United States. Federal Reserve Board Chairman Ben Bernanke called it a "global savings glut." As the United States ran a large current account deficit, flows into the country were unprecedented. Over six years from 2000 to 2006, U.S. Treasury debt held by foreign official public entities rose from $600billion to $1.43 trillion; as a percentage of U.S. debt held by the public, these holdings increased from 18.2 to 28.8 percent.

64.     According to Frederic Mishkin,former member (governor) of the Board of Governors of the Federal Reserve System:

> You had a huge inflow of liquidity. A very unique kind of situation where poor countries like China were shipping money to advanced countries because their financial systems were so weak that they [were] better off shipping [money] to countries like the United States rather than keeping it in their own countries.

The demand for what was perceived to be the safety of MBSs created a surplus in liquidity, thereby helping to lower long-term interest rates and providing easy money to mortgage originators.According to Paul Krugman, an economist at Princeton University:

> It's hard to envisage us having had this crisis without considering international monetary capital movements. The U.S. housing bubble was financed by large capital inflows. So were Spanish and Irish and Baltic bubbles. It's a combination of, in the narrow sense, of a less regulated financial system and a world that was increasingly wide open for big international capital movements.

And as more and more foreign capital became available, underwriting standards were lowered to extend credit to borrowers who represented a new risk paradigm.

65.     As 2007 went on, increasing mortgage delinquencies and defaults compelled the ratings agencies to downgrade first mortgage-backed securities, then CDOs. Alarmed investors sent prices plummeting. Hedge funds faced with margin calls from their repo lenders were forced

---

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE



to sell at distressed prices; many would shut down. Banks wrote down the value of their holdings by tens of billions of dollars.

66.    Predictably, borrowers who had been extended credit without having been adequately qualified began to default on their loans in escalating numbers beginning in late 2006. As demonstrated by the following chart, defaults peaked in 2010.



**Mortgage Delinquencies by Region**

*Arizona, California, Florida, and Nevada—the "sand states"—had the most problem loans*

IN PERCENT, BY REGION

- 13.6% Sand states
- 8.7% U.S. total
- 7.0% Non-sand states

NOTE: Serious delinquencies include mortgages 90 days or more past due and those in foreclosure.
SOURCE: Mortgage Bankers Association National Delinquency Survey

67.    The summer of 2007 also saw a near halt in many securitization markets, including the market for non-agency mortgage securitizations. For example, a total of $75 billion in subprime securitizations were issued in the second quarter of 2007 (already down from prior quarters). That figure dropped precipitously to $27 billion in the third quarter and to only $12 billion in the fourth quarter of 2007. Alt-A issuance topped $100 billion in the second quarter but fell to $13 billion in the fourth quarter of 2007. Once-booming markets were now gone—only

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

$14 billion in subprime or Alt-A mortgage-backed securities were issued in the first half of 2008, and almost none after that.

68.    To feed the MBS demand, Wall Street's system made virtually unlimited funds available to unqualified buyers. More buyers in the market caused housing prices to rise thereby creating a housing bubble. Pretty soon, there were not enough buyers, qualified or not, to sustain the model, and the entire system collapsed.

69.    The ease with which non-agency MBSs were created, and mortgages transferred into them, would not have been possible without the MERS System—a shadow recording system created by Wall Street to facilitate the commoditization the American mortgage and issuance of MBSs.

**D.    Wall Street Ignores 300 Years of History and Creates the "MERS System"**

70.    To facilitate the commoditization of mortgages and resulting explosion in non-agency MBSs, Wall Street needed to create a mechanism that would enable it to buy and sell mortgages and mortgage servicing rights multiple times, packaged with tens of thousands of other mortgages, without the "inconvenience," expense, or time associated with recording each transfer. In order to issue an MBS, however, the issuer was and is required by law and industry standards to record (and pay recording fees on) every assignment of a mortgage loan from origination through deposit in a securitization trust. Faced with this dilemma, Wall Street simply wrote its own rules and created MERSCORPand MERS, ignoring property laws throughout the United States.

71.    In order for a trust to have REMIC status, substantially all of its assets must be qualified mortgages. 26 U.S.C. §860D(a)(4). A qualified mortgage is defined as "any obligation (including any participation or certificate of beneficial ownership therein) which is principally




TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

---

**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**                    **Page 27**

secured by an interest in real property."26 U.S.C. §860G(a)(3). REMIC status is lost when too many non-qualified mortgages are in the trust. Retention of REMIC pass-through tax status is imperative because its loss would add significant costs to securitization, driving investors to other investments.

72.     The PSAs contain express language to ensure that all rights to the mortgage loanshave been transferred to the trust, so that the transaction is considered a true sale and,accordingly, bankruptcy-remoteness is achieved and the trust maximizes its ratings. The expresslanguage also ensures that the mortgage loan is secured by a security interest so that REMIC tax status is achieved.

73.     The security interests transferred to the REMIC must be perfected security interests. Accordingly, a REMIC would ordinarily record assignments in states where assignments must by law be recorded or where a ratings agency required recording for the REMIC to obtain initial ratings. As to mortgages or deeds of trust where MERS is identified as the "mortgagee" or "beneficiary," however, the assignments are not ordinarily recorded. The prospectus for a REMIC might explain this election not to record by stating:

> The mortgages or assignments of mortgage for some of the Mortgage Loans may have been recorded in the name of Mortgage Electronic Registration Systems, Inc., or MERS, solely as nominee for the related Originator and its successors and assigns, including the Issuing Entity. Subsequent assignments of those mortgages are registered electronically through the MERS system.
>
> ****
>
> Assignments of the Mortgage Loans to the Trustee (or its nominee) will not be recorded except in states where recordation is required by the rating agencies to obtain the initial ratings of the Certificates set forth in the table on page S-6 in this prospectus supplement. In addition to the foregoing, assignments of the Mortgage Loans will not be recorded (i) in states where, in the opinion of counsel acceptable to the Trustee, such recording is not required to protect the Trustee's interests in the Mortgage Loan against the claim of



TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

any subsequent transferee or any successor to or creditor of the Depositor, the Sponsor or the originator of such Mortgage Loan, or (ii) with respect to any Mortgage which has been recorded in the name of Mortgage Electronic Registration Systems, Inc. ("MERS") or its designee. With respect to any Mortgage that has been recorded in the name of MERS or its designee, no mortgage assignment in favor of the Trustee will be required to be prepared or delivered. Instead, each Servicer will be required to take all actions as are necessary to cause the Issuing Entity to be shown as the owner of the related Mortgage Loan on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS. The Trustee, or a custodian on behalf of the Trustee, will promptly review each Mortgage File after the Closing Date (or promptly after the receipt by the Trustee, or a custodian on behalf of the Trustee, of any document permitted to be delivered after the Closing Date) to determine if any of the foregoing documents is missing. If any portion of theMortgage File is not delivered to the Trustee, or a custodian on behalf of theTrustee, and the Depositor does not cure such omission or defect within 90 days, the Depositor will be required to repurchase the related Mortgage Loan (or any property acquired in respect thereof) at the Purchase Price described below to the extent such omission or defect materially and adversely affects the value of such Mortgage Loan.

1.    **How MERS Works**

74.    MERS is a subsidiary of MERSCORP. MERSCORP is owned by various mortgage banks, title companies, and title insurance companies, including Defendants BOA and Stewart. When a lender which is a "member" of MERS makes a mortgage loan, the lender instructs the title company to show not only the lender but also MERS, as "beneficiary" or "mortgagee" under the mortgage. MERS then shows up in the deed records as a "grantee."

75.    When the lender sells the note, or transfers the servicing rights, MERS remains as a "mortgagee" or "beneficiary" under the mortgage and "grantee" in the deed records. The purchaser of the note, or successor servicer, agrees at the time of acquisition of its rights to notify MERS when the note is paid so that MERS can "release" its lien and the lien of the original lender. MERShas described its role as follows:


TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

---

[MERS] and MERSCORP, Inc. were developed by the real estate industry to serve as the mortgagee of record and operate an electronic registration system for tracking interests in mortgage loans. . . Specifically, the MERS® System tracks the transfers of mortgage servicing rights and beneficial ownership interests in mortgage loans on behalf of MERS Members.

The promissory note is a negotiable instrument under Article 3 of the Uniform Commercial Code, and originating lenders routinely sell these notes on the secondary markets to investors."The ability of lender to replenish their capital by selling loans in the secondary market is what makes money accessible for home ownership."

**** 

At the origination of the loan by a lender who is a MERS Member, the lender takes possession of the note (and becomes the holder of the note), and the borrower and lender designate MERS (as the lender's nominee) to serve as the mortgagee or beneficiary of record. The lender's secured interest is thus held by MERS. . . Rules, which are incorporated into all MERS' agreements with its members, provide that members "shall cause Mortgage Electronic Registration System, Inc. to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System."

Accordingly, when a MERS Member originates a loan, the original lender and the borrower contractually agree in the mortgage that MERS will be the mortgagee and will serve as nominee for the lender and its successors and assigns. In the event of a default on the loan, MERS as the beneficiary or mortgagee, is authorized to foreclose on the home. After the borrower signs the mortgage agreement, it is recorded in the public, local land records with MERS as the named beneficiary or mortgagee.

The MERS Member then registers the mortgage loan information from the security instrument on the MERS® System. When the beneficial interest in a loan is sold, the promissory note is still transferred by an endorsement and delivery from the buyer to the seller, but MERS Members are obligated to update the MERS® System to reflect the change in ownership of the promissory note.

So long as the sale of the note involves a MERS Member, MERS remains the named mortgagee of record, and continues to act as the mortgagee, as the nominee for the new beneficial owner of the note (and MERS' Member). The seller of the note does not and need not assign the mortgage because under the terms of that security




TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

---

**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**                    **Page 30**

instrument, MERS remains the holder of title to the mortgage, that is, the mortgagee, as the nominee for the purchaser of the note, who is then the lender's successor and/or assign. Accordingly, there is no splitting of the note and mortgage for loans in the MERS® System. If, however, a MERS' Member is no longer involved with the note after it is sold, an assignment from MERS to the party who is not a MERS Member is executed by MERS, that assignment is recorded in the County Clerk's office where the real estate is located, and the mortgage is "deactivated" from the MERS® System.[9]

76.    MERS's assertion that the subsequent assignment of notes secured by a deed of trust does not trigger a duty to file a notice of the assignment is false. Texas law requires that in order to release, transfer, assignor take any other action "relating to an instrument that is filed, registered, or recorded in the office of the county clerk," a person must "file, register, orrecord another instrument relating to the action in the same manner as the original instrument was required to be filed, registered, or recorded." MERS is believed to have violated this duty millions of times in Texas alone.

### 2.    The MERS Lie – *[W]hat is a lie? 'Tis but the truth in masquerade.*[10]

77.    According to MERS, it is the "mortgagee" or "beneficiary" of record in more than 65 million mortgages filed in the deed records of counties throughout the United States.MERS is, however, neither a borrower nor a lender and, indeed, in MERS's own words:

> MERS has no interest at all in the promissory note evidencing the mortgage loan. MERS has no financial or other interest in whether or not a mortgage loan is repaid. . .
>
> MERS is not the owner of the promissory note secured by the mortgage and has no rights to the payments made by the debtor on such promissory note. . . . MERS is not the owner of the servicing rights relating to the mortgage loan and MERS does not service loans. **The beneficial interest in the mortgage (or the person or**

---

[9]*Mortgage Electronic Registration Systems, Inc. v. Nebraska Dept. of Bnkng and Fin.,* 704 N.W.2d 784 (Neb. 2005), Brief of Appellant at 11-12 (citations omitted).

[10] George Gordon Noel Byron, Lord Byron (1788–1824), *Don Juan.* Canto xi. Stanza 37.

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE




**entity whose interest is secured by the mortgage) runs to the owner and holder of the promissory note.** In essence, MERS immobilizes the mortgage lien while transfers of the promissory notes and servicing rights continue to occur. (citation omitted).[11]

78.     MERS has also admitted that under its agreement with its mortgagee-lender members, MERS **"cannot exercise, and is contractually prohibited from exercising, any of the rights or interests in the mortgages or other security documents"** and has **"no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans."[12]**

79.     At this point one might ask how MERS can be the "mortgagee" or "beneficiary" of a mortgage as to which the beneficial interest "runs to the owner and holder of the promissory note."[13] Plainly, it cannot. As one court has observed:

> MERS and its partners made the decision to create and operate under a business model that was designed in large part to avoid the requirements of the traditional mortgage recording process. This Court does not accept the argument that because MERS may be involved with 50% of all residential mortgages in the country, that is reason enough for this Court to turn a blind eye to the fact that this process does not comply with the law.
>
> ****
>
> Aside from the inappropriate reliance upon the statutory definition of "mortgagee," MERS's position that it can be both the mortgagee and an agent of the mortgagee is absurd, at best.

---

[11] *Mortgage Electronic Registration Systems, Inc. Nebraska Dept. of Bnkng and Fin.,* 704 N.W.2d 784 (Neb. 2005), Brief of Appellant at 11-12 (emphasis added). MERS does not explain how it can be a "mortgage lien" holder or how it can "inoculate" loans "against future assignments" while simultaneously insisting that "MERS is not the owner of the promissory note secured by the mortgage and has no rights to the payments made by the debtor on such promissory note" and "is not the owner of the servicing rights relating to the mortgage loan."

Also in question in cases pending in other jurisdictions is MERS's assertion that it has the authority to assign the note and mortgage to subsequent purchasers and the authority to appoint substitute trustees under the deeds of trust in which MERS appears as the "beneficiary" or "mortgagee."

[12] *Id.* at 10 (emphasis added).

[13] *Id.* at 11-12.





TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**                    Page 32

****

This Court finds that MERS's theory that it can act as a "common agent" for undisclosed principals is not supported by the law. The relationship between MERS and its lenders and its distortion of its alleged "nominee" status was appropriately described by the Supreme Court of Kansas as follows: "The parties appear to have defined the word [nominee] in much the same way that the blind men of Indian legend described an elephant – their description depended on which part they were touching at any given time." *Landmark Nat'l Bank v. Kesler*, 216 P.3d 158, 166-67 (Kan. 2010).[14]

80.     With regards to the legal accuracy of MERS's recitation that it is the "mortgagee" or "beneficiary," one scholar has stated:

MERS and its member use false documents to avoid paying recording fees to county governments. At the most simple level, mortgages and deeds of trust recorded at origination represent that MERS is the mortgagee or deed of trust beneficiary. Taking the appellate decisions in Arkansas, Kansas, Maine, and Missouri at face value, MERS recorded mortgages contain a false statement. While it is true that MERS recorded mortgages and deeds of trust also have qualifying language suggesting that MERS is also a "nominee," the representation that MERS is the owner of the lien is not some innocuous legalism. It causes county recorders that maintain grantor-grantee indexes to list MERS in the chain of title for the land. The false designation of MERS as a mortgagee or beneficiary creates a false lead in the true chain of title defeating an essential purpose of recording mortgages and deeds of trust.

But perhaps even more troubling are the documents recorded in the name of MERS later in the life of mortgage loans. Recall that MERS' business model does not include actually recording documents relating to its purported ownership itself. Instead, it allows employees of mortgage servicing companies and law firms to do so on its behalf. MERS has an internet web page where mortgage servicers and law firms can enter names of their own employees to automatically produce a boilerplate "corporate resolution" that purports to designate the servicers' and law firms' employees as certifying officers of MERS with the job title of assistant secretary and/or vice president. These servicer and law firm employees then sign and record documents such as mortgage assignments, substitution of deed of trust trustees, and substitutions

---

[14]*In Re Agard*,444 BR 231 (E.D.N.Y. 2011).

**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**                    Page 33

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE



of deed of trust beneficiaries—all including the representation that they are a MERS vice president or assistant secretary. Some states require that the individual signing a document conveying an interest in land have the job title of vice president or higher. Surely this policy is to prevent mistakes, confusion, and disputes over land ownership. But many servicer and law firm employees use the "vice president" title even when it is not required—perhaps because it just sounds better.

Only, it is not true. The representation that employees of mortgage servicing companies and foreclosure law firms are "vice presidents" of MERS is false. In the English language the words vice president primarily mean: "an officer next in rank to a president and usually empowered to serve as president in that officer's absence or disability." Sometimes, vice president can mean "any of several officers serving as a president's deputies in charge of particular locations or functions." The reality of what MERS "vice presidents" actually do, from whom they receive their paychecks, and their actual job titles are fundamentally inconsistent with a corporate officer than serves as president when the president is disabled, or acts as the president's deputy. A deposition transcript taken from a foreclosure case brought by a Florida debt collection law firm is illustrative. The deponent was a non-attorney employee of the firm that was claiming MERS certifying officer status. The employee was responsible for signing 20-40 mortgage assignments that would be recorded with county officials per day. The firm's rationale for allowing this was one of the boilerplate "corporate resolutions" taken off of MERS' website that stated: "The attached list of candidates are employees of Florida Default Law Group and are hereby appointed as assistant secretaries and vice-presidents of MERS." When this "Vice President" of MERS was asked about her relationship with MERS she responded:

> **Q.** Did you have to have any sort of training to become a Certified Officer?
>
> **A.** No.
>
> **Q.** Do you know where MERS is located?
>
> **A.** No.
>
> **Q.** Have you ever been there?
>
> **A.** No.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE



**Q.** Have you ever spoken with anyone at MERS?

**A.** No.

**Q.** Have you ever had e-mail transmissions back and forth with anyone from MERS?

**A.** No.

**Q.** Do you file any reports with MERS relating to assignments?

**A.** No.

**Q.** Do you know who the president of MERS is?

**A.** No.

                                    ****

**Q.** And I guess at some point, somebody explained to you that you were a Certified Officer is that correct? . . .

**A.** Yes.

**Q.** And what do you remember as to their explanation as to what that meant?

**A.** Why I was being chosen as a Certified Officer?

**Q.** Yes.

**A.** That it was actually a group of us, we had one meeting and they explained that people that had an understanding of what an assignment was were going to go ahead and become certified officers because we then had authorization to execute on behalf of MERS.

It is inconsistent with even the most expansive definition of the term vice president, that an individual who is not an employee of the company, has never been to the company's location, does not even know where the company is located, has never met the company's president, does not know who the president is, and has never personally communicated with the company in any way can be considered a vice-president of that company. It does not follow that because a belief is convenient, it is also true.

Perhaps the designation of servicer and law firm employees as "assistant secretaries" of MERS is less absurd, but it is also still false. While many of these servicer and law firm employees are

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE



---



secretarial workers in the businesses that they actually work for, they are not assistant secretaries of MERS in any meaningful economic sense. They have no more contact with MERS than vice presidents do. Indeed the fact that MERS' boilerplate resolutions allow the employees to just pick which title they want to use is compelling evidence that the whole concept is twaddle. MERS Assistant secretaries are not paid by MERS. They receive no health benefits from MERS. In yet one more example of Orwellian doublespeak, it is the financial institutions and law firms that pay MERS to allow them to pretend that they have MERS employees. Who pays to be an assistant secretary? While mortgage brokers and financiers may be keen on entrusting the nation's real property records to a company with these standard business practices, one can imagine that this might make the democratically elected county recorders that have dedicated their professional careers to preservation of land ownership rights somewhat uncomfortable.

County recorders deserve a fair hearing if they were to request payment of recording fees for assignments avoided through use of documents containing these false statements. Recording of these legally and factually false statements caused a reduction in the revenue that county governments would have collected from mortgage financiers. MERS itself used projections of this reduction in revenue in its sales pitches and marketing material. Indeed the studies done by accountants that justified the creation of MERS show how use of the MERS system—which entailed recording false documents—would cause a reduction in fees paid to counties.

But perhaps most compelling, pooling and servicing agreements packaging mortgage loans into securities legally require finance companies to record (and pay recording fees on) every assignment of a mortgage loan from origination through deposit in a securitization trust. A 2005 Pooling and Servicing Agreement between J.P. Chase Morgan's subprime subsidiary as a depositor, J.P. Chase Morgan's actual bank as servicer, and Wachovia Bank as trustee Chase's subprime subsidiary provides a typical example. The pool included both non-MERS and MERS loans, but had different assignment recording warranties for each. In the agreement Chase's subprime subsidiary promised to turn over to the securitization trustee "Originals of all recorded intervening Assignments of Mortgage, or copies thereof, certified by the public recording office in which such Assignments or Mortgage have been recorded showing a complete chain of title from the originator to the Depositor, with evidence of recording. . ." Conversely, in the case of MERS-recorded loans, the same





TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

---

agreement does not require recording of intermediate assignments. Instead it only requires the depositor to take "such actions as are necessary to cause the Trustee to be clearly identified as the owner of each such Mortgage Loan on the records of MERS. . ." In this typical securitization deal, Chase used the MERS system to duck a contractual obligation to produce recorded assignments for every non-MERS loan included in the pool—even though counties depend on the revenue produced by those assignments.[15]

81.     Recording deeds of trust containing these legally and factually false statements caused a reduction in the revenue that county governments, including Dallas County, Texas, would have collected had Defendants complied with Texas law and recorded all subsequent transfers, assignments, transfers, and other activities related to the original deed of trust identifying MERS as the "beneficiary" of the deed of trust.  MERS itself used projections of this reduction in revenue in its sales pitches and marketing material.  Indeed, the studies done by accountants that justified the creation of MERS show how use of the MERS System—which entailed recording false documents—would cause a reduction in fees paid to counties. And it has. By some estimates, the MERS System has cost counties nationwide in excess of $10 billion.

82.     In a nutshell, when Wall Street "financiers talk to investors, they claim to own mortgages in order to convey the sense that they own what they are selling. But when financiers talk to the government they claim not to own what they are selling so as to not be obliged to pay fees associated with owning it. MERS and its members prevent recording fees from being paid on assignments—that was the whole point of MERS—but then attempt to avail themselves of the protection that having taken such an action would have afforded."[16]

83.     The havoc wrought by MERS was summarized aptly in an April 6, 2011 letter

---

[15]   Christopher L. Peterson, *Two Faces: Demystifying the Mortgage Electronic Registration System's Land Title Theory*, 53 WILLIAM & MARY L. REV. (forthcoming in 2011) (citations omitted) (available at: www.papers.ssrn.com/sol3/papers.cfm?abstract_id=1684729).
[16]   *Id.*

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE




from the Guilford County, North Carolina Register of Deeds and Southern Essex District of

Massachusetts Register of Deeds to Iowa Attorney General Tom Miller, leader of the Mortgage

Foreclosure Multistate Group, comprised of state attorneys general in all 50 states. The letter

outlines the concerns shared by county clerks and recorders nationwide and states, in part:

> As County Land Record Recorders in Massachusetts and North Carolina, we have been gravely concerned about the role of the Mortgage Electronic Registration Systems (MERS) in not only foreclosure proceedings, but as it undermines the legislative intent of our offices as stewards of land records. MERS tracks more than 60 million mortgages across the United States and we believe it has assumed a role that has put constructive notice and the property rights system at risk. We believe MERS undermines the historic purpose of land record recording offices and the "chain of title" that assures ownership rights in land records.

> As a result, we are asking as part of your probe, that this task force and the National Association of Attorney Generals require that all past and present MERS assignments of deeds of trust/mortgages be filed in local recording offices throughout the United States immediately. Assignments are required by statute to be filed in Massachusetts, however they are not currently required to be recorded in North Carolina. We feel, that it is important that the Registers of Deeds should have representatives at the table before any settlement is discussed or agreed to as it relates to MERS failure to record assignments and pay the proper fees.

> This action would serve three specific purposes. First, the filing of all assignments would help recover the chain of title that determines property ownership rights that has been lost and clouded over during the past 13 years because of the scheme that MERS has set in place. Second, transparency and confidence in ownership rights would be restored and this would prevent the infringement upon those rights by others. Third, this action would support a return to sound fundamentals in our economy between the financial services industry and public recording offices.

> MERS has defended their practices by saying that they were helping the registries of deeds by reducing the amount of paperwork that needed to be recorded. This claim is outrageous. This is help we did not ask for, nor was it help that we needed. It is very clear that the only ones that they were helping were themselves. Over the past 10-12 years, recording offices across the



TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

United States have upgraded their internal and external technology to meet the demands of lenders, title underwriters, title searchers and citizens. In fact, in 1998 the Southern Essex District Registry of Deeds in Massachusetts became the first registry of deeds to provide both document images and indices available to the public, 24 hours a day, free of charge on the world-wide-web. In doing so, the Registry received a Computerworld Smithsonian Award which recognized the innovative use of technology to benefit society. In 2009, the Guilford County Register of Deeds was given a local Government Federal Credit Union Productivity Award by the North Carolina Association of County Commissioners for their technological innovations. Nationally, over 93% of the public land records are up to date and current, according to Ernest Publishing.

As of today, there are over 600 recording jurisdictions, covering 43% of the US population that have incorporated an eRecording model into their document recording operations. We believe these jurisdictions cover nearly 80% of the volume of assignments that should be recorded. The remaining areas could be covered quickly, with legislation requiring such action by state legislatures.

Quite frankly, we believe this can and should be done. It's the right thing to do.

In the coming weeks, we will be working with our national organizations, the National Association of County Recorders, Election Officials and Clerks (NACRC) and the International Association of Clerks, Recorders, Election Officials, and Treasurers (IACREOT) to take the same position. We are also sending a copy of this Letter to the National Conference on State Legislatures (NCSL) and the National Association of Counties (NACO).[17]

84.     The MERS System has created massive confusion as to the true owners of

beneficial interests in mortgage loans and mortgages throughout the United States, and the loss

of revenues has harmedU.S. counties, including Dallas County, Texas.

### E.     The Dallas County Deed Records

85.     Section 11.004 of the Texas Property Code requires that County Clerks

throughout the State of Texas, including Dallas County: (1) correctly record, as required by law,

---

[17]http://www.co.guilford.nc.us/departments/rod/ROD_Letter_To_AG_Miller.pdf.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

within a reasonable time after delivery, any instrument authorized or required to be recorded in

that clerk's office that is proved, acknowledged, or sworn to according to law; (2) give a receipt,

as required by law, for an instrument delivered for recording; (3) record instruments relating to

the same property in the order the instruments are filed; and (4) provide and keep in the clerk's

office the indexes required by law.

86.     Section 193.003 of the Texas Local Government Code requires that a county clerk

maintain "a well-bound alphabetical index to all recorded deeds, powers of attorney, mortgages,

and other instruments relating to real property" with "a cross-index that contains the names of

the grantors and grantees in alphabetical order." Under policies in effect for many years,

employees of the Dallas County Clerk's Office record as a grantee any person identified as a

"beneficiary"in a deed of trust.As of midnight on Sunday, September 11, 2011, MERS was

shown as "grantee" in 157,319 records and "grantor" in 128,206 records on the Dallas County,

Texas Clerk's ROAM website.

87.     In many of the deeds of trust filed by MERS or on MERS's behalf in Dallas

County, Texas, MERS is described as follows:

> The beneficiary of this Security Instrument is MERS (solely as
> nominee for Lender and Lender's successors and assigns) and the
> successors and assigns of MERS. This Security Instrument secures
> to Lender: (i) the repayment of the Loan, and all renewals,
> extensions and modifications of the Note; and (ii) the performance
> of Borrower's covenants and agreements under this Security
> Instrument and the Note.

In yet another section of these deeds of trust, MERS is identified as follows:[18]

---

[18]    If this description of MERS's status under deeds of trust in which it appears as the
"beneficiary" seems somewhat imprecise, that is because it is. MERS cannot be the "beneficiary" of a
deed of trust which secures to **another**, *i.e.*, the Lender, (i) the repayment of the Loan, and all renewals,
extensions and modifications of the Note and (ii) the performance of the Borrower's covenants and
agreements under the Security Instrument and the Note.




> "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument**. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679·MERS.

Despite itsdenomination as such, MERS is not the beneficiary of such deeds of trust,as the word "beneficiary" has been used in deeds of trust in Texas for over 100 years. MERS'sattempt to qualify that denomination by including the notation that it is the "beneficiary" solely as "nominee forLender and Lender's successors and assigns" does not cure this infirmity.

88.     The explanation for why MERS decided to identify itself as the "beneficiary" of a security interest in property pledged as security on a debt as to which MERS is not the obligee is simple—in order for the MERS System to work, MERS had to misrepresent its interests in the deeds of trust of which it purports to be a beneficiary.

89.     For over 100 years, Texas law has provided that the grantee or beneficiary of a deed of trust is the lender on the note secured by the deed of trust.[19] So long as a debt exists, the "security will follow the debt," and the assignment of the debt carries with it the rights created by the deed of trust securing the note.[20]

90.     Deed records in Texas were created to provide public notice of the identity of the person whose interest is protected by a deed of trust. Once properly filed, a deed of trust is "notice to all persons of the existence of the instrument," protects the lender's security interest against creditors of the mortgagor, and places subsequent purchasers on notice that the property

---

[19]*See Lawson v. Gibbs*, 591 S.W.2d 292, 294 (Tex. Civ. App.-Houston [1st. Dist.] 1979, writ ref'd n.r.e.).

[20] A deed of trust in Texas creates a lien in favor of the lender; it does not operate as a transfer of title. This has been the law in Texas for more than a century. *See McLane v. Paschal*, 47 Tex. 365, 369 (1877); *see also Johnson v. Snell*, 504 S.W.2d 397, 399 (Tex. 1973).

**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**                                    **Page 41**

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE



is encumbered by a mortgage lien.

91.     In order to be shown in deed records as a "grantee," and therefore a party whose interest is protected by recording, one must be identified on a deed of trust as either a "mortgagee," "grantee," or "beneficiary" of the deed of trust. As noted above, however, MERS has admitted that it is none of these:

> MERS has no interest at all in the promissory note evidencing the mortgage loan. MERS has no financial or other interest in whether or not a mortgage loan is repaid. . .
>
> MERS is not the owner of the promissory note secured by the mortgage and has no rights to the payments made by the debtor on such promissory note. . . MERS is not the owner of the servicing rights relating to the mortgage loan and MERS does not service loans. **The beneficial interest in the mortgage (or the person or entity whose interest is secured by the mortgage) runs to the owner and holder of the promissory note.** In essence, MERS immobilizes the mortgage lien while transfers of the promissory notes and servicing rights continue to occur. (citation omitted).[21]

92.     Acting only in its capacity as a "nominee" of the lender, MERS has no rights which qualify it to assert that it is a beneficiary of a deed of trust. But unless MERS identifies itself as a "beneficiary," MERS will not be denominated as a "grantee" in the deed records. And unless MERS is identified as a "grantee" in the deeds records, the MERS System does not work because the protections of the recording statutes are not extended to MERS. For MERS the solution was simple — ignore the law and identify itself as a "beneficiary" of an instrument in which it holds no beneficial interest. In that way, county clerks, including the Dallas County Clerk, would identify MERS as a "grantee" in the deed records, and MERS and its associates could take advantage of the recording system.

93.     As demonstrated by the criminal and civil penalties for filing false or deceptive

---

[21] *Mortgage Electronic Registration Systems, Inc. Nebraska Dept. of Bnkng and Fin.,* 704 N.W.2d 784 (Neb. 2005), Brief of Appellant at 11-12 (emphasis added).


TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

real estate liens, Texas public policy favors a reliable functioning public recordation system to avoid destructive breaks in title, confusion as to the true identity of the holder of a note, fraudulent foreclosures, and uncertainty as to title when a home is sold. The MERS System has all but collapsed this system throughout the United States, including Dallas County, Texas.[22]

## F.   Other Conduct of Defendants

94.   **MERSCORP:** MERSCORP is the operating company that owns and operates the MERS System,charges and receives all fees for use of the MERS System, establishes and promulgates Rules of Membership in MERSCORP for those lenders and loan servicers desiring to become members for purposes of utilizing the MERS System, determines the *bona fides* of membership applications in MERSCORP, and is responsible for the day-to-day operation of the MERS System. Accordingly, the acts of misconduct alleged herein against MERS are alleged as well against MERSCORP as the owner and operator of MERS.

95.   Pleading further, Dallas County, Texas would show that at all times material

---

[22] To understand the scale and seriousness of the institutional failures of MERS and MERSCORP and the role of these entities in creating a morass of the U.S. recordation systems, one need look no further than the disaster MERS has made of the foreclosure process. On April 12, 2011, MERSCORP and MERS entered into a *Consent Order* with several federal agencies. According to the findings contained in the *Consent Order*, MERS and MERSCORP "(a) have failed to exercise appropriate oversight, management supervision and corporate governance, and have failed to devote adequate financial, staffing, training, and legal resources to ensure proper administration and delivery of services to Examined Members; (b) have failed to establish and maintain adequate internal controls, policies, and procedures, compliance risk management, and internal audit and reporting requirements with respect to the administration and delivery of services to Examined Members" and, that "MERS and MERSCORP engaged in unsafe or unsound practices that expose[d] them and Examined Members to unacceptable operational, compliance, legal, and reputational risks." *Consent Order*, April 12, 2011, OCC No. AA-EC-11-20; Board of Governors Docket Nos. 11-051-B-SC-1 and 11-051-B-SC-2; FDIC-11-194b; OTS No. 11-040; FHFA No. EAP-11-01 at 4-5.

In response to the hundreds of cases filed nationwide against MERSCORP and MERS for wrongful foreclosure, MERSCORP and MERS recently promulgated new policies that include the mandate that "[n]o foreclosure proceeding may be initiated, and no Proof of Claim or Motion for Relief from Stay (Legal Proceedings) in a bankruptcy may be filed, in the name of Mortgage Electronic Registration Systems, Inc. (MERS)."




**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**                        **Page 43**

hereto, MERS has been a wholly-owned subsidiary of MERSCORP. MERS has been utilized by MERSCORP to shift liability away from MERSCORP and its shareholders for the violations of Texas statutes and law as set forth herein;to perpetrate a fraud in the form of wrongfully identifying MERS as the "beneficiary," "mortgagee," or "grantee" of deeds of trust and other documents filed in the Dallas County Deed Records; to evade the ongoing obligation to maintain the accuracy of deeds of trust and other documents filed in the Dallas County Deed Records; and to justify the wrongs set forth herein. Accordingly, MERSCORP is liable for all of the acts of misconduct alleged against MERS herein.

96.     MERSCORP established MERS without sufficient capitalization in view of the business in which MERS engaged. Moreover, MERSCORP failed to retain an appropriate number of employees opting instead to direct MERS's member to have the members' employees appointed as "Vice-Presidents" or "Secretaries" of MERS for purposes of having the members, including BOA, purport to take actions as "MERS" through members' employees falsely or improperly denominated as offices of MERS.

97.     **BOA:**Defendant BOA's actionable conduct related to MERS and the other activities made the basis of this action included, but was and is not limited to, originating loans secured by deeds of trust recorded in Dallas County, Texas listing MERS as "mortgagee" or "beneficiary" and which BOA knew or should have known would result in the Dallas County Clerk's Office improperly listing MERS as "grantee" in the deed records index. The denomination of MERS as "mortgagee" or beneficiary" or "grantee" is false.

98.     Upon information and belief, BOA has released, transferred, assigned, or taken other action relating to the instruments identified herein that BOA has filed or caused to be filed, but in violation of Texas law,BOA failed to file, register, or record another instrument relating to




such actions in the same manner as the original instrument was required to be filed, registered, or recorded.

99.    In addition to BOA's direct liability for its conduct alleged herein, Plaintiff seeks a determination of the court that it is appropriate to pierce the MERSCORP and MERS corporate veils in this instance and hold BOA as a shareholder of MERSCORP liable for the conduct of MERSCORP and its subsidiary, MERS.

100.    Recognizing the corporate existence of MERSCORP and MERS separate from their shareholders, including BOA, would bring about an inequitable result or injustice, or would be a cloak for fraud or illegality. MERSCORP and MERS were undercapitalized in light of the nature and risk of their business. The corporate fiction is being used to justify wrongs, as a means of perpetrating fraud, as a mere tool or business conduit for others, as a means of evading existing legal obligations, to perpetrate monopoly and unlawfully gain monopolistic control over the real property recording system in the State of Texas, and to circumvent statutory obligations.

101.    **ASPIRE:** Defendant Aspire's actionable conduct related to MERS and the other activities made the basis of this action included, but was and is not limited to, originating loans secured by deeds of trust recorded in Dallas County, Texas listing MERS as "mortgagee" or "beneficiary" and which Aspire knew or should have known would result in the Dallas County Clerk's Office improperly listing MERS as "grantee" in the deed records index. The denomination of MERS as "mortgagee" or beneficiary" or "grantee" is false. Upon information and belief, Aspire has released, transferred, assigned, or taken other action relating to the instruments it has filed or caused to be filed but in violation of Texas law failed to file, register, or record another instrument relating to such actions in the same manner as the original instrument was required to be filed, registered, or recorded.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**         Page 45

102.   **STEWART TITLE:**Defendant Stewart Title's actionable conduct related to MERS and the other activities made the basis of this action included, but was and is not limited to, directing the preparation and filing of thousands of deeds of trust in the deed records of Dallas County, Texas listing MERS as "mortgagee" or "beneficiary" and which Stewart Title knew or should have known would result in the Dallas County Clerk's Office improperly listing MERS as "grantee" in the deed records index. The denomination of MERS as "mortgagee" or beneficiary" or "grantee" is false. Upon information and belief, many of the notes and mortgages securing such notes have been sold, assigned, or transferred without notice of such sales, assignments, or transfers being recorded in the deed records of Dallas County, Texas, all in violation of Texas law.

103.   Stewart Title also marketed MERS through Stewart Title's established sales and marketing forces, thereby encouraging others to utilize the defective MERS System.

104.   **STEWART:**Stewart is a Texas-based title insurance underwriter. It is relatively unique within the industry in that it only insures title risks and does not generally conduct title examinations or perform closing-related services, such as document preparation, and acting as an escrow agent. Instead, Stewart contracts with independent and affiliated agents for these functions, including Stewart Title.[23]

105.   Plaintiff seeks a determination of the court that it is appropriate to pierce the MERSCORP and MERS corporate veils in this instance and hold Stewart as a shareholder of MERSCORP liable for the conduct of MERSCORP and its subsidiary, MERS.

106.   Recognizing the corporate existence of MERSCORP and MERS separate from their shareholders, including Stewart, would bring about an inequitable result or injustice, or

---

[23]   Stewart is the successor-in-interest of Stewart Title North Texas, Inc., which merged into Stewart on or about October 1, 2008.



**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**                    **Page 46**

would be a cloak for fraud or illegality. MERSCORP and MERS were undercapitalized in light of the nature and risk of their business. The corporate fiction is being used to justify wrongs, as a means of perpetrating fraud, as a mere tool or business conduit for others; as a means of evading existing legal obligations, to perpetrate monopoly and unlawfully gain monopolistic control over the real property recording system in the State of Texas, and to circumvent statutory obligations.

## VII.
## CAUSES OF ACTION

**A.    <u>Violation of § 12.002 of the Texas Civil Practice & Remedies Code – All Defendants</u>**

107.   Section 12.002 of the Texas Civil Practice & Remedies Code ("*CPRC*") provides:

(a)    A person may not make, present, or use a document or other record with:

(1)    knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property;

(2)    intent that the document or other record be given the same legal effect as a court record or document of a court created by or established under the constitution or laws of this state or the United States or another entity listed in Section 37.01, Penal Code, evidencing a valid lien or claim against real or personal property or an interest in real or personal property; and

(3)    intent to cause another person to suffer:

(B)    financial injury . . .

(b)    A person who violates Subsection (a) or (a-1) is liable to each injured person for:

(1)    the greater of:

(A)    $10,000; or

(B)    the actual damages caused by the violation;


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE


(2)     court costs;

(3)     reasonable attorney's fees; and

(4)     exemplary damages in an amount determined by the court.

108.    The records filed or caused to be filed by Defendants in the Dallas County Deed

Records and described herein falsely represent MERS's security interest in the real property that

is the subject of such instruments; Defendants knew at the time of filing that such instruments

falsely represented MERS's security interest in the real property that is the subject of such

instruments; Defendants filed or caused to be filed the instruments with the intent that they be

given the same legal effect as a court record or document of a court created by or established

under the constitution or laws of this state or the United States or another entity listed in Section

37.01, Texas Penal Code, evidencing a valid lien or claim against real or personal property or an

interest in real or personal property; and intended by such conduct to financially injure Dallas

County, Texas by avoiding the costs and filing fees associated with filing, registering, or

recordingsubsequent releases, transfers, assignments, or other action relating to such instrument

as required by Texas law.

109.    Defendants conduct described herein violated section 12.002 of the CPRC for

which Plaintiff seeks judgment against Defendants, jointly and severally, in the amount of

$10,000 per violation, together with attorney's fees, court costs, and exemplary damages in an

amount determined by the court.

**B.      Violation of Texas Local Government Code § 192.007**

110.    For almost 300 years, common law and statute have required or permitted the

recording of instruments affecting title to real property for the primary purpose of giving notice

of their contents to the public. One of the primary purposes of recording documents affecting the




TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

title to real property is to make information pertaining to that property available to the general public and thus to protect persons from fraud. And because real estate is so tightly woven into the fabric of the U.S. financial system, stability and certainty regarding titles to real property is essential to the efficient functioning of the markets.

111.    In order to perfect a security interest in real property in Texas, the instrument creating the security interest must be filed of record. But filing, generally, is not mandatory. Once a record of a security interest is filed of record, however, it must by statute be kept current in order to ensure continued accuracy of the real property records.

112.    Section 192.007 of the Texas Local Government Code provides:

### TEX. LOC. GOV'T, SEC. 192.007
### Records of Releases and Other Actions

(a)    To release, transfer, assign, or take another action relating to an instrument that is filed, registered, or recorded in the office of the county clerk, a person must file, register, or record another instrument relating to the action in the same manner as the original instrument was required to be filed, registered, or recorded.

(b)    An entry, including a marginal entry, may not be made on a previously made record or index to indicate the new action.

113.    Defendants violated section 192.007 of Texas Local Government Code by failing to record all releases, transfers, assignments, and other actions relating to the deeds of trust in which they, separately or jointly, identified MERS as the "beneficiary."

114.    Damages to Dallas County, Texas have been proximately caused by the conduct of Defendants as described herein, measured by the filing fees that would have been received by Dallas County, Texas had all of the releases, transfers, assignments and other actions relating to the deeds of trust and other instruments described herein been filed, registered, or recorded in the


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE



office of the county clerkin the same manner as the original instrument was required to be filed, registered, or recorded.

## C.    Unjust Enrichment – MERSCORP, MERS, BOA, and STEWART

115.    MERSCORP and MERS have been unjustly enriched by their conduct described above by their receipt of fees charged to MERS's members for MERS to track mortgage loan and mortgage transfers which would otherwise have been recorded in the deed records of Dallas County, Texas. BOA and Stewart are liable to Dallas County, Texas for these damages alleged herein as shareholders in MERSCORP and/or MERS under a theory of alter-ego or otherwise piercing the corporate veil of MERSCORP and/or MERS.

116.    Damages to Dallas County, Texas have been proximately caused by Defendants' conduct described herein as measured by the filing fees that would have been received by Dallas County, Texas had all of the transfers described herein been recorded or, in the alternative as to MERS and MERSCORP, as measured by the fees received by MERSCORP and MERS for tracking the mortgage loans and mortgages tracked by MERS but not recorded in the deed records of Dallas County, Texas, for which damages Dallas County, Texas seeks judgment of the Court.

## D.    Unjust Enrichment – BOA and Aspire

117.    Defendants BOA and Aspire have been unjustly enriched by avoiding the filing fees associated with recordation of transfers that would otherwise have been recorded, but for their participation in the MERS System and violation of Texas law.

118.    Damages to Dallas County, Texas have been proximately caused by the conduct of BOA and Aspire described herein as measured by the filing fees that would have been received by Dallas County, Texas had all of the transfers described herein, and in which BOA or



Aspire participated, been recorded rather than tracked exclusively on the MERS database, for which damages Dallas County, Texas seeks judgment of the court.

### E.  Negligent Misrepresentation – All Defendants

119.  Defendants negligently misrepresented the true beneficial owner of notes and related mortgages filed by them in Dallas County, Texas for the purpose of avoiding the recordation of subsequent transfers and payment of attendant filing fees.

120.  Defendants negligently failed to properly record all releases, transfers, assignments, or other actions relating to instruments Defendants filed, registered, or recorded in the office of the Dallas County Clerk in the same manner as the original instrument was required to be filed, registered, or recorded.

121.  The negligence of Defendants set forth herein was a proximate cause of damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.

### F.  Grossly Negligent Misrepresentation – All Defendants

122.  Defendants were grossly negligent in misrepresenting the true beneficial owner of notes and related mortgages filed by them in Dallas County, Texas for the purpose of avoiding the recordation of subsequent transfers and payment of attendant filing fees.

123.  Defendants grossly negligently failed to properly record all releases, transfers, assignments, or other actions relating to instruments Defendants filed, registered, or recorded in the office of the Dallas County Clerk in the same manner as the original instrument was required to be filed, registered, or recorded.

124.  The gross negligence of Defendants set forth herein was a proximate cause of damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.



TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

**G.**   <u>Negligent Undertaking – All Defendants</u>

125.   Defendants negligently undertook the misconduct alleged herein. Such negligence included, but was and is not limited to, filing false and deceptive records in the deed records of Dallas County, Texas and failing to properly record all releases, transfers, assignments, or other actions relating to instruments Defendants filed or caused to be filed, registered, or recorded in the office of the Dallas County Clerk in the same manner as the original instrument was required to be filed, registered, or recorded.

126.   The negligent undertaking of Defendants set forth herein was a proximate cause of damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.

**H.**   <u>Grossly Negligent Undertaking – All Defendants</u>

127.   Defendants were grossly negligent in the misconduct alleged herein. Such gross negligence included, but was and is not limited to, filing false and deceptive records in the deed records of Dallas County, Texas and failing to properly record all releases, transfers, assignments, or other actions relating to instruments Defendants filed or caused to be filed, registered, or recorded in the office of the Dallas County Clerk in the same manner as the original instrument was required to be filed, registered, or recorded.

128.   The grossly negligent undertaking of Defendants set forth herein was a proximate cause of damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.

**I.**   <u>Negligence Per Se</u>

129.   Defendants were negligent per se in the misconduct alleged herein. Such negligence per se included, but was and is not limited to:

   a.   violation of section 12.002 of the Texas Civil Practice & Remedies Code by filing false and deceptive records in the deed records of Dallas County, Texas; and



TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

---

**L.**   **Declaratory Judgment**

135.   Dallas County hereby seeks a judicial declaration that the filing of deeds of trust identifying MERS as a "mortgagee" or "beneficiary" under the deed of trust, when in fact MERS has no beneficial interest in the note secured by such deed of trust, constitutes a violation of section 51.901 of the Texas Government Code.

136.   Dallas County also seeks a judicial declaration that the Defendants and each of them is liable for having failed to properly record all releases, transfers, assignments, or other actions relating to instruments Defendants filed or caused to be filed, registered, or recorded in the office of the Dallas County Clerk in the same manner as the original instrument was required to be filed, registered, or recorded.

**M.**   **Request for Injunctive Relief**

137.   Plaintiff seeks an order of the Court permanently enjoining Defendants from filing any instruments in the deed records of Dallas County, Texas identifying MERS or any other person or entity as a "mortgagee" or "beneficiary" of any mortgage in which such person or entity does not have a beneficial interest or other legally sufficient interest.

138.   Plaintiff further seeks an order of this court requiring Defendants, jointly and severally, to correct the false and deceptive filings described herein by causing the recordation of corrective instruments setting forth the entire chain of title for each instrument described herein.

**N.**   **Exemplary Damages – All Defendants**

139.   The conduct of each Defendant as set forth herein constituted fraud, malice, or gross negligence such that each Defendant is liable for exemplary damages for which Plaintiff seeks judgment of the Court.



TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

---

**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**                **Page 54**

     b.    violation of section 192.007 of the Texas Local Government Code by failing to properly record all releases, transfers, assignments, or other actions relating to instruments Defendants filed or caused to be filed, registered, or recorded in the office of the Dallas County Clerk in the same manner as the original instrument was required to be filed, registered, or recorded.

130.    The negligence per se of Defendants set forth herein was a proximate cause of damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.

## J.   Gross Negligence Per Se

131.    Defendants were grossly negligent per se in the misconduct alleged herein. Such gross negligence per se included, but was and is not limited to:

     a.    violation of section 12.002 of the Texas Civil Practice & Remedies Code by filing false and deceptive records in the deed records of Dallas County, Texas; and

     b.    violation of section 192.007 of the Texas Local Government Code by failing to properly record all releases, transfers, assignments, or other actions relating to instruments Defendants filed or caused to be filed, registered, or recorded in the office of the Dallas County Clerk in the same manner as the original instrument was required to be filed, registered, or recorded.

132.    The gross negligence per se of Defendants set forth herein was a proximate cause of damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.

## K.   Fraudulent Misrepresentation – All Defendants

133.    Defendants fraudulently misrepresented the true beneficial owner of notes and related mortgages filed by them in Dallas County, Texas for the purpose of avoiding the recordation of subsequent transfers and payment of attendant filing fees.

134.    Defendants' fraudulent misrepresentations described herein were a proximate cause of damages to Dallas County, Texas for which Plaintiff seeks judgment of the court.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE



**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**        

# XIII.
## PRAYER

145.    Wherefore, premises considered, Plaintiff requests that Defendants be cited to appear and answer and, upon trial of this matter, Plaintiff be awarded damages as set forth above, costs of bringing this action, including allcourt costs, attorney's fees, and related expenses of bringing the action (including investigative expenses), pre- and post-judgment interest at the highest rate allowed by law, and for such other and further relief, in law and in equity, to which Plaintiff may show itself justly entitled.

146.    Plaintiff further requests that the Court order Defendants, jointly and severally, to file, register, or record another instrument relating to any release, transfer, assignment, or any other action relating to any instrument that was filed or caused to be filed by any Defendant in the office of the Dallas County Clerk and to do so in the same manner as the original instrument was required to be filed, registered, or recorded.





# VIII.
## CONSPIRACY

140.    Defendants and each of them conspired together in the actionable conduct alleged herein so as to make each of MERSCORP, MERS, BOA, Stewart, Stewart Title, and Aspire liable for all damages suffered by Dallas County, Texas.   The conspiracy included these Defendants establishing an object to be accomplished; a meeting of minds on the object or course of action; one or more unlawful, overt acts; and damages to Dallas County, Texas as the proximate result. As a result, Dallas County, Texas seeks damages against these Defendants jointly and severally.

# IX.
## REQUESTS FOR DISCLOSURE

141.    Plaintiff requests that Defendants disclosethe information or material described in Rule 194.2(a)-(l) of the Texas Rules of Civil Procedure.

# X.
## NO FEDERAL QUESTIONS

142.    Dallas County, Texas expressly affirms that no federal questions, federal claims, or federal causes of action are asserted against any defendant.

# XI.
## JURY DEMAND

143.    Plaintiff requests trial by jury.

# XII.
## DESIGNATION OF ATTORNEY IN CHARGE

144.    Pursuant to Rule 8 of the Texas Rules of Civil Procedure, Plaintiff Dallas County, Texas designates Stephen F. Malouf as Attorney in Charge for Plaintiff. Mr. Malouf will work under the direct supervision of District Attorney Craig Watkins.

TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**                   Page 55

Respectfully submitted,

/Sarah Shulkin/

**MALOUF & NOCKELS LLP**
Stephen F. Malouf
SBN 12888100
Jonathan Nockels
SBN 24056047
Sarah Shulkin
SBN 24057720
3811 Turtle Creek Blvd., Suite 800
Dallas, Texas 75219
214-969-7373 (Telephone)
214-969-7648 (Facsimile)

**BARON & BLUE**
Lisa Blue
SBN 02510500
3811 Turtle Creek Blvd., Suite 800
Dallas, Texas 75219
214-969-7373 (Telephone)
214-969-7648 (Facsimile)

**THE LAW OFFICES OF TERRI MOORE**
Terri Moore
SBN 14377780
1407 Texas St., Suite 102
Ft Worth, Texas 76102
(817) 817-877-4700

**KAESKE LAW FIRM**
Mike Kaeske
SBN 00794061
1301 W. 25th St., Suite 406
Austin, TX 78705
512-366-7300 (Telephone)
512-366-7767 (Facsimile)

**DALLAS COUNTY DISTRICT ATTORNEY**
Craig Watkins
SBN 00791886
Gordon R. Hikel
Chief, Civil Division
SBN 00787696
Frank Crowley Courts Building
133 N. Industrial Blvd., LB19
Dallas, Texas 75207-4399
214-653-3600 (Telephone)
214-653-5774 (Facsimile)

Barbara Radnofsky
SBN 16457000303
Timber Terrace Rd.
Houston Texas 77024
713- 858-8509 (Telephone)

Mark White
SBN 21318000
72 E. Briar Oaks Dr.
Houston, Texas 77056
713-906-6848 (Telephone)




TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

---

**SECOND AMENDED PETITION OF DALLAS COUNTY, TEXAS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was either hand-delivered, sent via telefacsimile, or sent via regular mail or via certified mail, return receipt requested on this 10th day of October, 2011 as follows:

Bill Beckmann
President and Chief Executive Officer
MERSCORP, INC.
1818 Library Street, Suite 300
Reston, Virginia 20190

Bill Beckmann, President and Chief Executive Officer
Mortgage Electronic Registration Systems, Inc.
1818 Library Street, Suite 300
Reston, Virginia 20190

Malcolm S. Morris, Chairman and Chief Executive Officer
Stewart Title Guaranty Company
1980 Post Oak Boulevard, Suite 800
Houston, Texas 77252-2029

STEWART TITLE COMPANY
C/o CT Corporation System
350 N. St. Paul Street, Suite 2900
Dallas, Texas 75201-4234

BANK OF AMERICA, NATIONAL ASSOCIATION
C/o Its Registered Agent
CT Corporation System
350 N. St. Paul Street, Suite 2900
Dallas, Texas 75201-4234

Kevin C. Miller, President
Aspire Financial, Inc.
4100 Alpha Road, Suite 400
Dallas, Texas 75244

_Sarah Shulkin_
**SARAH SHULKIN**


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE



# MALOUF & NOCKELS LLP

Turtle Creek Centre
3811 Turtle Creek Blvd., Suite 800
Dallas, Texas  75219
Telephone:  (214) 969-7373
Telecopier:  (214) 969-7648
www.smalouf.com

October 10, 2011

**Via Hand Delivery**
Sandy Walker, Chief Clerk
County Court at Law No. 5
George L. Allen, Sr. Courts Bldg.
600 Commerce St., 5th Floor
Dallas, Texas 75202

Re:  *Dallas County, Texas v. MERSCorp, Inc.; Mortgage Electronic Registration Systems, Inc.; Stewart Title Guaranty Company; Stewart Title Company; Bank of America, National Association; and Aspire Financial, Inc. d/b/a Texaslending.com*; Cause No. CC-11-06571-E; Our File No. 1666-1

Dear Mr. Warren:

Enclosed please find the original and one copy of *Second Amended Petition of Dallas County, Texas*.  Please file the original with the appropriate court, returning a file-marked copy to the waiting.

Thank you for your kind assistance in this matter. Please call me should you have any questions or concerns.

Sincerely,

Jenny McKenzie, Paralegal

:jm/encl


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE